CONFORM & RETURN

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1   JONATHAN SOLISH (SBN 67609)
    LOUISE NUTT (SBN 273130)
2   **BRYAN CAVE LLP**
    120 Broadway, Suite 300
3   Santa Monica, California  90401-2386
    Telephone:   (310) 576-2100
4   Facsimile:    (310) 576-2200
    E-Mail:       jonathan.solish@bryancave.com
5                 louise.nutt@bryancave.com

6   Attorneys for Defendant

7

```
FILED
CLERK, U.S. DISTRICT COURT

JUN 23 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY
```

8   **UNITED STATES DISTRICT COURT**

9   **CENTRAL DISTRICT OF CALIFORNIA**

10

11  JH DEVELOPMENT, LLC,                Case No. SACV11-00949 JVS (MLGx)

12              Plaintiff,              [County of Orange Superior Court Case
                                        No. 30-2011-00475754-CU-BC-CJC]
13          v.
                                        **TULLY'S NOTICE OF REMOVAL**
14  TC GLOBAL, INC. fka TULLY'S
    COFFEE CORP. dba TULLY'S            **[28 U.S.C. §§ 1332, 1441, 1446]**
15  COFFEE; and DOES 1 THROUGH 50,
    inclusive,
16
                Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

843140

NOTICE OF REMOVAL

1       TO THE PLAINTIFF, ITS COUNSEL OF RECORD, AND THE CLERK

2   OF THE ABOVE-ENTITLED COURT:

3       PLEASE TAKE NOTICE that pursuant to 28 U.S.C. §§ 1332, 1441 and 1446,

4   TC GLOBAL, INC. fka TULLY'S COFFEE CORP. dba TULLY'S COFFEE

5   ("Tully's") removes to this Court the state court action described below.

6       1.    On May 17, 2011, JH DEVELOPMENT, LLC (the "plaintiff") filed a

7   complaint in the Superior Court of the State of California, County of Orange,

8   entitled *JH Development, LLC v. TC Global, Inc. fka Tully's Coffee Corp. dba*

9   *Tully's Coffee.*; County of Orange Superior Court Case No. 30-2011-00475754-CU-

10  BC-CJC (the "State Court Action").

11      2.    Tully's was served with the complaint on May 25, 2011 via personal

12  service on a Tully's employee so this notice is being timely filed pursuant to 28

13  U.S.C. § 1446(b), as it is filed within thirty days after service.

14      3.    A copy of all pleadings filed in the State Court Action is attached as

15  Exhibit A.  Exhibit A includes all process, pleadings, and orders served upon Tully's

16  as required by 28 U.S.C. § 1446(a).

17      4.    Tully's is the only named defendant.  No other defendants were

18  required to join or consent to this notice.

19      5.    This is a civil action of which this Court has original jurisdiction under

20  28 U.S.C. § 1332.  This action may be removed to this Court, pursuant to the

21  provisions of 28 U.S.C. §§ 1441 and 1332, because it is a civil action between

22  citizens of different states and the matter in controversy exceeds $75,000.

23      6.    The matter in controversy is between citizens of different states.

24      a.    The plaintiff was and is a California limited liability company.

25  [*See, e.g.*, Complaint, ¶ 1, "At all relevant times, Plaintiff was and is a California

26  limited liability company qualified to do business in the State of California . . ."]

27  For diversity purposes, a corporate party to this action is deemed to be a citizen of

28  the state by which it has been incorporated and the state where it has its principal

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

1  place of business.  28 U.S.C. §1332(c)(1).  Tully's is a citizen of Washington

2  because that is the location that its articles of association establish as its main office

3  and because its principal place of business is 3100 Airport Way South, Seattle,

4  Washington 98134.  [*See* Complaint, ¶ 2, Tully's is a "Washington corporation"; *see*

5  *also* the search results for "TC Global, Inc." at the U.S. Securities and Exchange

6  Commission's Company Search Website at

7  http://www.sec.gov/edgar/searchedgar/companysearch.html]

8          b.      The plaintiff has also named Does 1 through 50 under fictitious

9  names as defendants (the "Doe Defendants").  The citizenship of such defendants

10  sued under fictitious names are to be disregarded for diversity purposes.  28 U.S.C.

11  §1441(a) ("citizenship of defendants sued under fictitious names shall be

12  disregarded").

13          7.      This action is a civil action where the amount in controversy exceeds

14  the sum or value of $75,000, exclusive of interest and costs.

15          a.      The plaintiff does not allege a specific amount in controversy,

16  but the plaintiff does seek compensatory damages, rescission of three separate

17  agreements, and attorney's fees.  [Complaint, Prayer for Relief, p. 9, lines 17-21]

18  The plaintiff paid at least $550,000 to Tully's pursuant to an Area Development

19  Agreement and Asset Purchase Agreement in August of 2008 and now seeks to

20  rescind both of those agreements, in addition to a Franchise Agreement also signed

21  in August of 2008.  [Complaint, ¶¶ 11-13]  The plaintiff's allegations reveal that the

22  matter in controversy exceeds the sum or value of $75,000, exclusive of interest and

23  costs, as measured by the value of the damages sought and the fact that rescission

24  alone would entail, at the very least, a transfer of $550,000.  *See Lamke v. Sunstate*

25  *Equip. Co., LLC*, 319 F. Supp. 2d 1029, 1032 (N.D. Cal. 2004) ("When the

26  complaint does not demand a specific dollar amount…the defendant must establish

27  that it is more likely than not that the amount in controversy exceeds $75,000.")

28  (citation omitted).

1        8.    The complaint was filed in the unlimited division of the Orange County

2  Superior Court of California, the proper venue for cases with a demand exceeding

3  $25,000.00.  The United States District Court for the Central District of California,

4  Southern Division, is the District Court for the district that includes the County of

5  Orange, California.  28 U.S.C. § 84(c)(3).

6        9.    A copy of this Notice of Removal is being served on all parties and will

7  be filed promptly with the clerk of state court pursuant to 28 U.S.C. § 1446(d).

8        WHEREFORE, Tully's hereby gives notice that the above action now

9  pending in the Superior Court of the State of California for the County of Orange is

10  removed in its entirety to this Court.

11

12

13  Dated:  June 23, 2011                Respectfully submitted,

14                                         **BRYAN CAVE LLP**

15                                         JONATHAN SOLISH

16                                         LOUISE NUTT

17                              By:_____

18                                     Louise Nutt

19                              Attorneys for Defendant

20

21

22

23

24

25

26

27

28

BRYAN CAVE LLP
120 BROADWAY, SUITE 300
SANTA MONICA, CALIFORNIA 90401-2386

843140

NOTICE OF REMOVAL

# EXHIBIT A

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

**NOTICE TO DEFENDANT:** TC GLOBAL, INC. fka TULLY'S
**(AVISO AL DEMANDADO):** COFFEE CORP. dba TULLY'S COFFEE;
and DOES 1 through 50, inclusive

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 17 2011

ALAN CARLSON, Clerk of the Court

BY _____ B. LEA _____, DEPUTY

**YOU ARE BEING SUED BY PLAINTIFF:** JH DEVELOPMENT, LLC
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
(El nombre y dirección de la corte es):
Orange County Superior Court
700 Civic Center Drive West
Santa Ana, CA 92702

CASE NUMBER:
(Número del Caso):
30-2011
00475754

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Laura C. Hess, SBN 198284
KRING & CHUNG, LLP
38 Corporate Park
Irvine, CA 92606-5105

949.261.7700     949.261.8800

JUDGE GREGORY MUNOZ
DEPT. C14

DATE: MAY 17 2011     ALAN CARLSON, Clerk, by _____ BRITTNEY LEA _____, Deputy
(Fecha)               (Secretario)                                           (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☒ on behalf of (specify): TC Global, Inc. FKA Tully's Coffee Corp. dba Tully's Coffee
   under: ☒ CCP 416.10 (corporation)     ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☐ by personal delivery on (date):

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Legal
Solutions
Plus

Code of Civil Procedure §§ 412.20, 465

Page 1 of 1

**EXHIBIT A, PAGE 4**



CM-010

**ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):*
Laura C. Hess, SBN 198284
KRING & CHUNG, LLP
38 Corporate Park
Irvine, CA   92606-5105

TELEPHONE NO.: 949.261.7700   FAX NO.: 949.261.8800
ATTORNEY FOR *(Name):* Pltf. JH DEVELOPMENT, LLC

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Orange
STREET ADDRESS: 700 Civic Center Drive West
MAILING ADDRESS:
CITY AND ZIP CODE: Santa Ana, CA  92702
BRANCH NAME: Central Justice Center

CASE NAME:   JH Development, LLC v. TC Global, Inc.

FOR COURT USE ONLY

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

MAY 17 2011

ALAN CARLSON, Clerk of the Court

BY _____ E. LEA _____ DEPUTY

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER 30-2011 |
|---|---|---|
| [X] Unlimited  [ ] Limited | [ ] Counter   [ ] Joinder | |
| (Amount demanded exceeds $25,000)  (Amount demanded is $25,000 or less) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE 00475757 |

JUDGE GREGORY MUNOZ
DEPT. C13

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[X] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation**
**(Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is   [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary  b. [X] nonmonetary; declaratory or injunctive relief  c. [X] punitive
4. Number of causes of action *(specify):*  THREE
5. This case [ ] is  [X] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: May 17, 2011

Laura C. Hess, SBN 198284
(TYPE OR PRINT NAME)                                   (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Legal
Solutions
Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

**EXHIBIT A, PAGE 5**

# SUPERIOR COURT OF CALIFORNIA
## ORANGE COUNTY – CENTRAL JUSTICE CENTER
## CIVIL DEPARTMENT CALENDAR SCHEDULING CHART
Ex Parte applications must comply with California Rules of Court, rules 3.1200 – 3.1207
Court Local Rules are located at www.occourts.org

| Dept. | Judicial Officer | Motion Days and Time | Ex Parte Days and Time | Telephonic Notice to Courtroom the day before the hearing but no later than: | Ex Parte Application and Proposed Order presented to the court the day before the hearing but no later than: | Rulings posted on Internet? | Other Call for available dates. |
|---|---|---|---|---|---|---|---|
| C12 | MOBERLY 657-622-5212 | Friday 1:30 p.m. | M, T, W, TH 1:30 p.m. | Noon | 3:00 p.m. | Yes 4:30 p.m. the day before | If there is no appearance for argument, the court will order the tentative ruling to become effective and final the date of the hearing. To schedule an ex parte matter the moving party/attorney shall contact the courtroom clerk (657) 622-5212 to reserve a date no later than noon, the day prior to the hearing. Motions for Summary Judgment must be reserved with C12 prior to filing by calling (657)622-5212. |
| C16 | MONROE 657-622-5216 | Tuesday 2:00 p.m. | T, W, TH 8:30 a.m. | Noon | 4:00 p.m. if day prior to the Ex Parte hearing is Monday-Thursday; 3:00 P.M. if day prior to the Ex Parte hearing is Friday. | Yes 4:00 p.m. the day before | If Monday is a holiday, law and motion is heard on Thursday at 2:00 p.m. |
| C23 | MOSS 657-622-5223 | Friday 10:00 a.m. | Daily 8:30 a.m. | Not required | 12:00 p.m. | Yes 4:00 p.m. the day before | Teleconference appearances are voluntary and do not require consent by court or other parties. However, the court reserves to right to reject any request. Teleconference appearances are conducted in conformity with the guidelines, which are available by calling CourtCall, LLC at (310)914-7884 or (888) 88-COURT |
| C13 | MUÑOZ 657-622-5213 | Thursday 2:00 pm | M, T, W, TH 8:30 a.m. | 10:00 a.m. | Noon | Yes 4:00 p.m. the day before | |
| C3 | MYERS 657-622-5203 | Thursday Unlimited/ Omni 1:30 p.m. Limited 2:00 p.m. | M, T, W, TH 1:30 p.m. Fri 11:00 a.m.- emergency only | Not required | 3:00 p.m. day before | No | |
| C8 | NAKAMURA 657-622-5208 | Thursday 2:00 p.m. | M, T, W, TH 1:30 p.m. | 24 hours, the day before the hearing | M, T, W, Th, 10:00 a.m. day of ex parte | Yes 4:00 p.m. the day before | Counsel must reserve a motion date with the courtroom, prior to setting the motion. |

**EXHIBIT A, PAGE 6**

## SUPERIOR COURT OF CALIFORNIA
### COUNTY OF ORANGE

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

### NOTICE TO PLAINTIFF(S) AND/OR CROSS-COMPLAINANT(S):

**Rule 3.221(c) of the California Rules of Court requires you to serve a copy of the ADR Information Package along with the complaint and/or cross-complaint.**

California Rules of Court – Rule 3.221
Information about Alternative Dispute Resolution (ADR)

(a) Each court shall make available to the plaintiff, at the time of filing of the complaint, an ADR Information Package that includes, at a minimum, all of the following:

(1) General information about the potential advantages and disadvantages of ADR and descriptions of the principal ADR processes.

(2) Information about the ADR programs available in that court, including citations to any applicable local court rules and directions for contacting any court staff responsible for providing parties with assistance regarding ADR.

(3) Information about the availability of local dispute resolution programs funded under the Dispute Resolutions Program Act (DRPA), in counties that are participating in the DRPA. This information may take the form of a list of the applicable programs or directions for contacting the county's DRPA coordinator.

(4) An ADR stipulation form that parties may use to stipulate to the use of an ADR process.

(b) A court may make the ADR Information Package available on its Web site as long as paper copies are also made available in the clerk's office.

(c) The plaintiff must serve a copy of the ADR Information Package on each defendant along with the complaint. Cross-complainants must serve a copy of the ADR Information Package on any new parties to the action along with the cross-complaint.

L1200 (Rev. January 2010)

EXHIBIT A, PAGE 7

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF ORANGE

## ADR Information

### Introduction.

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts and others offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. ADR is usually less formal, less expensive, and less time-consuming than a trial. ADR can also give people more opportunity to determine when and how their dispute will be resolved.

### BENEFITS OF ADR.

Using ADR may have a variety of benefits, depending on the type of ADR process used and the circumstances of the particular case. Some potential benefits of ADR are summarized below.

**Save Time.** A dispute often can be settled or decided much sooner with ADR; often in a matter of months, even weeks, while bringing a lawsuit to trial can take a year or more.

**Save Money.** When cases are resolved earlier through ADR, the parties may save some of the money they would have spent on attorney fees, court costs, experts' fees, and other litigation expenses.

**Increase Control Over the Process and the Outcome.** In ADR, parties typically play a greater role in shaping both the process and its outcome. In most ADR processes, parties have more opportunity to tell their side of the story than they do at trial. Some ADR processes, such as mediation, allow the parties to fashion creative resolutions that are not available in a trial. Other ADR processes, such as arbitration, allow the parties to choose an expert in a particular field to decide the dispute.

**Preserve Relationships.** ADR can be a less adversarial and hostile way to resolve a dispute. For example, an experienced mediator can help the parties effectively communicate their needs and point of view to the other side. This can be an important advantage where the parties have a relationship to preserve.

**Increase Satisfaction.** In a trial, there is typically a winner and a loser. The loser is not likely to be happy, and even the winner may not be completely satisfied with the outcome. ADR can help the parties find win-win solutions and achieve their real goals. This, along with all of ADR's other potential advantages, may increase the parties' overall satisfaction with both the dispute resolution process and the outcome.

**Improve Attorney-Client Relationships.** Attorneys may also benefit from ADR by being seen as problem-solvers rather than combatants. Quick, cost-effective, and satisfying resolutions are likely to produce happier clients and thus generate repeat business from clients and referrals of their friends and associates.

### DISADVANTAGES OF ADR.

ADR may not be suitable for every dispute.

**Loss of protections.** If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

L1200 (Rev. January 2010)

EXHIBIT A, PAGE 8

**Less discovery.** There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

**Additional costs.** The neutral may charge a fee for his or her services. If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

**Effect of delays if the dispute is not resolved.** Lawsuits must be brought within specified periods of time, known as statues of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

## TYPES OF ADR IN CIVIL CASES.

The most commonly used ADR processes are arbitration, mediation, neutral evaluation and settlement conferences.

**Arbitration.** In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. Generally, there is no right to appeal an arbitrator's decision. *Nonbinding* arbitration means that the parties are free to request a trial if they do not accept the arbitrator's decision.

**Cases for Which Arbitration May Be Appropriate.** Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

**Cases for Which Arbitration May Not Be Appropriate.** If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Mediation.** In mediation, an impartial person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

**Cases for Which Mediation May Be Appropriate.** Mediation may be particularly useful when parties have a relationship they want to preserve. So when family members, neighbors, or business partners have a dispute, mediation may be the ADR process to use. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

**Cases for Which Mediation May Not Be Appropriate.** Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Neutral Evaluation.** In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is

L1200 (Rev. January 2010)

Page 3 of 4

EXHIBIT A, PAGE 9

often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

**Cases for Which Neutral Evaluation May Be Appropriate.** Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

**Cases for Which Neutral Evaluation May Not Be Appropriate.** Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences.** Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

## ADDITIONAL INFORMATION.

In addition to mediation, arbitration, neutral evaluation, and settlement conferences, there are other types of ADR, including conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR types. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute.

To locate a dispute resolution program or neutral in your community:
* Contact the California Department of Consumer Affairs, Consumer Information Center, toll free, 1-800-852-5210
* Contact the Orange County Bar Association at (949) 440-6700
* Look in the Yellow Pages under "Arbitrators" or "Mediators"

Free mediation services are provided under the Orange County Dispute Resolution Program Act (DRPA) For information regarding DRPA, contact:
* Community Service Programs, Inc. (949) 851-3168
* Orange County Human Relations (714) 834-7198

For information on the Superior Court of California, County of Orange court ordered arbitration program, refer to Local Rule 360.

The Orange County Superior Court offers programs for Civil Mediation and Early Neutral Evaluation (ENE). For the Civil Mediation program, mediators on the Court's panel have agreed to accept a fee of $300 for up to the first two hours of a mediation session. For the ENE program, members of the Court's panel have agreed to accept a fee of $300 for up to three hours of an ENE session. Additional information on the Orange County Superior Court Civil Mediation and Early Neutral Evaluation (ENE) pilot programs is available on the Court's website at www.occourts.org.

L1200 (Rev. January 2010)

Page 4 of 4

**EXHIBIT A, PAGE 10**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name & Address)*: | FOR COURT USE ONLY |
|---|---|
| Telephone No.:                    Fax No. (Optional):<br>E-Mail Address (Optional):<br>ATTORNEY FOR *(Name)*:                    Bar No.: | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE**
JUSTICE CENTER:
☐ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701-4045
☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512
☐ Harbor-Laguna Hills Facility – 23141 Moulton Pkwy., Laguna Hills, CA 92653-1251
☐ Harbor – Newport Beach Facility – 4601 Jamboree Rd., Newport Beach, CA 92660-2595
☐ North – 1275 N. Berkeley Ave., P.O. Box 5000, Fullerton, CA 92838-0500
☐ West – 8141 13th Street, Westminster, CA 92683-0500

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION** | CASE NUMBER: |
|---|---|

Plaintiff(s)/Petitioner(s)_____

_____

and defendant(s)/respondent(s),_____

_____

agree to the following dispute resolution process:

☐  Mediation

☐  Arbitration (must specify code)
       ☐Under section 1141.11 of the Code of Civil Procedure
       ☐Under section 1280 of the Code of Civil Procedure

☐  Neutral Case Evaluation

The ADR process must be completed no later than 90 days after the date of this Stipulation or the date the case was referred, whichever is sooner.

☐  I have an *Order on Court Fee Waiver* (FW-003) on file, and the selected ADR Neutral(s) are eligible to provide pro bono services.

☐  The ADR Neutral Selection and Party List is attached to this Stipulation.

We understand that there may be a charge for services provided by neutrals. We understand that participating in an ADR process does not extend the time periods specified in California Rules of Court rule 3.720 et seq.

Date:_____          _____          _____
                (SIGNATURE OF PLAINTIFF OR ATTORNEY)          (SIGNATURE OF PLAINTIFF OR ATTORNEY)

Date:_____          _____          _____
                (SIGNATURE OF DEFENDANT OR ATTORNEY)          (SIGNATURE OF DEFENDANT OR ATTORNEY)

**ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION**

Approved for Optional Use
L1270 (Rev. January 2010)

California Rules of Court, rule 3.221

**EXHIBIT A, PAGE 11**

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>JUSTICE CENTER:<br>☑ Central - 700 Civic Center Dr. West, Santa Ana, CA 92701-4045<br>☐ Civil Complex Center - 751 W. Santa Ana Blvd., Santa Ana, CA 92701-4512<br>☐ Harbor-Laguna Hills Facility – 23141 Moulton Pkwy., Laguna Hills, CA 92653-1251<br>☐ Harbor – Newport Beach Facility – 4601 Jamboree Rd., Newport Beach, CA 92660-2595<br>☐ North – 1275 N. Berkeley Ave., P.O. Box 5000, Fullerton, CA 92838-0500<br>☐ West – 8141 13th Street, Westminster, CA 92683-0500 | FOR COURT USE ONLY |
|---|---|
| PLAINTIFF/PETITIONER:<br><br>DEFENDANT/RESPONDENT: | |
| **ALTERNATIVE DISPUTE RESOLUTION (ADR)<br>NEUTRAL SELECTION AND PARTY LIST**<br><br>☐ Arbitration  ☐ Mediation  ☐ Neutral Evaluation | CASE NUMBER: |

**(ATTACH THIS FORM TO FORM L-1270, ALTERNATIVE DISPUTE RESOLUTION (ADR) STIPULATION, AND FILE IT WITH THE COURT.)**

## ADR NEUTRAL SELECTION

For Arbitration, parties may select a Neutral and Alternate or may have a Neutral randomly assigned from the Court's Panel. For Mediation and Neutral Evaluation, parties must select a Neutral and an Alternate below.

☐ For Arbitration, please check this box to have an arbitrator assigned at random.

The parties select the following Neutral and Alternate from the Court ADR Panel:

Neutral: _____

Alternate: _____

The above named Neutral will be notified by a Notice of Assignment of ADR Neutral that he or she has been selected as the neutral in this proceeding. In the event the neutral does not accept the assignment, a new Notice of Assignment of ADR Neutral will be sent to the above named Alternate. The assignment of the Alternate to serve as the Neutral does not extend the time to complete the ADR process.

**ALTERNATIVE DISPUTE RESOLUTION (ADR)<br>NEUTRAL SELECTION AND PARTY LIST**

Adopted for Mandatory Use<br>L2748 (New February 2008)

www.occourts.org

**EXHIBIT A, PAGE 12**

| Short Title: | Case Number: |
|---|---|

**PARTY LIST**
**(Including Affiliates)**

The parties agree that the ADR Session may be conducted on one of the following dates:

1._____  2._____  3._____  4._____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____ Fax_____

Attorney for:_____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____ Fax_____

Attorney for:_____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____ Fax_____

Attorney for:_____

Attorney and Firm Name:_____

Mailing Address:_____City_____ZIP_____

Area Code and Telephone Number:_____ Fax_____

Attorney for:_____

This Party List must also include the full names, addresses, and phone numbers of corporate parties' parent and subsidiary corporations, and of all insurance carriers. Counsel must immediately notify the neutral upon discovery if any attorney or self-represented party is not listed on this Party List Form.

☐ Attach additional copies of this page if necessary to include additional parties, affiliated entities or insurance carriers.

**ALTERNATIVE DISPUTE RESOLUTION (ADR)**
**NEUTRAL SELECTION AND PARTY LIST**

Adopted for Mandatory Use
L2748 (New February 2008)                                              www.occourts.org

**EXHIBIT A, PAGE 13**

1   Kenneth W. Chung, Bar No. 167872
    Laura C. Hess, Bar No. 198284
2   Min K. Chai, Bar No. 223804
    KRING & CHUNG, LLP
3   38 Corporate Park
    Irvine, CA 92606-5105
4   Telephone: (949) 261-7700
    Facsimile: (949) 261-8800
5
    Attorneys for Plaintiff
6   JH DEVELOPMENT, LLC

7

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**MAY 1 7 2011**

ALAN CARLSON, Clerk of the Court

BY B. LEA, DEPUTY

8                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                **COUNTY OF ORANGE, CENTRAL JUSTICE CENTER**

10

11  JH DEVELOPMENT, LLC,                    )   Case No.   **30-2011**
                                            )
12              Plaintiff,                   )   **COMPLAINT FOR:** **00475754**
                                            )
13      vs.                                  )   **1. CONCEALMENT**
                                            )   **2. BREACH OF WRITTEN CONTRACT**
14  TC GLOBAL, INC. fka TULLY'S COFFEE       )   **3. FALSE PROMISE**
    CORP. dba TULLY'S COFFEE; and DOES 1     )   **4. VIOLATION OF FRANCHISE LAW**
15  through 50, inclusive,                   )
                                            )
16              Defendants.                  )   **JUDGE GREGORY MUNOZ**
    _____)   **DEPT. C13**

17          COMES NOW plaintiff JH DEVELOPMENT, LLC (hereinafter "Plaintiff") for its causes

18  of action against defendants TC GLOBAL, INC. fka TULLY'S COFFEE CORP. dba TULLY'S

19  COFFEE and DOES 1 through 50, inclusive, (hereinafter collectively "Defendants"), and

20  complains and alleges as follows:

21          1.      At all relevant times, Plaintiff was and is a California limited liability company

22  qualified to do business in the State of California. Plaintiff was formed for the purpose of owning

23  and operating Tully's Coffee franchise outlets in Southern California.

24          2.      Plaintiff is informed and believes and thereon alleges that, at all relevant times,

25  defendant TC GLOBAL, INC. fka TULLY'S COFFEE CORP. dba TULLY'S COFFEE ("TC

26  GLOBAL") is and at relevant times was a Washington corporation qualified to do business in the

27  State of California. TC GLOBAL is in the business of selling at retail a menu of specialty espresso

28  and coffee drinks, teas, baked goods, ice cream products, cold blended beverages, smoothies, juice

_____
                                    COMPLAINT

F:\6661\0005\pld\Complaint.docx                          **EXHIBIT A, PAGE 14**

1 | drinks, and other food and beverage items, in retail locations throughout Oregon, Washington, and
2 | California. TC GLOBAL also purports to be a franchisor of Tully's Coffee franchise outlets.

3 |     3.    The true names and capacities, whether individual, corporate, associate or otherwise,
4 | of Defendants named as DOES 1 through 50, inclusive, are unknown to Plaintiff who sues said
5 | Defendants by such fictitious names. Plaintiff will ask leave to amend this Complaint to show their
6 | true names and capacities when ascertained.

7 |     4.    Plaintiff is informed and believes and thereon alleges that each of the Defendants
8 | designated as DOES herein are responsible in some manner for the events and happenings herein
9 | referred to and that said Defendants caused the injury and damages proximately to Plaintiff as
10 | herein alleged through the conduct of their agents, servants, or employees, or in some other manner
11 | having liability imposed upon them.

12 |     5.    Plaintiff is informed and believes, and thereon alleges that each Defendant was the
13 | agent of all of the other Defendants, including DOE Defendants, and was acting within the course
14 | and scope of such agency. Additionally, each of the Defendants authorized, consented to and/or
15 | ratified each act and omission of the remaining Defendants, and each of them, as hereinafter
16 | alleged. Each of the Defendants was the alter ego, joint venturer, successor in interest, parent or
17 | successor entity, or otherwise joint and severally or otherwise responsible for the acts, omissions,
18 | and contractual liability of the remaining Defendants, and each of them.

19 |     6.    Plaintiff is informed and believes that there is and was such a unity of interest and
20 | ownership between the Defendants that the separate personalities of the corporations and the
21 | individuals do not exist, and that an inequity will result if the corporate entities are treated as the
22 | sole actors.

23 |     7.    Venue is proper in this jurisdiction because the contracts described herein and upon
24 | which this lawsuit is based, including the Area Development Agreement, Asset Purchase
25 | Agreement, and Franchise Agreement, were formed in Buena Park, California, and the contracts
26 | were performed in Buena Park, California.

27 | ///
28 | ///

2
COMPLAINT

F:\6661\0005\pld\Complaint.docx

EXHIBIT A, PAGE 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIRST CAUSE OF ACTION

### CONCEALMENT

8.    Plaintiff realleges each preceding paragraph as though fully set forth herein.

9.    In about July 2008, Plaintiff negotiated with Defendants regarding Plaintiff's purchase of five existing Tully's Coffee stores from Defendants, located in Newport Beach, Los Angeles, Lake Forest, Irvine, and Santa Monica (the "Existing Stores") and Plaintiff's acquisition of area development rights to open new Tully's Coffee stores throughout Southern California. All of the contract negotiations described herein occurred during in person meetings and telephone conversations from about July and August 2008, between Ron Gai as Vice President of Defendants; Karl Caraveo as Regional Manager of Defendants; Young Ill Hwang as Member/President of Plaintiff; and Jaehee "Jay" Hwang as Chief Financial Officer of Plaintiff.

10.    On about July 19, 2008, Plaintiff entered into a Letter of Intent with Defendants whereby Plaintiff agreed to purchase the Existing Stores and area development rights for $550,000. A true and correct copy of the Letter of Intent is attached hereto as Exhibit A and incorporated herein by reference.

11.    On about August 7, 2008, Plaintiff entered into an Area Development Agreement with Defendants whereby Plaintiff acquired the rights to develop and open new Tully's Coffee stores in the following seven counties in Southern California: Los Angeles, Orange, San Diego, Riverside, San Bernardino, Ventura, and Imperial, in exchange for $400,000. A true and correct copy of the Area Development Agreement is attached hereto as Exhibit B and incorporated herein by reference.

12.    On about August 8, 2008, Plaintiff entered into an Asset Purchase Agreement with Defendants for Plaintiff's purchase of the five Existing Stores for $150,000. A true and correct copy of the Asset Purchase Agreement is attached hereto as Exhibit C and incorporated herein by reference.

13.    On about August 8, 2008, Plaintiff entered into a Franchise Agreement with Defendants for the Existing Stores. A true and correct copy of the Franchise Agreement is attached hereto as Exhibit D and incorporated herein by reference.



COMPLAINT

F:\6661\0005\pld\Complaint.docx

EXHIBIT A, PAGE 16

1    14.    Pursuant to the Area Development Agreement, Plaintiff opened six new Tully's
2  Coffee stores at Cal State Fullerton, LA Equitable Plaza, Anaheim Hills, Fullerton, Anaheim
3  Stadium, Huntington Beach, and UC Berkeley between 2008 and 2010 (the "New Stores").

4    15.    At the time that the parties entered into the Area Development Agreement, Asset
5  Purchase Agreement, and Franchise Agreement (collectively referred to herein as the "Contracts,")
6  Defendants were in dire financial straits and were negotiating the sale of a substantial part of
7  Defendants' business. Defendants failed to disclose that Defendants were in financial distress to
8  Plaintiff before the parties entered into the Contracts. Defendants failed to disclose that they had in
9  fact already engaged D.A. Davidson & Co. to help Defendants procure investors about seven
10  months before the parties entered into the Contracts. Defendants also failed to disclose that
11  Defendants were actively negotiating with Green Mountain Coffee Roasters, Inc. ("Green
12  Mountain") for Green Mountain to purchase Defendants' wholesale division and the rights to the
13  "Tully's" trademark and brand name. These were all important facts that were unknown to Plaintiff
14  at the time of entering into the Contracts and which Defendants failed to disclose before entering
15  into the Contracts with Plaintiffs. If Plaintiffs had known these facts, Plaintiffs would not have
16  entered into the Contracts.

17    16.    On about September 15, 2008, about one month after the parties entered into the
18  Contracts, Defendants entered into an Asset Purchase Agreement whereby Defendants sold their
19  wholesale division and the rights to the "Tully's" trademark and brand name to Green Mountain for
20  about $40.3 million.

21    17.    Defendants' failure to disclose important facts to Plaintiff was deceptive. These
22  facts were known only to Defendants. Plaintiff could not have discovered them prior to entering
23  into the Contracts.

24    18.    Defendants actively concealed these important facts from Plaintiff and prevented
25  Plaintiff from discovering them.

26    19.    Defendants intended to deceive Plaintiff by concealing these important facts.

27    20.    Plaintiff reasonably relied upon Defendants' deception by entering into the
28  Contracts. It was reasonable for Plaintiff to rely upon Defendants' deception because Defendants

F:\6661\0005\pld\Complaint.docx                                    EXHIBIT A, PAGE 17

1  were in the only position to know what their financial condition was, as well as what Defendants

2  were in the process of doing as far as looking to immediately sell off significant portions of their

3  business.

4       21.    Plaintiff was harmed as a result of Defendants' deception. Plaintiff's harm includes,

5  but is not limited to, the following:

6              a.    After Defendants' sale of its wholesale division to Green Mountain, Plaintiff

7  was required to purchase products for Plaintiff's stores from a distribution company called

8  Specialty Foods ("DPI"). DPI sold products to Plaintiff for a substantially higher cost than Plaintiff

9  used to pay before Defendants' sale of its wholesale division to Green Mountain. For instance, the

10 wholesale coffee price rose from about $3/lb. to $4.75/lb.; and the wholesale price of Keurig coffee

11 cups tripled. Plaintiff was forced to absorb these price increases, but Defendants did not permit

12 Plaintiff to make any adjustments to its own retail prices. As a result, Plaintiff made substantially

13 less profits.

14             b.    Plaintiff was required to purchase its products from DPI, although DPI was

15 unable to properly fill orders so that Plaintiff could stock inventory for its stores.

16             c.    Due to Defendants' sale of the "Tully's" brand, no marketing efforts were

17 made to enhance the brand on a national level. Furthermore, Plaintiff's right to use the "Tully's"

18 trademark in connection with its franchise outlets was now subject to the terms of the licensing

19 agreement between Green Mountain and Defendants, which impeded Plaintiff's ability to develop

20 the "Tully's" brand.

21             d.    Defendants provided little to no support to Plaintiff as their franchisee due in

22 part to a desire to sell off the company as well as Defendants being in a precarious financial

23 situation. This franchise support includes but is not limited to marketing support and assistance

24 with keeping product costs down.

25      22.    Defendants' deception was a substantial factor in causing Plaintiff's harm.

26      23.    Plaintiff is informed and believed and thereon alleges that Defendants were urgently

27 pressing Plaintiff to buy the Existing Stores so that Defendants could generate immediate cash flow

28 to help with Defendants' financial problems and avoid potential bankruptcy, and so Defendants



5
COMPLAINT

EXHIBIT A, PAGE 18

1  could attract potential investors like Green Mountain.  At the time Defendants sold the five

2  Existing Stores to Plaintiff, only two of these stores were in fact profitable.

3      24.    Because the Contracts were procured as a result of fraudulent concealment, plaintiff

4  seeks to rescind the Contracts and regain all consideration paid for and all money expended

5  pursuant to the Contracts.  Plaintiff hereby offers to restore any consideration given by Defendants

6  for the Contracts.

7      25.    Defendants fraudulently induced Plaintiff's consent to the Contracts by concealing

8  facts as described herein.  As a result, the Contracts are void and subject to rescission.

9      26.    As a proximate result of Defendants' concealment, Plaintiff has suffered damages in

10  an amount according to proof at trial, but in excess of the jurisdictional limits of this court.

11      27.    Defendants' conduct was malicious, oppressive, or fraudulent, entitling Plaintiff to

12  an award of punitive damages.

13                        **SECOND CAUSE OF ACTION**

14                      **BREACH OF WRITTEN CONTRACT**

15      28.    Plaintiff realleges each preceding paragraph as though fully set forth herein.

16      29.    Within the last four years, Defendants breached the Franchise Agreement, including

17  but not limited to as follows:

18          a.    Defendants were not registered as a franchisor at the time the parties entered

19  into the Franchise Agreement, as required by Corporations Code § 31110 and the Federal Trade

20  Commission Franchise Rule.

21          b.    Defendants failed to provide initial and periodic training to Plaintiff.

22          c.    Defendants failed to provide support services and assistance, including but

23  not limited to requiring Plaintiff to purchase products from distributor DPI, which was often out of

24  stock of basic supplies, resulting in business interruptions.

25          d.    Defendants failed to provide support services and assistance by failing to

26  promptly respond to Plaintiff regarding specifications and standards for build outs and lease

27  renewals.

28  ///



COMPLAINT

1         e.     Defendants failed to provide periodic accounting of marketing fees collected

2  under the Franchise Agreement and how said funds were used.

3         f.     Defendants failed to provide Plaintiff with a copy of the basic franchise

4  Operations Manual containing proprietary information, including know-how, recipes, lists of

5  approved suppliers, company policies, etc.

6         g.     Defendants unreasonably refused to allow Plaintiff to sell a majority interest

7  in certain franchise outlets.

8         h.     Plaintiff is informed and believes that Defendants breached their requirement

9  to maintain high product standards by not requiring Green Mountain to continue Defendants'

10  advertised and promoted practice of using only hand roasted coffee beans. Instead, Green

11  Mountain engaged in less costly microwave roasting methods which lessened the coffee flavor and

12  quality.

13         i.     Plaintiff is informed and believes and thereon alleges that Defendants

14  breached the Franchise Agreement by entering into a License Agreement and Noncompetition

15  Agreement with Green Mountain on about September 15, 2008, whereby Green Mountain acquired

16  the rights to the "Tully's" brand and Defendants agreed not to compete by engaging in the coffee

17  business except for licensed stores. Plaintiff is informed and believes and thereon alleges that, by

18  entering into these agreements with Green Mountain, Defendants restricted their own ability to

19  open new Tully's Coffee franchise outlets in the restricted territory and thereby handcuffed

20  Defendants' ability to promote and develop the brand and reputation of Tully's Coffee products in

21  the Southern California region. Defendants' therefore made it so they had to solely rely on their

22  licensees' ability to operate licensed stores and sell Tully's products. This was limiting in the sense

23  that Defendants would have to rely on third parties' efforts rather than its own efforts to promote

24  and market the Tully's brand. More importantly, Defendants acknowledged in their 10-K filing that

25  their ability to successfully operate the licensed stores and enhance the brand would depend on

26  Green Mountain's ability to maintain and defend the trademarks, and also on Defendants' ability to

27  retain the rights granted under the License Agreement with Green Mountain. If Defendants or any

28  of their licensees or other third parties jeopardize or cause to compromise the rights under the

F:\6661\0005\pld\Complaint.docx

EXHIBIT A, PAGE 20

KC

KRING & CHUNG
ATTORNEYS LLP

1  License Agreement with Green Mountain, Defendants will no longer have the right to use or

2  sublicense the use of the marks.

3      31.      As a proximate result of Defendants' breach, Plaintiff has suffered damages in an

4  amount according to proof at trial, but in excess of the jurisdictional limits of this court.

5                          **THIRD CAUSE OF ACTION**

6                              **FALSE PROMISE**

7      32.      Plaintiff realleges each preceding paragraph as though fully set forth herein.

8      33.      Plaintiff is informed and believes and thereon alleges that, at the time the parties

9  entered into the Franchise Agreement, Defendants did not have any intention to perform their

10  obligations to provide franchise support to Plaintiff pursuant to Defendant's obligations set forth in

11  the Franchise Agreement, i.e. by providing marketing support to promote the "Tully's" brand on a

12  national level, providing information and specifications necessary for Plaintiff to build out its

13  franchise outlets, providing accounting of how marketing fees collected were used, providing a

14  copy of the franchise Operating Manual, providing training to Plaintiff, etc.

15      34.      Plaintiff is informed and believes and thereon alleges that Defendants' sole

16  motivation in entering into the Contracts with Plaintiff was for Defendants to generate immediate

17  cash flow to solve some of Defendants' immediate financial problems and to entice a potential

18  buyer such as Green Mountain to purchase portions of Defendants' business, and also to unload

19  some of Defendants' unprofitable franchise outlets onto Plaintiff.  However, Plaintiff is informed

20  and believes and thereon alleges that Defendants never intended to perform Defendants' obligations

21  under the Franchise Agreement to support Plaintiff with the development of its stores.

22      35.      Defendants fraudulently induced Plaintiff's consent to the Contracts by making

23  promises therein which Defendants had no intention of performing.  As a result, the contracts are

24  void and subject to rescission.  Plaintiff seeks to rescind the Contracts and recover all consideration

25  given for and money expended pursuant to the Contracts.  Plaintiff hereby offers to restore any

26  consideration received from Defendants.

27      36.      As a proximate result of Defendants' false promise, Plaintiff suffered damages in an

28  amount according to proof at trial, in excess of this court's jurisdictional limits.

F:\6661\0005\pld\Complaint.docx

EXHIBIT A, PAGE 21

1    37.    Defendants' conduct was malicious, oppressive, or fraudulent, entitling Plaintiff to

2  punitive damages.

3                          **FOURTH CAUSE OF ACTION**

4                          **VIOLATION OF FRANCHISE LAW**

5    38.    Plaintiff realleges each preceding paragraph as though fully set forth herein.

6    39.    Plaintiff is informed and believes and thereon alleges that Defendants failed to

7  comply with Corporations Code § 31110 by failing to be registered as a franchisor at the time

8  Defendants entered into the Franchise Agreement with Plaintiff.

9    40.    As a proximate result of Defendants' failure to register as a franchisor, Plaintiff has

10  suffered damages. Plaintiff seeks damages pursuant to Corporations Code § 31300 in an amount

11  according to proof at trial, but in excess of the jurisdictional limits of this court.

12    41.    Plaintiff further seeks to rescind the Franchise Agreement pursuant to Corporations

13  Code § 31300, on the grounds that Defendants' failure to be registered as a franchisor at the time

14  the parties entered into the Franchise Agreement was willful. Plaintiff hereby offers to restore any

15  consideration received from Defendants for the Franchise Agreement.

16    WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

17    1.    For compensatory damages in an amount according to proof at trial;

18    2.    For punitive damages;

19    3.    For rescission of the Contracts;

20    4.    For prejudgment interest;

21    5.    For attorney fees;

22    6.    For costs of suit; and

23    7.    For such other and further relief as the court deems just and proper.

24  Dated: May 17, 2011                      KRING & CHUNG, LLP

25

26                                    By: _____

27                                        Kenneth W. Chung
                                          Laura C. Hess
28                                        Min K. Chai
                                          Attorneys for Plaintiff
                                          JH DEVELOPMENT, LLC

9

COMPLAINT

F:\6661\0005\pld\Complaint.docx

# EXHIBIT

## A

## LETTER OF INTENT

1.   **Parties.** The parties to this Agreement are JH Development, Inc. ("Franchisee") and Tully's Coffee Corporation ("Franchisor"). Franchisee operates retail food outlets and wholesale food and beverage distribution operations, as well as constructing and remodeling retail food stores. Franchisor owns, operates and supplies Tully's Coffee stores nationally and internationally.

2.   **Intent.** This Letter of Intent is a non-binding memorialization of the core terms of an agreement of the parties hereto. It is the parties' intent to enter into agreements, including but not limited to one or more Area Development Agreements and individual Franchise Agreements, to implement these core terms and to supersede this Letter of Intent thereby.

3.   **Purchases.** Franchisee seeks to acquire, as franchisee and/or master franchisee, certain area rights and five of Franchisor's company-operated stores ("Existing Stores"), located at the following addresses:

8631 W. 3rd St., Ste. 311E, Los Angeles, CA 90048 (Cedars Sinai)
2425 Colorado Ave., Ste. 118B, Santa Monica, CA (Santa Monica)
20025 Lake Forest Dr., Lake Forest, CA 92630 (Lake Forest)
1280 Bison St., Ste. D-1, Newport Beach, CA 92660 (Newport Beach)
4610 Barranca Pkwy., Irvine, CA 92604 (Irvine)

4.   **Purchase Price.** Franchisee seeks to purchase, via franchise agreement(s), the Existing Stores for the sum of $550,000.00. The purchase price is based on the following:

(a)   Franchisee will pay the Franchisor $150,000.00 for the Existing Stores, including fixtures and existing inventory, at the close of escrow. The price is subject to successful renegotiation of current lease for each store through at least May 1, 2015. Each store's inventory shall be maintained at current levels during the negotiation of the purchase/sale of the stores. Any material change thereto shall be deemed to affect the value of this proposal and subject it to revision.

(b)   Franchisee will pay Franchisor $400,000.00 to acquire the Area Development rights for following seven California counties:  Orange, Los Angeles, San Diego Riverside, San Bernardino, Ventura and Imperial ("Territory").

5.   **New Store Openings.** For the purpose of maintaining master franchisee rights, Franchisee agrees to open a minimum of ten new stores in the Territory within four years of execution of the Franchise Agreement applicable to this Letter of Intent. Once Franchisee opens and operates a total of twenty stores in the Territory, Franchisee's master franchisee rights shall become permanent. Should Franchisee not open the minimum ten stores within four years, Franchisee will forfeit the Area Development rights for the Territory and will be reimbursed by Franchisor the sum of $10,000.00 per unopened location.

6.   **Franchise Fees and Royalties.** For each future location in the Territory, excluding the Existing Stores, the franchise fee shall be $7,500.00 per location. Royalties shall be limited to two percent (2%) of gross income per store. Franchisee will be responsible for ongoing marketing costs, including updated menus, drink promotions and display materials.

7.   **Franchise Coffee Pricing.** Franchisor shall agree to sell coffee to the Franchisee at the same pricing schedule that Franchisor uses for its other franchisees.

8.   **Licensing Agreements.** Franchisor will be allowed to offer licensing agreements within the Territory in locations where Tully's Coffee is not the primary business, such as supermarkets and college campuses. Franchisor shall not permit a Tully's-licensed outlet to be placed in the Territory within 500 feet of a then-existing

Page 1 of 2

**EXHIBIT A, PAGE 24**

store location. Franchisee shall have the right of first refusal to provide product distribution to franchise- and company-operated stores and licensed outlets within the Territory as such rights become available.

9.     **Right to Liquidate.**  If, within nine months, Franchisee is unable to turnaround any store location operating at a loss as of the date of execution of the applicable franchise agreement, Franchisee shall have the right to sell and liquidate the store location to prevent further loss of capital.

10.     **Right to Transfer Interest.**  Franchisee will have the right to transfer any or all of its interest in any store to one or more investors only with Franchisor's written consent, which consent will not be unreasonably withheld, subject to the terms of the franchise agreement and upon condition that the investor(s), if receiving a 50% or greater interest of the subject store, shall meet the financial qualifications of a franchisee as established by the applicable franchise agreement. If such transfer occurs within two (2) years of Franchisee's acquisition of an Existing Store or upon the opening of a new store, Franchisee shall retain operation control of such store and shall remain subject to the terms of the applicable franchise agreement for that two-year term.

11.     **Right of First Refusal.**  Franchisee's rights hereunder shall be exclusive; provided however that, during the time of this Development Agreement (which shall be for 5 years), if Franchisor has a qualified prospective franchisee or developer ("Franchise Candidate") for one or more proposed Tully's franchise locations within the Territory, Franchisor shall present the opportunity to Franchisee to participate, in whole or in part, with the Franchise Candidate on terms acceptable to Franchisee and Franchise Candidate, subject to both Franchisor's approval, which shall not be unreasonably withheld, and compliance with the terms of the franchise agreement terms then in effect or as agreed upon by all parties. Should the parties not come to an executed written agreement within sixty (60) days of presentation of the Franchise Candidate to Franchisee, Franchisor may enter into a franchise or development agreement with such Franchise Candidate, and Franchisee's first-refusal right to participation in the franchise or development, or any other form of right to first refusal, shall be deemed waived.

12.     **Closing Date.**  The parties will work in good faith to execute (1) a Purchase and Sale Agreement; (2) Area Development Agreement; and (3) Franchise Agreements for the Existing Stores, by September 1, 2008.

JH DEVELOPMENT, INC.

Dated: _July 19-008_.          By:  _Young Ill Hwang_
                                    Young Ill Hwang, President

Dated: _July - 19 boo 8_        By:  _Jaehee Hwang_
                                    Jaehee Hwang, Chief Financial Officer

TULLY'S COFFEE CORPORATION

Dated: _July 14, 200%_          By:  _____
                                    Its: _Carl Pennington, Jr., President_

Page 2 of 2

**EXHIBIT A, PAGE 25**

# EXHIBIT
## B



**ARTICLE 1.    DEVELOPMENT OF DEVELOPMENT AREA** ........................................................... 1

1.01    DEVELOPMENT SCHEDULE. ................................................................................................ 1
1.02    FAILURE TO MEET DEVELOPMENT SCHEDULE. ............................................................. 2
1.03    NEW FRANCHISE AGREEMENT FOR EACH OUTLET. ..................................................... 2
1.04    STANDARDS OF PERFORMANCE. ..................................................................................... 3
1.05    NO USE OF FRANCHISOR'S NAME AND MARKS. ............................................................ 3

**ARTICLE 2.    TERM AND CONSIDERATION** ............................................................................. 3

2.01    TERM. ................................................................................................................................. 3
2.02    CONSIDERATION. ............................................................................................................... 3

**ARTICLE 3.    REPORTS AND AUDITS** ...................................................................................... 3

3.01    RECORDS AND REPORTS. .................................................................................................. 3

**ARTICLE 4.    OPERATION OF DEVELOPMENT BUSINESS** ...................................................... 4

4.01    INDEPENDENT CONTRACTOR. ......................................................................................... 4
4.02    DEVELOPMENT ENTERPRISE MANAGEMENT. ................................................................ 4
4.03    SITE SELECTION. ............................................................................................................... 4
4.04    COMPLIANCE WITH LAWS. ............................................................................................... 4
4.05    COMPLIANCE WITH METHODS AND STANDARDS .......................................................... 5

**ARTICLE 5.    INDEMNITY AND INSURANCE** ........................................................................... 5

5.01    INDEMNITY. ....................................................................................................................... 5
5.02    INSURANCE ....................................................................................................................... 5

**ARTICLE 6.    ENTITY DEVELOPER** ......................................................................................... 5

6.01    ENTITY DEFINITION. ......................................................................................................... 5
6.02    FOUNDING DOCUMENT RESTRICTION. ........................................................................... 5
6.03    LIABILITY OF OWNER(S). .................................................................................................. 6
6.04    RESTRICTION ON CERTIFICATES OF OWNERSHIP. ......................................................... 6
6.05    ADDITIONAL REQUIREMENTS OF ENTITY DEVELOPER. ................................................. 6

**ARTICLE 7.    ASSIGNMENT OR TRANSFER** ............................................................................ 6

7.01    PRIOR CONSENT. .............................................................................................................. 6
7.02    CONDITIONS OF ASSIGNMENT OF DEVELOPMENT AGREEMENT. .................................. 6
7.03    ASSIGNMENT TO AN ENTITY. ........................................................................................... 7
7.04    APPROVAL PROCESS. ....................................................................................................... 7
7.05    TRANSFER BY FRANCHISOR. ........................................................................................... 7
7.06    NO SUBLICENSING. ........................................................................................................... 8

**ARTICLE 8.    DEATH OR INCAPACITY** ................................................................................... 8

8.01    ALTERNATIVES UPON DEATH OR INCAPACITY. .............................................................. 8
8.02    EFFECT OF FAILURE TO COMPLY. .................................................................................... 8
8.03    INCAPACITY DEFINED. ...................................................................................................... 8

**ARTICLE 9.    OPTION TO PURCHASE DEVELOPMENT BUSINESS** ........................................... 8

9.01    FRANCHISOR MAY PURCHASE THE DEVELOPMENT BUSINESS. ..................................... 8
9.02    CALCULATION OF THE OPTION PRICE. ............................................................................ 9
9.03    DOCUMENTATION OF THE PURCHASE. ............................................................................ 9

Tully's
**DEVELOPMENT AGREEMENT**
DA-40A
Page i

initials



**ARTICLE 10.    SUCCESSORS AND ASSIGNS** ..................................................................................................9

**ARTICLE 11.    TERMINATION** .........................................................................................................................9

11.01    FRANCHISOR MAY TERMINATE THIS AGREEMENT AS FOLLOWS: ..............................................................9
11.02    DEVELOPER MAY TERMINATE THIS AGREEMENT AS FOLLOWS: .............................................................10

**ARTICLE 12.    COMPETITION WITH FRANCHISOR**.................................................................................10

12.01    COMPETING BUSINESS ACTIVITIES DURING TERM. ...............................................................................10
12.02    COMPETING BUSINESS ACTIVITIES AFTER TERM...................................................................................11

**ARTICLE 13.    EFFECT OF TERMINATION** .................................................................................................12

13.01    LOSS OF RIGHTS........................................................................................................................................12
13.02    CHANGE OF IDENTITY. ...............................................................................................................................13
13.03    OPERATION OF FRANCHISED OUTLET(S) AFTER TERMINATION DATE...................................................13
13.04    OPTION TO PURCHASE CERTAIN ASSETS..................................................................................................13
13.05    PAYMENT AND TERMS................................................................................................................................13
13.06    SURVIVAL OF TERMS. .................................................................................................................................13

**ARTICLE 14.    ARBITRATION OF DISPUTES.** .............................................................................................13

14.01    AGREEMENT TO ARBITRATE.......................................................................................................................13
14.02    CONDUCT OF ARBITRATION. .......................................................................................................................14
14.03    CONDITIONS PRECEDENT TO ARBITRATION...............................................................................................14
14.04    LIMITED EXCEPTIONS TO ARBITRATION AND MEDIATION. .......................................................................14

**ARTICLE 15.    REPRESENTATIONS OF DEVELOPER**.................................................................................14

15.01    REPRESENTATIONS.....................................................................................................................................14

**ARTICLE 16.    MISCELLANEOUS PROVISIONS** .........................................................................................15

16.01    NONWAIVER.................................................................................................................................................15
16.02    ATTORNEYS FEES........................................................................................................................................15
16.03    SEVERABILITY..............................................................................................................................................15
16.04    WARRANTY OF AUTHORITY.........................................................................................................................15
16.05    ESTOPPEL CERTIFICATE..............................................................................................................................15
16.06    PARAGRAPH HEADINGS...............................................................................................................................16
16.07    RECITALS. ....................................................................................................................................................16
16.08    NO THIRD PARTY BENEFICIARY...................................................................................................................16
16.09    CHOICE OF LAW...........................................................................................................................................16
16.10    NOTICES.......................................................................................................................................................16
16.11    ENTIRE AGREEMENT. ..................................................................................................................................16
16.12    MODIFICATION. ...........................................................................................................................................16
16.13    EFFECTIVE DATE..........................................................................................................................................16
16.14    TIME OF ESSENCE.......................................................................................................................................16

**ARTICLE 17.    BUSINESS RISK.** .....................................................................................................................17

17.01    NO PROMISES...............................................................................................................................................17

**ARTICLE 18.    RECEIPT FOR DISCLOSURE DOCUMENT.** .......................................................................17

**EXHIBITS**

A.    Development Area ..............................................................................................................A-1
B.    Personal Guaranty .............................................................................................................B-1
C.    Parent Entity Guaranty .....................................................................................................C-1
D.    Plan of Development of the Development Area................................................................D-1
E.    Developer's Release Agreement .......................................................................................E-1
F.    Addendum to Development Agreement..............................................................................F-1

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page ii

_____
initials



### TULLY'S DEVELOPMENT AGREEMENT

This Agreement is made and entered into by and between Tully's Coffee Corporation, d.b.a. "Tully's" (hereinafter "Franchisor") and JH Development, LLC, a California limited liability company, (hereinafter "Developer"). This Agreement is referred to herein as the "Development Agreement".

### RECITALS

WHEREAS Franchisor desires to establish Tully's franchised outlets in the geographic area identified in Exhibit A hereto ("Development Area");

WHEREAS Franchisor currently offers franchises to open and operate Tully's outlets under Franchisor's Marks and pursuant to Franchisor's system as fully described and governed by the Tully's Franchise Agreement;

WHEREAS Developer desires to develop and operate Tully's outlets in the Development Area, each pursuant to the Tully's Franchise Agreement as modified in accordance with this Development Agreement;

WHEREAS Developer is simultaneously entering into Developer's first Tully's Franchise Agreement;

WHEREAS the parties each acknowledge the mutual benefit of proceeding with this transaction, but only subject to the terms and conditions herein;

NOW THEREFORE, for and in consideration of the mutual covenants herein set forth, and other good and valuable consideration, the receipt and sufficiency of which each party hereby acknowledges, and each party fully intending to be legally bound hereby, Franchisor and Developer mutually agree as follows:

### Article 1.        DEVELOPMENT OF DEVELOPMENT AREA

#### *1.01  Development Schedule.*

(a) Subject to this Agreement, Developer shall have the right and obligation to develop, own and operate Tully's outlets in the Development Area as set forth in Exhibit A hereto.  Developer shall execute Developer's first Franchise Agreement for Developer's first outlet simultaneously with executing this Agreement.  The business described in this paragraph 1.01 is referred to herein as the "Development Business".  Subject to the terms of this Agreement, Franchisor will not open or operate or permit another franchisee or assignee to open or operate any Tully's outlets in the Development Area during the term of this Agreement.

(b) Notwithstanding the grant of the Development Area herein, Franchisor may, directly, indirectly, or through a licensee or franchisee offer products and services under the same or a different trade name or trademark, including within the Development Area, through alternative distribution methods, including through catalogs, mail order and through electronic media (including television, radio, the "Internet" and through other new or emerging commercial technological media).  Franchisor shall have no obligation to share any revenues from alternative distribution activities with Developer.  Without limiting the foregoing, Developer shall not, without Franchisor's prior written approval, which approval may be withheld for any reason whatsoever, use the Marks or any part of the Marks or anything similar to the Marks as part of a domain name, in meta tags or otherwise in connection with any commerce on the Internet or similar media.  Developer shall not use the Marks in or market through alternative distribution methods without Franchisor's prior written approval, which approval may be withheld for any reason whatsoever.

(c) Nothing in this Development Agreement shall restrict Franchisor, or its authorized distributors and resellers, from selling Franchisor's coffees or any other products of Franchisor to Wholesale Accounts (restaurants, office coffee service providers and food service organizations who sell or serve Franchisor's products, but do business under a name other than "Tully's") in the Development Area, and Developer shall not be entitled to any compensation in connection with such sales.

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 1

_____
*Initials*

**EXHIBIT A, PAGE 29**

(d) Nothing in this Development Agreement shall restrict Franchisor, or its authorized distributors and resellers, from selling Franchisor's bulk and packaged coffees or any other packaged products of Franchisor intended primarily for "at home" consumption, to any grocer or other retailer operating in the Development Area, and Developer shall not be entitled to any compensation in connection with such sales.

### 1.02  Failure To Meet Development Schedule.

(a) Should Developer fail to meet the Development Schedule, including by having the required number of outlets open and operating pursuant to franchise agreements at any time, then upon written notice from Franchisor giving Developer not less than four months to cure, if Developer does not cure by coming into compliance with the Development Schedule, then Developer's development rights pursuant to this Development Agreement shall be modified as follows:

  (i) If the number of Tully's outlets in operation as of any anniversary of the Effective Date of the Development Agreement is less than the Minimum Number of Tully's outlets set forth for that date in Exhibit D, but is equal to or more than 50% of the Minimum Number of Tully's outlets set forth for that date, Developer shall continue to have development rights under this Agreement, but such development rights shall no longer be exclusive to Developer. (For purposes of this 50% calculation, the computed amount shall be rounded to the nearest whole number). Thereafter, Franchisor may grant non-exclusive development rights within the Development Area to other parties. Thereafter, Franchisor may, directly or indirectly, open and operate Tully's outlets within the Development Area subject only to Developer's rights under any individual franchise agreements. Provided Developer is not in material breach of any of Developer's franchise agreements, Developer shall have the right and obligation to continue to own and operate each franchised outlet then in operation pursuant to and subject to the terms of the applicable franchise agreement, and will be permitted, if not in breach thereof, to continue to operate franchised outlets pursuant to applicable franchise agreements as previously modified pursuant to this Development Agreement and to execute new or renewal franchise agreements on the terms pursuant to this Development Agreement, subject to Franchisor's proximitiy restrictions for new stores opened by Franchisor or any other franchisee after the date that Developer loses its exclusive development rights.

  (ii) If the number of Tully's outlets in operation as of any anniversary of the Effective Date of the Development Agreement is less than 50% of the Minimum Number of Tully's outlets set forth for that date in Exhibit D, then Developer's development rights pursuant to this Development Agreement shall terminate. (For purposes of this 50% calculation, the computed amount shall be rounded to the nearest whole number). Thereafter, Franchisor may grant development rights within the Development Area to other parties that may be exclusive, subject to the rights of Developer as provided in this section. Thereafter, Franchisor may, directly or indirectly, open and operate Tully's outlets within the Development Area subject only to Developer's rights under any individual franchise agreements. After termination of Developer's development rights hereunder, provided Developer is not in material breach of any of Developer's franchise agreements, Developer shall have the right and obligation to continue to own and operate each franchised outlet then in operation pursuant to and subject to the terms of the applicable franchise agreement. Developer shall then lose the opportunity and obligation to enter into new or renewal franchise agreements pursuant to this Development Agreement, but will be permitted, if not in breach thereof, to continue to operate franchised outlets pursuant to applicable franchise agreements as previously modified pursuant to this Development Agreement and to execute renewals of those franchise agreements pursuant to their terms as previously modified pursuant to this Development Agreement. After a termination of Developer's development rights pursuant to this paragraph (ii), if Franchisor is offering franchises in the Development Area and Developer wishes to open one or more additional outlet(s) in that area, Developer may apply for a new franchise agreements on the terms then being generally offered by Franchisor.

### 1.03  New Franchise Agreement For Each Outlet.

(a) Before signing a lease or beginning construction or remodeling for any new outlet, Developer shall first obtain Franchisor's approval of the proposed location for the outlet, as provided in paragraph 4.03, and shall then execute a new franchise agreement for that outlet in the form then being offered to new individual franchisees by Franchisor. Each franchise agreement executed pursuant to this agreement shall have the following modifications, by addendum:

  (i) The Initial Franchise Fee for each franchised outlet shall be seventeen thousand dollars ($17,000.00);

  (ii) The Initial Term of each franchise agreement shall be ten years; thereafter, the term of each franchise agreement shall be the same as those Franchisor is generally offering;

Tully's
**DEVELOPMENT AGREEMENT**
DA-03A
Page 2

*Initials*

(iii)  The Royalty shall be five percent (5.0%) of Gross Revenues for the ten year term of the franchise agreement;

(iv)  The Marketing Fee shall initially be two percent (2.0%) of Gross Revenues, and may be increased in Franchisor's sole discretion to not more than four percent (4.0%) of Gross Revenues during the ten year term of the franchise agreement;

(v)  If Franchisor provides training for baristas and others, subsequent to Developer's initial training, Franchisor may do so by training one or more of Developer's employees who will then be designated an authorized trainer. Unless Developer has an authorized trainer on staff, Developer will be solely responsible for the costs of having Franchisor provide training for baristas and other employees.

(vi)  In the event of a conflict or inconsistency between the Development Agreement and any individual franchise agreement, the provisions of the Development Agreement shall prevail.

(vii)  Notwithstanding the provisions of any individual franchise agreement, the Territory for a Licensed Business Location may overlap with the territory or territories established for other location(s) that are subject to other franchise agreements between Franchisor and Developer. In the event of transfer of any individual franchise or franchise agreement to any third party, the assignee or transferee shall take subject to the overlapping territory(s).

### 1.04   Standards of Performance.

(a) Developer acknowledges and agrees that it is important to Developer, Franchisor and Franchisor's Marks and System (as defined in the Tully's Franchise Agreement) to maintain, at all times, uniform, a high quality, professional approach to Developer's operation of the Development Business. Franchisor may loan to Developer one or more manuals or other materials ("Manual") providing directions and guidelines for operation of the Development Business. Franchisor shall remain the owner of the Manual which Developer shall treat, at all times, as a trade secret. Franchisor shall have the right to modify the Manual at any time. Developer agrees that Franchisor's copy of the Manual shall be controlling if there is any question as to its contents. The Manual shall not modify any term of this Agreement. Developer shall, at all times, comply with all requirements contained in the Manual unless prohibited by applicable law. Developer shall use best efforts to protect all trade secrets and proprietary information of Franchisor.

### 1.05   No use of Franchisor's Name and Marks.

(a) Developer shall not use any name or registered trademark owned or controlled by Franchisor ("the Marks") in any Entity or assumed name or in connection with the Development Business. Developer may and shall use the Marks in connection with outlets owned by Developer pursuant to individual Tully's Franchise Agreements.

### Article 2.     TERM AND CONSIDERATION

### 2.01   Term.

(a) The term of this Development Agreement shall be for ten years from and after the Effective Date, as set forth below. Upon expiration of the initial ten year term, Developer will be permitted to renew this Agreement for one additional ten year term, provided that Developer is not then and has not been in material breach of this Agreement or of any other agreement between the parties, including franchise agreements, during the two years immediately preceding the expiration date. This renewal right is personal to Developer.

### 2.02   Consideration.

(a) In consideration for this Agreement, Developer shall pay to Franchisor, immediately upon signing, the greater of (a) _____ Thousand Dollars (US$_____) or (b) the amount which is computed by multiplying the population of the Development Area, as established by the most recent U.S. census update or other authoritative source designated by Franchisor, by five cents per person. The amount of the consideration is set forth in Exhibit A.

### Article 3.     REPORTS AND AUDITS

### 3.01   Records And Reports.

(a) Developer shall at all times maintain true and accurate business records in the manner specified by Franchisor. Developer shall, on a monthly basis or at such other intervals as specified by Franchisor, provide Franchisor with such report(s), in the form(s) specified by Franchisor, as Franchisor may require, and at such times as Franchisor may require, including, but not limited to corporate documentation, reports of construction process, status of site

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 3

Initials

**EXHIBIT A, PAGE 31**

selection, number and locations of all outlets, and all other information required by the Franchise Agreement as to specific outlets. By submitting any reports to Franchisor, Developer is certifying that they are true and correct. Franchisor may use data from the reports and financial documents in composite or statistical form for any purpose in Franchisor's sole discretion. Franchisor is authorized to obtain or verify the information and reports described herein by electronic means. Developer shall retain all business records for at least five (5) years or such longer period of time as may be required by applicable law. Franchisor shall have the right to audit Developer's records at any time during normal business hours, on reasonable notice. Franchisor shall have the right to enter the premises of any franchised Tully's outlet operated by Developer under this Agreement, during normal business hours, for purposes of inspecting the franchised Tully's outlet. During inspections, Franchisor may assess compliance with the System, the applicable franchise agreement and this Agreement.

## Article 4.    OPERATION OF DEVELOPMENT BUSINESS

### 4.01  Independent Contractor.

(a) Each party to this Agreement is and shall remain an independent contractor and shall control the manner and means of operation of its respective business and shall exercise complete control over and responsibility for all labor relations and the conduct of its agents and employees. Neither party shall be considered or held out to be agent(s), joint venturers, partners or employee(s) of the other, except as specifically authorized by this Agreement. Neither party shall negotiate or enter into any agreement or incur any liability in the name of or on behalf of the other unless, and to the extent, specifically authorized by this Agreement. Developer shall prominently display signs or legends at all times in the manner specified by Franchisor, indicating the name of the Developer and stating that the Development Business is independently owned and operated. Developer's business forms that bear the Marks shall contain Developer's name and a statement that the Development Business is independently owned and operated in such form as Franchisor may specify.

### 4.02  Development Enterprise Management.

(a) Throughout the term of this Agreement, the sole business activity of Developer shall be the development and management of the franchised Tully's outlets in the Development Area. Developer shall establish and maintain sufficient operational, administrative, management and other resources to open and operate the franchised Tully's outlets within the Development Area. Although Franchisor shall provide certain consultation, training and other support as provided in this Development Agreement and in the Franchise Agreement for each specific outlet, it shall nonetheless be the responsibility of Developer to provide the overall training, quality control, administration, accounting and management for Developer's Tully's outlets. At all times during the term of this Agreement, Developer shall employ a full-time senior manager as the principal executive officer for the Development Business and shall notify Franchisor in the event that any change is made with respect to the person designated as serving in this position. Developer shall have the ultimate authority and responsibility with respect to the operation and management of the Development Business in accordance with the Development Agreement and the franchise agreement for each Tully's outlet. In its reasonable discretion, Developer may contract with other service providers (who may be affiliates of Developer) to provide certain administrative and accounting services for Developer, but Developer shall be responsible for the actions of such service providers.

### 4.03  Site Selection.

(a) Developer shall be solely responsible for selecting the location for each of the franchised Tully's outlets in the Development Area. Developer shall select each such location, subject to Franchisor's approval. Developer shall not sign a lease, sub-lease or other obligation until after Developer has received Franchisor's approval of the location and lease or sub-lease, which approval shall be deemed to have been given if Franchisor provides Developer a franchise agreement for such location, for execution by Developer. Approval of the Premises or the lease or sub-lease by Franchisor does not constitute a representation or warranty by Franchisor that the Premises will be good and does not constitute a legal or other opinion as to any term of the lease or sub-lease.

### 4.04  Compliance With Laws.

(a) Developer shall be solely responsible, at Developer's sole cost and expense, for obtaining and maintaining all necessary or required permits and licenses in order to operate the Development Business. Developer is solely responsible for strictly complying with each and every law, ordinance and regulation applicable to the Development Business, including, but not limited to, licensing, health, safety, environmental, consumer and labor

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 4

_Initials_

regulations. Developer shall timely pay all applicable taxes as they come due, but may challenge the amount or applicability thereof; provided, that Developer hereby agrees to indemnify, hold harmless and defend Franchisor from any and all liabilities for taxes based upon Developer's operations.

### 4.05  Compliance with Methods and Standards

(a) Developer shall comply with all methods and standards of operation adopted from time to time by Franchisor for multi-unit franchise operators and developers, which methods and standards of operation shall not be inconsistent with the terms of this Agreement.

### Article 5.    INDEMNITY AND INSURANCE

### 5.01  Indemnity

(a) Developer shall defend, hold harmless and indemnify Franchisor, its officers, directors, shareholders, agents, employees, landlords and related companies from any and all losses, claims, damages, liabilities, or expenses of any kind or nature, including fines, penalties, interest, attorneys' fees, and all other types of costs or expenses, arising directly or indirectly from the acts or omissions (whether or not negligent or wrongful) of Developer or of any of Developer's manager(s), employees or agents in connection with the performance or breach of any obligation under this Agreement. Franchisor shall indemnify and hold harmless Developer, its officers, directors and shareholders from any losses, claims, damages, liabilities or expenses of any kind or nature, arising from the wrongful acts or omissions of Franchisor in connection with the performance or breach of any obligation under this Agreement.

### 5.02  Insurance

(a) Developer shall purchase and maintain, at Developer's expense, throughout the term of this Agreement commercial general liability insurance, including bodily injury, property damage, personal injury, advertising injury, non-owned automobile, and broad form contractual coverage for liability assumed under this Agreement. Such insurance shall be on an occurrence basis and shall consist of combined single limit coverage of at least two million dollars per occurrence/$two million annual aggregate, including umbrella liability coverage. Developer shall purchase and maintain worker's compensation and employer's liability insurance with a reputable insurer with a Best rating of not less than "A" or with a state agency. Developer shall purchase and maintain, at Developer's expense, adequate commercial property insurance for any office or other premises used in connection with the Business, including business income and extra expense coverage. Developer shall provide Franchisor with one or more certificates of insurance evidencing such coverages and naming Franchisor as an additional insured as to each applicable policy. Such certificate(s) of insurance shall provide that the coverages under the respective policy(ies) may not be modified (except to increase coverage) or canceled until at least thirty (30) days prior written notice of such cancellation or modification has been given to Franchisor. Upon request by Franchisor, Developer shall provide Franchisor with a true copy of any insurance policy.

### Article 6.    ENTITY DEVELOPER

### 6.01  Entity Definition.

(a) An "Entity" is any form of business organization except for a sole proprietorship and includes all kinds of corporations, limited liability companies, limited partnerships and general partnerships and any other form of business organization involving either multiple equity owners or which attempts to provide limited liability.

### 6.02  Founding Document Restriction.

(a) If Developer is an Entity or becomes an Entity or if Developer transfers Developer's interest under this Agreement or any interest in the Development Business to an Entity, the founding document(s) of the Entity must provide as follows:

This [insert type of Entity] shall not enter into any agreement or undertaking which would, directly or indirectly, limit any of the rights or obligations of the [insert type of Entity] or of any owner of the [insert type of entity] under the Tully's Development Agreement dated _____, _____. Any such agreement or undertaking is void.

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 5

_____|_____
*Initials*

### 6.03  Liability Of Owner(s).

(a) Except if Developer is a publicly traded Entity, every owner of an equity or other interest in any Entity Developer (and any individual person who is an owner of an Entity which owns any equity interest in any Entity Developer) shall personally guaranty this Agreement. Any change in or addition of equity or other owner(s) shall be subject to the Assignment or Transfer provisions of Article 7 and the and Death or Incapacity provisions of Article 8 of this Agreement.

### 6.04  Restriction On Certificates Of Ownership.

(a) Each and every document, if any, issued by any Entity Developer evidencing ownership of an equity or other interest in the Entity must provide as follows:

Ownership of this [insert type of Entity] is restricted and cannot be transferred, assigned, sold or encumbered except in strict compliance with the Tully's Development Agreement dated _____, ____. Any other transfer or attempted transfer is void.

### 6.05  Additional Requirements Of Entity Developer.

(a) Developer shall, upon Franchisor's request, provide Franchisor or its designee with true copies of such of Developer's Entity records and documents as Franchisor shall designate. An Entity Developer shall, at all times, have one individual person who shall be the designated principal who shall have authority to act on behalf of the Entity in all respects under this Agreement. The designated principal shall be the individual who is responsible for assuring compliance by the Entity with all of the terms of this Agreement. Notwithstanding the requirement of a designated principal, Franchisor shall be entitled to rely upon the acts or words of any principal, employee or agent of an Entity Developer whom Franchisor understands to be acting or speaking on behalf of the Entity.

## Article 7.    ASSIGNMENT OR TRANSFER

### 7.01  Prior Consent.

(a) Developer shall not assign, transfer, sell, sublease, sublicense or encumber (hereinafter collectively referred to as "Assign" or "Assignment"), in whole or in part this Agreement, the Developer, the Development Business, any option or first right of refusal relating to this Agreement, the Developer or the Development Business, the assets of the Development Business or the leasehold of the Development Business or represent to any person that such an Assignment has been made, without Franchisor's prior written approval. For purposes of this Article, the terms "Assign" or "Assignment" shall include any assignment, transfer, sale or encumbrance of any shares of stock of a Developer that is a corporation, any partnership interest of a Developer that is a partnership, any membership interest of a Developer that is a limited liability company, and any equity or ownership interest or rights in any other form of entity. Any attempted Assignment without Franchisor's prior written consent shall be void and a breach of this Agreement. The restrictions on transfer or assignment of ownership interests shall not apply to a Developer that is a publicly traded Entity.

### 7.02  Conditions Of Assignment of Development Agreement.

(a) As preconditions for obtaining Franchisor's consent to an Assignment, at least the following terms and conditions must be met:

  (i) Subject to Franchisor's approval hereunder, Developer may be permitted to sell or assign this Development Agreement, but, if at all, only in conjunction with the sale of all of its interest in all franchised outlets then owned and operated by Developer. Subject to the terms of the individual franchise agreements, Developer may be permitted to sell one or more individual outlets, but not less than all of Developer's interest therein and Developer shall not retain any royalty or similar interest in any outlet sold. No sale of an outlet by Developer shall reduce or modify the requirement that Developer be and remain in compliance with the Development Schedule.

  (ii) Developer must be current in payment of all fees and charges to Franchisor and any of its related companies and must be current with and in compliance with the Development Schedule;

  (iii) Developer must not be in material breach of this Agreement or of any other agreement between Franchisor and Developer;

  (iv) On or before closing of the sale transaction, Developer must have paid in full all debts in connection with this Agreement;

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 6

*Initials*

**EXHIBIT A, PAGE 34**

(v) The assignee must have agreed to assume all of the obligations of the Developer related this Agreement;

(vi) The assignee must execute a disclosure form containing a waiver and release of any claim against Franchisor for any amount(s) paid to, or representation(s) made by Developer or any omission by Developer to disclose facts, material or otherwise;

(vii) Developer must execute, at Franchisor's option, a mutual termination of this Agreement and a general release, or an assignment of this Agreement and a general release, and an agreement to defend, hold harmless and indemnify Franchisor from any claim by the assignee in a form specified by Franchisor;

(viii) The assignee must pay to Franchisor a Transfer Fee in the amount of Five Thousand Dollars ($5,000) and execute, at Franchisor's option, the then current form of Development Agreement or an assumption of this Agreement;

(ix) The assignee must, in the sole opinion of Franchisor, successfully complete any then current initial developer training program at the assignee's sole cost and expense;

(x) The assignee must have met the then current standards of Franchisor for experience, financial strength, reputation and character required of new or renewal Area Developers and multi-unit franchisees; and

(xi) Franchisor must have been given at least thirty (30) business days written first right of refusal by Developer, upon the same terms as those agreed upon by Developer with any proposed assignee; provided, however, Franchisor may substitute cash of equivalent value for any non-cash term. In the event Franchisor waives or fails to exercise its right of first refusal, if Developer thereafter agrees to accept a revised offer, regardless of the nature of the revision, Franchisor shall have a new right of first refusal hereunder on the new terms.

### 7.03  Assignment To An Entity.

(a) Notwithstanding the foregoing, if Developer is an individual, Developer may assign this Agreement to an Entity formed under the laws of the Developer's state, which is wholly owned by Developer; provided that the individual Developer shall first provide written notice of the assignment to Franchisor and shall personally guarantee the performance of this Agreement. If Developer is an Entity, Developer may assign this Agreement to another Entity, formed under the laws of the state where the Development Business is located, of the same or different form, which has exactly the same ownership, including percentages of ownership as Developer; provided that each of the individual equity or other owners of the new Entity shall personally guarantee the performance of the Agreement. The personal guarantee shall be in the form of Exhibit B hereto. No assignment under this paragraph shall change or limit the liability of any person or entity under this Agreement. Developer shall pay to Franchisor a processing fee of one thousand dollars ($1,000.00) for an assignment pursuant to this sub-paragraph.

### 7.04  Approval Process.

(a) Franchisor may use its own discretion in approving or rejecting prospective transferees in the same manner as if it was approving or rejecting any other new prospective developer or franchisee, taking into consideration such factors as their financial ability, character, business reputation, experience and capability to conduct the type of business involved. The approval of one Assignment does not obligate Franchisor to approve any other or subsequent Assignment. If Developer is an Entity, notwithstanding any statute or agreement to the contrary, the addition, withdrawal or expulsion of any equity or other owner or the transfer, encumbrance or assignment of any equity or ownership or control interest of any equity or other owner or the dissolution or reorganization of the Entity for any reason is subject to the same considerations as any other Assignment.

### 7.05  Transfer By Franchisor.

(a) There shall be no restriction upon Franchisor's right to encumber, transfer or assign this Agreement or the System. Following such a transfer or assignment, Franchisor shall have no further obligation or liability to Developer hereunder or otherwise so long as the assignee or transferee agrees to assume all of Franchisor's liabilities and obligations to Developer.  Upon Franchisor's request, Developer shall execute and deliver a certificate to Franchisor, as described in Paragraph 16.05, in connection with an anticipated transfer or financing procedure by Franchisor.  Developer agrees to accept any transferee of Franchisor, including any subfranchisor and perform for such transferee the same as for Franchisor.

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 7

_Initials_

**EXHIBIT A, PAGE 35**

### 7.06  No Sublicensing.

(a) Developer shall not, directly or indirectly, sublicense or attempt to sublicense the Marks or the System or any part thereof to any person or entity for any purpose. Any attempted or purported sublicense shall be void.

### Article 8.     DEATH OR INCAPACITY

### 8.01  Alternatives Upon Death Or Incapacity.

(a) In the event of the death or incapacity of an individual Developer, or of any individual equity or other owner of an Entity Developer, the heirs, beneficiaries, devisees or legal representatives of said individual shall, within ninety (90) days of such event:

  (i) Apply to Franchisor for the right to continue to operate under this Agreement for the duration of the term of this Agreement and any renewals hereof, which right to continue to operate will be granted upon the fulfillment of all of the conditions set forth in Article 7 of this Agreement (except that no transfer fee shall be required); or

  (ii) Sell, transfer or convey Developer's interest to a third party in compliance with the provisions of Article 7 of this Agreement; provided, however, in the event a proper and timely application for the right to continue to operate has been made and rejected, the ninety (90) days to sell, transfer or convey shall be computed from the date of said rejection. For purposes of this paragraph, Franchisor's silence on an application to continue to operate through the ninety (90) days following the event of death or incapacity shall be deemed a rejection made on the last day of such period.

### 8.02  Effect Of Failure To Comply.

(a) In the event of the death or incapacity of an individual Developer, or any owner of an equity or other interest in an Entity Developer where the provisions of this Article have not been fulfilled within the time provided, all rights granted to Developer under this Agreement shall, at the option of Franchisor, terminate.

### 8.03  Incapacity Defined.

(a) For purposes of this Agreement, "incapacity" is the inability of Developer to operate or oversee the operation of the Development Business on a regular basis and in the usual manner by reason of any continuing physical, mental or emotional disability, chemical dependency or other similar limitation which has continued or will more likely than not continue for a period of 60 consecutive days or more. Developer shall advise Franchisor in writing, immediately, upon receipt of advice from any physician or other professional that Developer or a principal of an Entity Developer has an incapacity. However, Developer's failure or inability to advise Franchisor of Developer's incapacity shall not limit Franchisor's rights under this sub-paragraph. Any dispute as to the existence of an incapacity as defined herein shall be resolved by majority decision of three (3) licensed medical physicians practicing in the state in which the Development Business is located, with each party selecting one (1) physician, and the two (2) physicians so designated selecting the third physician. The determination of the majority of the three (3) physicians shall be binding upon the parties and all costs of making said determination shall be borne by the party against whom it is made. Notwithstanding the foregoing, if any insurance company pays to the Developer or Developer's Entity any disability benefits for 60 consecutive days, or more, of disability, the Franchisor may regard that as conclusive evidence of incapacity.

### Article 9.     OPTION TO PURCHASE DEVELOPMENT BUSINESS

### 9.01  Franchisor May Purchase the Development Business.

(a) Upon ninety (90) days notice to Developer, Franchisor shall have the right, but not the obligation, to purchase all, but not less than all of the Development Business, including all of the Developer's rights under this Development Agreement; provided that Franchisor shall not exercise Franchisor's right under this Article 9 until after five years from the effective date of this Development Agreement;

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 8

_____|_____
*Initials*

**EXHIBIT A, PAGE 36**

## 9.02  Calculation of the Option Price.

(a) The option price shall be calculated as the greater of (a) one times Developer's total Gross Revenues for the twelve months preceding Franchisor's notice of election of its options hereunder (the "measurement year") or (b) Developer's total EBITDA for the measurement year times six, plus a sum calculated as the amount of Developer's Initial Fee herein divided by 120 and multiplied by the number of months remaining in Developer's Term.  Gross Revenues shall mean the Gross Revenues reported by Developer to Franchisor for purposes of determining Royalties to Franchisor for all of the Developer's Tully's outlets in the Development Area operating as of the date of Franchisor's notice but excluding the Gross Revenues for any outlet which will close prior to the purchase.  If any outlet is newly opened and had less than twelve full months of Gross Revenues, Gross Revenues for computation of the option price shall be computed on an annualized basis for the location.  EBITDA is defined as: earnings before interest, taxes, depreciation and amortization for all of Developer's Tully's outlets in the Development Area operating as of the date of Franchisor's notice.  If any outlet has negative EBITDA, its results shall be excluded from the computation of total EBITDA if the outlet will be closed prior to the date of purchase.  The parties agree that this formula results in a fair price to each party and does not result in a forfeiture or unjust enrichment for either party.

## 9.03  Documentation of the Purchase.

(a) Franchisor shall prepare and the parties shall execute such commercially reasonable documents as are necessary to implement the purchase of the Development Business, including bills of sale and lease assignments or sub-lease documents.  Developer shall fully assign its rights and interest in this Agreement to Franchisor, and the parties will execute a general release with respect to the Agreement.

### Article 10.   SUCCESSORS AND ASSIGNS

This Agreement shall bind and inure to the benefit of the successors, permitted transferees and assigns, personal representatives, heirs and legatees of the parties hereto.

### Article 11.   TERMINATION

## 11.01 Franchisor may terminate this Agreement as follows:

(a) Franchisor may terminate this Agreement upon at least thirty days notice and opportunity to cure (or longer if required by law) if Developer is in breach of any term of this Agreement or of any other agreement between Developer and Franchisor or any affiliate of Franchisor.

(b) Franchisor may terminate this Agreement upon at least 72 hours notice and opportunity to cure (or longer if required by law) for occurrence of any one or more of the following events (each of which Developer acknowledges is good cause for termination and a material breach of this Agreement), notwithstanding that Franchisor may have the option to give a longer notice and cure period pursuant to other provisions of this Agreement:

  (i) Developer fails to pay or deposit when due, and in the manner prescribed by Franchisor, any moneys owed to Franchisor or any of its related companies or to another Tully's developer or franchisee;

  (ii) Developer files a voluntary petition in bankruptcy or has an involuntary petition filed against Developer, Developer makes an assignment for the benefit of creditors, or a receiver or trustee is appointed;

  (iii) Developer violates or attempts to violate any of the Assignment provisions of this Agreement;

  (iv) Developer vacates, deserts, or otherwise abandons all or any substantial portion of the Development Business for more than 24 hours (whether or not Developer intends to abandon);

  (v) Developer sublicenses or attempts to sublicense the Marks or the System in violation of this Agreement;

  (vi) Developer is an Entity and an impasse exists between equity or other owners or there is any change in the ownership of any interest in the Entity without having first complied with the provisions of this Agreement;

  (vii) Developer fails to timely permit any audit or inspection by or on behalf of Franchisor;

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 9


*Initials*

(viii) Developer violates or fails to comply with any law, rule, regulation, ordinance or order relating to the operation of the Development Business (including any health codes, rules or regulations) or fails to obtain and continue any license, permit or bond necessary, in Franchisor's opinion, for Developer's operation of the Development Business;

(ix) Developer is convicted of or pleads guilty or no contest to any felony;

(x) Developer operates or attempts to operate the Development Business in violation of Section 1.05 of this Agreement;

(xi) Developer engages in any business dealings in relation with the Development Business or the Developer which are unethical, dishonest or otherwise could cause harm to the Marks, the System, Franchisor, other developers or franchisees, the goodwill associated with the Marks, or to any customer, client or vendor of Developer or any other developer or franchisee or the Franchisor;

(xii) Developer fails or refuses to timely execute and deliver a truthful certificate pursuant to paragraph 16.05;

(xiii) Developer fails to maintain insurance or workers compensation coverage; or

(xiv) Any other agreement, including any other Franchise Agreement to which Developer is a party, between Developer and Franchisor or between Developer and any of Franchisor's related companies is terminated for cause by Franchisor.

(c) Franchisor may terminate this Agreement without giving notice or opportunity to cure upon occurrence of any one or more of the following events (each of which Developer acknowledges is good cause for termination and a material breach of this Agreement), notwithstanding that Franchisor may have the option to give a longer notice and a cure period pursuant to other provisions of this Agreement:

(i) Upon three willful and material breaches of the same term of this Agreement occurring within a twelve-month period;

(ii) Developer is adjudicated a bankrupt or insolvent;

(iii) Developer makes an assignment for the benefit of creditors or similar disposition of the assets of the Development Business;

(iv) Developer voluntarily abandons the Development Business; or

(v) Developer is convicted of or pleads guilty or no contest to a charge of violating any law relating to the Development Business.

(d) Notwithstanding any right of Franchisor to terminate this Agreement, pursuant to this Agreement or otherwise, Franchisor may, in Franchisor's sole discretion, elect to not terminate this Agreement and to, in lieu thereof, impose limitations on Developer, including, but not limited to, limitation or revocation of Developer's Territorial rights, and revocation of Developer's rights to acquire or offer and sell certain products and services. Franchisor's election to not terminate this Agreement pursuant to this paragraph shall not constitute an election of remedies and Franchisor may, thereafter, terminate this Agreement on account of the same or any other event(s) of default as set forth herein.

### 11.02 Developer may terminate this Agreement as follows:

(a) At any time, upon not less than ninety (90) days prior written notice to Franchisor, Developer may secure a release from Developer's continuing obligations under this Agreement by executing a Developer's Release Agreement in substantially the form of Exhibit E and by electing one of the alternatives contained in the Developer's Release Agreement. Upon receipt of a notice pursuant to this paragraph, Franchisor may, but is not obligated to, accelerate the effective date of Developer's termination to such date as Franchisor may select in Franchisor's sole discretion.

### Article 12.    COMPETITION WITH FRANCHISOR

### 12.01 Competing Business Activities During Term.

(a) During the term of this Agreement, Developer shall not engage, directly or indirectly, either personally or as an employee, partner, member, manager, franchisor, subfranchisor, developer, franchisee, agent, consultant, shareholder, director, officer, advisor or otherwise, in any other business the same as or similar to that defined under "Development Business" herein or which is or would directly or indirectly compete with the Development

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 10

Initials

Business or otherwise with the business of Franchisor or with any other developer or franchisee of Franchisor. This prohibition includes, but is not limited to, any retail business offering and selling espresso and coffee drinks, baked goods, juice drinks and other complementary items. Developer shall not operate any other business from the premises of its Tully's outlets. Developer shall not use nor knowingly permit any affiliate, employee, director, or agent of Developer to use any Trade Secret(s) of Franchisor or the Marks or anything resembling the Marks in connection with any other business, whether or not such other business is owned, controlled by or associated with Developer, without the prior written authorization of Franchisor.

## 12.02 Competing Business Activities After Term.

(a) Developer covenants and agrees that, at no time will Developer, directly or indirectly, disclose or cause or permit to be disclosed, sell, or otherwise transfer to any party other than Franchisor, including, but not limited to, a person or Entity, for or not for consideration, the Trade Secrets, or any part thereof;

(b) Developer covenants and agrees that, for a period of twenty-four (24) months following the effective date of any termination, expiration or non-renewal of this Development Agreement ("the Termination Date"), Developer will not, individually or together with another, directly or indirectly, on its own behalf or on behalf of or through any other person, sole proprietorship, or Entity, do any of the following:

   (i) Compete with Franchisor or any developer or franchisee of Franchisor within a twenty mile radius of the boundary of Developer's designated Territory, as it existed immediately before the Termination Date, in the development, ownership or operation of any retail business offering and selling espresso and coffee drinks, baked goods, juice drinks and other complementary items, any aspect of such business as it exists on the Termination Date, or any business substantially similar thereto or tending to compete for the same customers as Franchisor or its developers or franchisees ("Prohibited Activities");

   (ii) Solicit, take away, or divert, and/or influence or attempt to influence any customers, developers, franchisees, vendors, clients, and/or patrons of Franchisor or of any developer or franchisee of Franchisor, which customers, developers, franchisees, vendors, clients, and/or patrons were served by Franchisor or a developer or franchisee of Franchisor at any time during the four (4) years preceding the Termination Date, to transfer or divert their business or patronage from Franchisor or Franchisor's developer(s) or franchisee(s) to any other person or Entity engaged in the Prohibited Activities or anything similar to the Development Business;

   (iii) Solicit or attempt to hire any person who was an employee of Franchisor or of any other developer or franchisee of Franchisor during the one (1) year period ending on the Termination Date, or attempt to influence any such person to terminate his employment with Franchisor or Franchisor's developer(s) or franchisee(s).

(c) Developer covenants and agrees that, for a period of twenty-four (24) months from the Termination Date, Developer will not, individually or together with another, directly or indirectly, through others or on its own behalf, hold any ownership or have a financial or other interest in, be employed by, or otherwise have any ownership or management relationship with, any person or Entity, either as principal, broker, member, agent, stockholder of any class, or as a partner, officer, director, trustee, franchisee, franchisor, subfranchisor, developer, employee, consultant, lender, guarantor, member of a board of directors or board of trustees, or in any other capacity, which does any of the following:

   (i) Competes with Franchisor or any developer or franchisee of Franchisor;

   (ii) Solicits, takes away, or diverts, and/or influences or attempts to influence any customers, clients, developers, franchisees, vendors, and/or patrons of Franchisor or of any other developer or franchisee of Franchisor, which customers, clients, developers, franchisees, vendors, and/or patrons were served by Franchisor or any developer or franchisee of Franchisor at any time during the four (4) years preceding the Termination Date, to transfer or divert their business or patronage from Franchisor or any other developer or franchisee to any other person or Entity engaged in the Prohibited Activities or anything similar to the Development Business;

   (iii) Solicits or attempts to hire any person who was an employee of Franchisor or of any other developer or franchisee of Franchisor during the two (2) year period ending on the Termination Date, or attempts to influence any such person to terminate his employment with Franchisor or any developer or franchisee of Franchisor.

(d) Developer covenants and agrees that, at no time will Developer, directly or indirectly, through others or on its own behalf, hold any ownership or have a financial or other interest in, be employed by, or otherwise have any ownership or management relationship with, any person or Entity, either as principal, broker, agent, stockholder of any class, or as a member, partner, officer, director, trustee, developer, franchisee, Franchisor, employee,

Tully's
**DEVELOPMENT AGREEMENT**
DA-03A
Page 11

_Initials_

**EXHIBIT A, PAGE 39**

consultant, lender, guarantor, member of a board of directors or board of trustees, or in any other capacity, which, discloses or causes to be disclosed, sells, or otherwise transfers to any party other than Franchisor, including, but not limited to, a person, sole proprietorship, partnership, joint venture, firm, limited liability company, corporation, trust, or other Entity, for or not for consideration, the Trade Secrets, or any part thereof;

(e) Developer acknowledges and agrees that the periods of time of this covenant and the geographical areas of restriction imposed by this covenant are fair and reasonable and are reasonably required for the protection of Franchisor and its developers and franchisees. Developer would desire at least this same protection against competitive activities by another former developer whose Development Agreement was either expired, terminated or non-renewed. Developer agrees that, in the event a court or arbitrator should determine any part of this covenant to be excessively broad, unenforceable, and/or invalid, the remaining parts hereof shall nevertheless continue to be valid and enforceable as though the invalid portions were not a part hereof. Developer further agrees that, in the event that any of the provisions of this Agreement relating to the geographic area of restriction or the periods of time of the covenants shall be deemed to exceed the maximum area or periods of time which a court of competent jurisdiction or duly selected arbitrator would deem enforceable, the geographic area or periods of time shall, without further action on the part of any person, be deemed to be modified, amended and/or limited, to the maximum geographic area or time periods which a court of competent jurisdiction or duly selected arbitrator would deem valid and enforceable in any jurisdiction in which such court shall be convened. Any such modification shall apply only in the jurisdiction of the deciding court or in the state where the arbitrator made the decision.

(f) It shall not be a violation of this Article for Developer to have or maintain a passive investment in stock of any publicly traded corporation, provided said stock holdings shall not exceed five percent (5%) of the issued and outstanding stock of such corporation.

(g) For purposes of this Agreement, all references to Franchisor shall be deemed to include: (a) any corporation or entity which acquires all, or substantially all, of the assets of Franchisor, whether by statutory merger or otherwise, (b) any corporation, partnership, or other entity directly or indirectly controlled by or under common control with Franchisor or its successor, and (c) any subfranchisor or other assignee of Franchisor.

(h) Developer agrees that it would be extremely difficult to prove with certainty the exact amount of damages caused to Franchisor by a violation of this Article 12 by Developer and therefore, Developer agrees that, upon proof that Developer violated this Article 12, Franchisor shall be entitled to liquidated damages in an amount calculated by multiplying the amount of gross revenues generated by Developer or a third party that benefited from the violation during the period of breach and multiplying it by 1.5. Developer acknowledges that this results in a reasonable estimate of what Franchisor's actual damages would be and is not a penalty.

(i) Developer agrees that any violation of the covenants contained in this Article will cause irreparable harm to Franchisor and its other developers and franchisees and may, as a matter of course, be restrained by process issued out of a court of competent jurisdiction, in addition to any other remedies provided by law. In the event of any action for a temporary or permanent injunction to enforce this Covenant, Developer hereby waives any requirement of a bond to the extent that any bond would exceed one hundred dollars. The substantially prevailing party in any such enforcement action shall be entitled to recover their attorneys fees and costs incurred therein in addition to any and all other remedies.

(j) Nothing in this Article shall obligate Franchisor to take action to enforce this or any other covenant against competition against any other developer, franchisee or former developer or franchisee. Nothing in this Article shall entitle Developer to take any action to enforce this or any other covenant against competition against any other developer or franchisee or former developer or franchisee.

(k) The terms of this Article shall survive the termination or expiration of this Agreement for any reason.

## Article 13.   EFFECT OF TERMINATION

### 13.01 Loss Of Rights.

(a) After the Termination Date, Developer shall have no further rights to use, in any manner, the System, the Marks, anything similar to the Marks, the telephone numbers, the telephone listings, any proprietary computer software licensed, purchased or otherwise obtained from Franchisor, any trade secrets or the Manual. Developer shall immediately notify such persons as Franchisor shall reasonably require of Developer's loss of rights thereto. All sums of money due from Developer to Franchisor or to any other Tully's developer or franchisee as of the

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 12

_Initials_



Termination Date shall become immediately due and payable. Developer specifically agrees to execute such document(s) as may be necessary to transfer the telephone number(s) to Franchisor or Franchisor's designee.

### 13.02 Change Of Identity.

(a) After the Termination Date, Developer shall immediately refrain from holding itself out to the public in any way as a Developer or affiliate of Franchisor or as a former Developer or affiliate of Franchisor. If Developer fails to make such changes within ten (10) calendar days, then Franchisor shall have the right to enter upon the Developer's premises, without liability for trespass or otherwise, and to make or cause to be made such changes at the expense of Developer, which expenses shall be paid by Developer upon demand. Developer shall immediately file the appropriate forms to abandon or withdraw any assumed name certificate or to change the name of its corporation or partnership to eliminate any reference to the System or the Marks. If Developer fails or refuses to cooperate with Franchisor, Developer hereby appoints Franchisor as its Attorney in Fact to complete the changeover. Developer shall immediately return to Franchisor the Manual, Trade Secrets, bulletins, instruction sheets, software, forms, Marks, designs, signs, printed matter and other material containing any part of the System or the Marks together with all copies thereof (including electronic or digital copies) that are or have been within Developer's custody or control. Developer shall retain no copies whatsoever of any such materials in any form.

### 13.03 Operation of Franchised Outlet(s) after Termination Date.

(a) Notwithstanding the provisions of Article 12 and Paragraphs 13.01 and 13.02, after the Termination Date, provided Developer is not in material breach of Developer's relevant franchise agreement(s) and was not in material breach of the Development Agreement as of the Termination date, Developer shall have the right and obligation to continue to own and operate each franchised outlet then in operation pursuant to and subject to the terms of the applicable franchise agreement.

### 13.04 Option To Purchase Certain Assets.

(a) Franchisor shall have and is hereby granted an exclusive option for a period of sixty (60) days from and after the Termination Date, to purchase from Developer all of Developer's right, title and interest in all or any part of the Development Business and business assets and/or the Developer's premises, if applicable, at the fair market value, except as otherwise specifically provided herein, of all assets purchased, but excluding any value for purported "goodwill" or "blue sky". Developer acknowledges that Franchisor already owns the "goodwill" or "blue sky", which is attached to the Marks. Franchisor's notice exercising the option granted herein shall contain a list, at least by major category, of the assets Franchisor is purchasing. Franchisor shall not be obligated to assume any liabilities of Developer.

### 13.05 Payment And Terms.

(a) Franchisor shall pay to Developer all sums due pursuant to this Article, and any other sums required by this Agreement or by law, over a period of sixty months, or such shorter period as Franchisor, in its sole discretion, shall elect, with interest thereon at the prime interest rate as published by Bank of America or its successor, if applicable, determined as of the end of the calendar quarter immediately preceding the Termination Date.

### 13.06 Survival Of Terms.

(a) The terms of this Article shall survive the termination, non-renewal or expiration of this Agreement for any reason.

### Article 14.    ARBITRATION OF DISPUTES.

### 14.01 Agreement to Arbitrate.

(a) Except as provided in paragraph 14.04, any controversy or claim or dispute between the parties hereto or between any party hereto and any other person arising out of or relating to this Agreement, the negotiation thereof, the offer or acceptance thereof, the legality thereof, or the performance or breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. This Article shall be governed by the Federal Arbitration Act. Any arbitration shall be before a panel of three arbitrators and shall take place in Seattle, Washington, U.S.A. No party shall join or attempt to join their claims in a single proceeding with the claims of any other party, person or entity even if similarly situated. The parties shall bear their own expenses, including their own attorneys fees and costs and shall share equally all expenses of the arbitrator.

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 13

_____
*Initials*

**EXHIBIT A, PAGE 41**

### 14.02 Conduct of Arbitration.

(a) Unless otherwise specifically required by applicable law, a demand for arbitration or proceedings in arbitration, or court proceedings shall not operate to stay, postpone, prohibit or rescind any expiration, termination or non-renewal of this Agreement as provided in this Agreement, and the parties will be limited to their remedy in damages, as determined by the court or arbitrator, for non-renewal or termination found by the arbitrator to be wrongful. Damages would be an adequate remedy for any such wrongs. The court or arbitrator shall not extend, modify or suspend any of the terms of this Agreement or the reasonable standards of business performance set by Franchisor. The arbitrators shall permit discovery between the parties pursuant to the Federal Rules of Civil Procedure.

### 14.03 Conditions Precedent to Arbitration.

(a) As conditions precedent to commencing an arbitration proceeding pursuant to this Agreement, the parties shall first comply with the terms of this paragraph 14.03. Failure to comply with this paragraph shall be a material breach of this Agreement and shall entitle the non-defaulting party to an award of all of their attorneys fees and costs reasonably expended in enforcing the terms of this paragraph. Such award of attorneys fees shall be made by the court enforcing this paragraph and shall be paid by the breaching party before and as a condition precedent to further proceeding in accordance with this Article. For the limited purpose of enforcing this paragraph 14.03, each party hereby waives arbitration and the matter shall be heard in the King County Superior Court in Seattle, Washington. Within not more than sixty days following the date on which the aggrieved party first discovered or reasonably should have discovered the facts of a dispute between the parties, but not more than one year after the date of the events or facts which gave rise to the dispute, the aggrieved party shall give a Notice to the other party (and any involved other persons) of the existence of the dispute, and shall set forth, in writing, a detailed description of the relevant facts together with a reasonably detailed description of the legal basis of the claim. The Notice shall include a detailed description by the aggrieved party of the remedy or outcome desired. The non-aggrieved party shall respond to the Notice within thirty days following its receipt. If the Notice and response does not resolve the dispute, the parties shall meet, in person, within sixty days following the date of the non-aggrieved party's response, in the corporate offices of the Franchisor, and attempt to informally resolve the matter. If the informal meeting does not resolve the matter, the parties shall, within sixty days following the date of the informal meeting, submit to non-binding mediation in Seattle, Washington with a mediator selected according to the rules of the American Arbitration Association. If the dispute is not resolved through mediation, then either party may commence an arbitration proceeding, but must do so within ninety days following the date that either party or the mediator has declared the mediation terminated. The demand for arbitration shall contain a certificate by the party commencing arbitration that the party has fully complied with every provision of this paragraph 14.03. Copies of the Notice and the response thereto exchanged pursuant to this paragraph shall be attached to the demand for arbitration and the issues in the arbitration shall be limited to matters contained therein.

### 14.04 Limited Exceptions to Arbitration and Mediation.

(a) The requirements of paragraphs 14.01, 14.02, and 14.03 shall not apply to actions for the purpose of collecting unpaid money pursuant to this Agreement or to actions for the purpose of enforcing Franchisor's rights in the Marks (both for injunctive relief and damages), the Trade Secrets or the covenant against competition. Such actions and claims are not submitted to arbitration. Any such actions and claims shall be brought in the King County Superior Court in Seattle, Washington, U.S.A. Any counterclaims to such actions and claims are submitted to arbitration and shall be subject to paragraphs 14.01, 14.02 and 14.03.

### Article 15.   REPRESENTATIONS OF DEVELOPER

### 15.01 Representations

(a) Developer represents and warrants as follows:

(i) Developer is not currently a party to or subject to any contract or agreement, including any franchise agreement, employment agreement or any covenant not to compete which would directly or indirectly be breached by entering into this Agreement or which would directly or indirectly prohibit or restrict Developer's signing of this Agreement or performance thereunder;

(ii) Developer is executing this Agreement and purchasing the license herein for Developer's own account and not as an agent or representative of another (unless for an Entity otherwise named herein and in compliance herewith);

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 14

*Initials*

(iii) Developer intends to be actively involved in the Development Business for the entire term of this Agreement and knows of no reason that he/she might become a passive owner;

(iv) Developer is basing Developer's decision to execute this Development Agreement, in full, upon statements and representations contained in this Agreement and the Tully's Uniform Franchise Offering Circular and upon facts obtained pursuant to Developer's own investigation. Developer is not relying upon any statements or any information received either directly or indirectly from Franchisor or any person acting or purporting to act on behalf of Franchisor which information or statements are not contained in this Agreement or the Tully's Uniform Franchise Offering Circular or otherwise in writing and signed by an officer of Franchisor. Developer has not received any earnings claims or financial performance information, directly or indirectly, from Franchisor excepting only such information as may be contained in Item 19 of the Tully's Uniform Franchise Offering Circular.

(v) Developer has received, read and understood the Tully's Uniform Franchise Offering Circular, in its entirety and has had ample opportunity to consult with Developer's independent counsel and advisors before entering into this Development Agreement.

(vi) Developer has not terminated and will not terminate Developer's existing employment or cease any other income-producing activity until after Developer has begun operation of the Development Business. If Developer elects, notwithstanding this sub-paragraph to terminate employment or income-producing activity, Developer knowingly assumes the risk of loss of income and does so contrary to Franchisor's advice.

### Article 16.   MISCELLANEOUS PROVISIONS

#### *16.01 Nonwaiver.*

(a) No act or omission or delay in enforcing a right by either party shall waive any right under or breach by the other of this Agreement unless such party executes and delivers a written waiver. The waiver by either party of any right under or breach of this Agreement shall not be a waiver of any subsequent or continuing right or breach.

#### *16.02 Attorneys Fees.*

(a) In the event that legal action is properly commenced in court by either party to enforce this Agreement or to determine the rights of any party, as permitted by paragraph 14, including any appeal proceeding, the substantially prevailing party, in addition to any other remedy, shall be entitled to receive its reasonable actual attorneys fees and costs, including expert fees and fees on appeal.

#### *16.03 Severability.*

(a) In the event that any of the provisions, or portions thereof, of this Agreement are held to be unenforceable or invalid by any court of competent jurisdiction or by an arbitration panel, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected thereby, and full effect shall be given to the intent manifested by the provisions, or portions thereof, held to be enforceable and valid, unless such invalidity shall pertain to the obligation to pay fees, in which event this Agreement shall terminate.

#### *16.04 Warranty Of Authority.*

(a) Each person signing this Agreement for or on behalf of any party to this Agreement warrants that he/she has full authority to sign and to legally bind the party.

#### *16.05 Estoppel Certificate*

(a) In the event that Franchisor is considering transferring, assigning or encumbrancing this Agreement, the System, or any other of Franchisor's rights or assets, or upon request by Franchisor at any time, Developer shall, within ten (10) calendar days after Franchisor shall request the same, execute, acknowledge and deliver to Franchisor, a written certificate that (a) this Agreement is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Agreement as so modified is in full force and effect); (b) the date to which royalties or other charges have been paid in advance, if any; (c) there are not, to Developer's knowledge, any uncured defaults on the part of Franchisor or Developer hereunder, or specifying such defaults if any are claimed; (d) setting forth the dates of commencement and expiration of the Term of this Agreement; (e) Developer has and knows of no basis for any claims of any kind against Franchisor (or, if Developer has or knows of any such claims, a detailed statement of all such claims and a statement that Developer has and knows of no other claims); and (f) any other matter upon which certification is requested by Franchisor or a prospective

Tully's
**DEVELOPMENT AGREEMENT**
<small>DA-05A</small>
Page 15

assignee or encumbrancer. Franchisor may rely upon any certificate given pursuant to this sub-paragraph as may any prospective purchaser or encumbrancer of all or any portion of Franchisor's rights hereunder. Any failure or refusal to timely execute a truthful certificate pursuant to this sub-paragraph shall be a material breach of this Agreement.

### 16.06 Paragraph Headings.

(a) The various paragraph headings are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement or any portion thereof.

### 16.07 Recitals.

(a) The recitals preceding the first numbered paragraph of this Agreement are hereby made part of this Agreement as if set forth within the numbered paragraphs. All references to "Developer" shall include all owners, parents and subsidiaries of Developer if Developer is an entity.

### 16.08 No Third Party Beneficiary.

(a) Nothing in this Agreement shall be construed to give Developer any rights as a third party beneficiary or otherwise arising out of any similar or other agreement(s) between Franchisor and any other developer(s) or franchisee(s). Nothing in this Agreement shall be construed to give to any other developer or franchisee or any other person any rights arising out of this Agreement. Any action or inaction by Franchisor with regard to any other developer's or franchisee's performance or non-performance as to any term of this or any similar agreement shall not give rise to any claims or rights in favor of Developer under this Agreement.

### 16.09 Choice Of Law.

(a) Except as otherwise specified herein, this Agreement shall be governed by and construed under the laws of the state or province in which the Development Business is located.

### 16.10 Notices.

(a) All notices required or permitted by this Agreement ("Notice" or "Notices") shall be sent to the respective parties at the addresses set forth herein. The place of Notice may be modified by appropriate Notice to the other party. All Notices shall be sent by certified mail, return receipt requested, postage prepaid, personally delivered, or by facsimile, overnight delivery, or telegraph. Notices shall be deemed given at the earlier of (a) receipt by the addressee, including by facsimile or electronic mail, (b) two (2) days following deposit with the United States Postal Service or its successor, with postage prepaid, or (c) immediately upon refusal of delivery by the addressee.

### 16.11 Entire Agreement.

(a) This document, together with any exhibits and addenda appended hereto, constitutes the full and complete agreement between the parties hereto with respect to the subject matter hereof. There are no verbal or other agreements that affect or modify this Agreement. Any prior or contemporaneous representations, promises, contracts or agreements not contained in this Agreement or the Uniform Franchise Offering Circular presented herewith are hereby fully superseded.

### 16.12 Modification.

(a) This Agreement shall not be modified or changed except by a written agreement executed by an officer of Franchisor. No approval of a deviation from the terms of this Agreement shall be valid unless signed by an officer of Franchisor.

### 16.13 Effective Date.

(a) This Agreement shall have no force or effect unless and until signed by an officer of Franchisor. The Effective Date shall be the date of such corporate signature, as indicated below. Notwithstanding the order of signatures, this Agreement shall be deemed made and entered into in the state where the Development Business is located.

### 16.14 Time Of Essence.

(a) Time is of the essence of this Agreement.

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 16

_Initials_

 Hwang! S...a / Does

### Article 17.   BUSINESS RISK.

*17.01 No Promises.*

(a) Developer has been informed by Franchisor, realizes and acknowledges that the business venture contemplated by this Agreement involves business risks and its success or failure will be largely dependent upon Developer's abilities in operating and managing the Development Business. Except to the extent expressly set forth in the Tully's Uniform Franchise Offering Circular, neither Franchisor nor anyone acting or purporting to act on behalf of Franchisor has made any promises or warranties, expressed or implied, as to Developer's potential sales, profits or success or the cost effective availability of good locations. As to those issues, Developer has made its own investigation and evaluation.

### Article 18.   RECEIPT FOR DISCLOSURE DOCUMENT.

(a) Developer has received a copy of this Agreement and the Tully's Uniform Franchise Offering Circular at least ten (10) days before signing this Agreement or paying any fee to Franchisor. Developer has received a complete copy of this Agreement and all exhibits and addenda, with all material blanks filled in, at least five (5) days before signing this Agreement. Developer has been encouraged and provided ample opportunity to consult an attorney or other advisor(s) of its own choosing before entering into this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year indicated below.

Dated: 8/13/2008 (the "Effective Date")

Date signed: 8/7/08

**FRANCHISOR:**
Tully's Coffee Corporation

By _____ , its President
Tully's Coffee Corporation
3100 Airport Way South
Seattle WA 98134
206-233-2070
Fax: 206-233-2075

**DEVELOPER:**

JH Development, LLC
By: _____
CEO
6281 Beach Blvd., Ste. 156
Buena Park, CA 90621

Tully's
**DEVELOPMENT AGREEMENT**
DA.doc
Page 17

Initials



Hwang/ SoCal / Docs

## Article 17.   BUSINESS RISK.

### 17.01 No Promises.

(a) Developer has been informed by Franchisor, realizes and acknowledges that the business venture contemplated by this Agreement involves business risks and its success or failure will be largely dependent upon Developer's abilities in operating and managing the Development Business.  Except to the extent expressly set forth in the Tully's Uniform Franchise Offering Circular, neither Franchisor nor anyone acting or purporting to act on behalf of Franchisor has made any promises or warranties, expressed or implied, as to Developer's potential sales, profits or success or the cost effective availability of good locations.  As to those issues, Developer has made its own investigation and evaluation.

## Article 18.   RECEIPT FOR DISCLOSURE DOCUMENT.

(a) Developer has received a copy of this Agreement and the Tully's Uniform Franchise Offering Circular at least ten (10) days before signing this Agreement or paying any fee to Franchisor.  Developer has received a complete copy of this Agreement and all exhibits and addenda, with all material blanks filled in, at least five (5) days before signing this Agreement.  Developer has been encouraged and provided ample opportunity to consult an attorney or other advisor(s) of his own choosing before entering into this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year indicated below.

Dated: ___8 | 13 | 2008___ (the "Effective Date")

**FRANCHISOR:**
Tully's Coffee Corporation

By _____ its _President_

Tully's Coffee Corporation
3100 Airport Way South
Seattle WA 98134
206-233-2070
Fax: 206-233-2075

Date signed: ___8/7/08___

**DEVELOPER:**

JH Development, LLC
By: _____
CBO
6281 Beach Blvd., Ste. 156
Buena Park, CA 90621

Tully's
**DEVELOPMENT AGREEMENT**
Page 17

_____
Initials

### Article 17.   BUSINESS RISK.

#### *17.01 No Promises.*

(a) Developer has been informed by Franchisor, realizes and acknowledges that the business venture contemplated by this Agreement involves business risks and its success or failure will be largely dependent upon Developer's abilities in operating and managing the Development Business.  Except to the extent expressly set forth in the Tully's Uniform Franchise Offering Circular, neither Franchisor nor anyone acting or purporting to act on behalf of Franchisor has made any promises or warranties, expressed or implied, as to Developer's potential sales, profits or success or the cost effective availability of good locations.  As to those issues, Developer has made its own investigation and evaluation.

### Article 18.   RECEIPT FOR DISCLOSURE DOCUMENT.

(a) Developer has received a copy of this Agreement and the Tully's Uniform Franchise Offering Circular at least ten (10) days before signing this Agreement or paying any fee to Franchisor.  Developer has received a complete copy of this Agreement and all exhibits and addenda, with all material blanks filled in, at least five (5) days before signing this Agreement.  Developer has been encouraged and provided ample opportunity to consult an attorney or other advisor(s) of its own choosing before entering into this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the day and year indicated below.

Dated: _____ (the "Effective Date")        Date signed: _____ 7/7/08 _____

**FRANCHISOR:**                                             **DEVELOPER:**
Tully's Coffee Corporation

By _____                                   JH Development, LLC
_____, its _____                       By: _____
Tully's Coffee Corporation                                      CEO
3100 Airport Way South                                     6281 Beach Blvd., Ste. 156
Seattle WA 98134                                           Buena Park, CA 90621
206-233-2070
Fax: 206-233-2075

Tully's
**DEVELOPMENT AGREEMENT**
DA-05A
Page 17                                                    _____
                                                            *Initials*

**C.  Scope of Amendment:**

This Addendum amends the Development Agreement to the extent specifically set forth herein. This Addendum is personal to Developer and is not assignable without Franchisor's prior written consent. Any conflict between the terms of the Development Agreement and this Addendum shall be resolved in favor of the terms of this Addendum. Except as specifically amended by this Addendum, the Development Agreement shall remain in full force and effect as to all of its terms.

**IN WITNESS WHEREOF,** the parties have executed this Addendum on the day and year indicated below.

Dated: _8|13|2008_                            Date signed: _8/7/08_

**FRANCHISOR:**                               **DEVELOPER:**
Tully's Coffee Corporation                    JH Development, LLC

By _____                            By _____ 4. 1. Hwang _____

(Print Name) _Carl Pennington, Sr._          (Print Name) _YOUNGILL HWANG_

(Title) _President_                           (Title) ___ C E O ___

3100 Airport Way South
Seattle, WA 98134                             _____

206-233-2070                                  _____

## C. Scope of Amendment:

This Addendum amends the Development Agreement to the extent specifically set forth herein. This Addendum is personal to Developer and is not assignable without Franchisor's prior written consent. Any conflict between the terms of the Development Agreement and this Addendum shall be resolved in favor of the terms of this Addendum. Except as specifically amended by this Addendum, the Development Agreement shall remain in full force and effect as to all of its terms.

**IN WITNESS WHEREOF**, the parties have executed this Addendum on the day and year indicated below.

Dated: _____            Date signed: _____ Aug / 6 / 08 _____

**FRANCHISOR:**                           **DEVELOPER:**
Tully's Coffee Corporation                JH Development, LLC

By _____                By _____ Y. I. Hwang _____

(Print Name) _____      (Print Name) Young ill Hwang

(Title) _____           (Title) CEO

3100 Airport Way South
Seattle, WA 98134

206-233-2070

                                          _____
                                          _____

                                          _____

Tully's Development Agreement
**Exhibit F – Addendum to Development Agreement**
DA-05A                                                    _____|_____
F - 4                                                      *initials*

# EXHIBIT
## C

ASSET PURCHASE AND SALE AGREEMENT

**by and between**

**TULLY'S COFFEE COMPANY, a Washington corporation;**

**and**

**JH DEVELOPMENT, LLC, a California limited liability company**

1

EXHIBIT A, PAGE 51

This Asset Purchase and Sale Agreement ("**Agreement**") is entered into effective August 8, 2008 by and between Tully's Coffee Company, a Washington corporation ("**Seller**"), and JH Development, LLC, a California limited liability company ("**Buyer**").

## RECITALS

A.    Seller is the owner of certain assets, tangible and intangible, real and personal, which are used in Seller's business which includes selling at retail a menu of specialty espresso and coffee drinks, teas, baked goods, ice cream products, cold blended beverages, smoothies, juice drinks, and other food and beverage items, in retail locations throughout Washington, Oregon, California, and Idaho.

B.    Subject to the terms and conditions of this Agreement, Seller desires to sell, and Buyer desires to purchase all of the assets, inventory, equipment and fixtures of Seller and assume the leases associated with Seller's Business at the following five retail locations: (1) 8631 W. 3rd Street, Suite 311E, Los Angeles, CA 90048 ("**Cedars Sinai**"), (2) 2425 Colorado Avenue, Suite 118B, Santa Monica, CA ("**Santa Monica**"), (3) 20025 Lake Forest Drive, Lake Forest, CA 92630 ("**Lake Forest**"), (4) 1280 Bison Street, Suite D-1, Newport Beach, CA 92660 ("**Newport Beach**"), and (5) 4610 Barranca Parkway, Irvine, CA 92604 ("**Irvine**") (collectively, referred to as the "**Five Tully's Stores**").

C.    Seller and Buyer desire to have Buyer operate the Five Tully's Stores under a franchising arrangement.

THEREFORE, in consideration of the mutual promises set forth in this Agreement and *other good and valuable consideration, the parties agree as follows:*

1.    **Assets Being Purchased.** On the Closing Date, Seller will sell, transfer, assign, convey and deliver to Buyer, and Buyer will purchase from Seller, the following assets (the "**Assets**"), situated at the Five Tully's Stores subject to the terms and conditions of this Agreement:

1.1.    *Furniture, Fixture and Equipment.* The furniture, fixtures, equipment, and other tangible personal property listed on Schedule 1.1, together with all transferable rights of Seller.

1.2.    *Inventory.* All of Seller's inventory of saleable products and supplies.

1.3.    *Use of Trademarks.* With respect to trademarks, service marks and trade names used in the Business at the Five Tully's Stores, Seller and Buyer shall simultaneously execute an area developer agreement with a five-year term and individual franchise agreements for a term of not less than ten years, on terms and conditions materially identical to the agreement currently existing for University of California Berkeley location.

1.4    *Leases.* All of Seller's right, title, and interest in each of the real estate leases entered into by Seller with respect to the Five Tully's Stores (the "**Leases**"), listed in Schedule 1.4 and pursuant to paragraph 3.4 below; Seller shall make all payments on any leased equipement existing in the Five Tully's Stores for a period of xisty (60) days from Closing, after which time, Buyer shall either assume the leases or terminate them.

2

**EXHIBIT A, PAGE 52**

1.4.    *Conveyance; Title.*  Seller shall transfer, convey, and assign the Assets to Buyer free and clear of all liabilities, obligations, liens and encumbrances, pursuant to a Bill of Sale in a form to be agreed upon by the parties (the **"Bill of Sale"**), Lease Assignment Agreements for each of the Five Tully's Stores in a form to be agreed upon by the parties (the **"Lease Assignments"**), and such other general instruments of transfer and conveyance, in form and substance sufficient to vest in Buyer all right, title, and interest in and to the Assets.

2.    **Purchase Price.**  The Purchase Price for the Assets shall be as follows:  cash in the amount of One Hundred Fifty Thousand and 00/100 ($150,000.00) to be paid at the Closing. Except as provided for in this Agreement regarding the assumption or assignment of the Leases, or subletting of each of the Five Tully's Stores as agreed upon by the parties hereto, Buyer shall not assume and shall not be assigned to pay, perform, and discharge any liabilities of Seller of any kind or nature.

The allocation of the purchase price for tax purposes shall be set forth below.  This allocation of the Purchase Price is intended to comply with the requirements of the Internal Revenue Code, and all tax returns and reports filed by Seller and Buyer with the Internal Revenue Service or other taxing authorities with respect to this transaction shall be consistent with this allocation, provided however, that the remainder of this Agreement shall remain in full force and effect in the event that the allocation of the Purchase Price is challenged or modified upon audit by the Internal Revenue Service or any other taxing authority.

The total Purchase Price shall be allocated as follows:

| | |
|---|---|
| Furniture, Fixtures & Equipment | $75,000 |
| Goodwill | $60,000 |
| Inventory | $15,000 |
| **TOTAL** | **$150,000** |

3.    **Representations and Warranties of Seller and Shareholders.**  Seller represents and warrants to Buyer that the following are true and correct as of the date of this Agreement and will be true and correct as of the Closing Date:

3.1.    *Organization and Good Standing.*  Seller is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use.

3.2.    *Enforceability; Authority; No Conflict.*

(a)    This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms. Upon the execution and delivery by Seller of this document and any other agreement to be executed or delivered by Seller at the Closing (collectively, the **"Seller's Closing Documents"**), each of Seller's Closing Documents will constitute the legal, valid and binding obligation of the Seller, enforceable against the Seller, or its assigns or successors in interest, in accordance with its terms. Seller has the absolute and unrestricted right, power and authority to execute and deliver this Agreement and the Seller's Closing Documents to which it is a party and to perform its obligations under this Agreement and the Seller's Closing Documents, and such action has been duly authorized by all necessary action by Seller's shareholders and board of directors.

2

(b)     Neither the execution and delivery of this Agreement nor the consummation or performance of any of the contemplated transactions therein will, directly or indirectly (with or without notice or lapse of time):

(i)     Breach (a) any provision of any of the governing documents of Seller or (b) any resolution adopted by the board of directors or the shareholders of Seller;

(ii)    Breach or give any governmental body or other person the right to challenge any of the contemplated transactions or to exercise any remedy or obtain any relief under any legal requirement or any order to which any of the Seller entities, or any of the Assets, may be subject;

(iii)   Contravene, conflict with or result in a violation or breach of any of the terms or requirements of, or give any governmental body the right to revoke, withdraw, suspend, cancel, terminate or modify, any governmental authorization that is held by Seller or that otherwise relates to the Assets or to the business of Seller;

3.3.    *List of Assets.* The Assets include all of the operating assets necessary to operate the Five Tully's Stores. Such assets are listed in Schedule 1.1 attached hereto.

3.4.    *Leased Real Property.* Seller shall initially sublease to Buyer, and Buyer shall assume from Seller, all of its rights, title and interest in and to the leases for the Five Tully's Stores. Buyer shall, with Seller's good faith assistance, obtain assignments and/or renegotiation of the leases of The Five Tully's stores at the earliest possible time, but in no event later than the expiration of each such lease. If requested to do so, Seller shall use its reasonable efforts to assist Buyer, or its nominee, at no expense to Seller, in obtaining written consent to the lease assignments from the respective lessors. Seller shall provide Buyer copies of the existing leases for the Five Tully's Stores.

3.5.    *Title to Assets; Encumbrances.* Seller warrants that all Assets shall be sold to Buyer free of any and all encumbrances and that Seller has free and clear title to all assets contemplated in this transaction.

3.6.    *Condition of Assets.* Seller warrants that each item of tangible personal property is in good repair and good operating condition, is suitable for immediate use in the ordinary course of business or is free from latent and patent defects. Seller warrants that the use of the real properties for the various purposes for which they are presently being used is permitted as of right under all applicable zoning legal requirements. Additionally, Seller warrants that the improvements are in compliance with all applicable legal requirements, including those pertaining to zoning, building and the disabled, are in good repair and in good condition, and are free from latent and patent defects.

3.7.    *Brokers or Finders.* Neither Seller nor any of its representatives have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement.

4.      **Representations and Warranties of Buyer.**   Buyer represents and warrants to Seller and Seller's shareholders as follows:

3

4.1.    *Organization and Good Standing*.    Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California, with full power and authority to conduct its business as it is now conducted.

4.2.    *Enforceability; Authority; No Conflict*.

(a)    This Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against it in accordance with its terms.  Upon the execution and delivery by Buyer of this document and any other agreement to be executed or delivered by Buyer at the Closing (collectively, the "**Buyer's Closing Documents**"), each of Buyer's Closing Documents will constitute the legal, valid and binding obligation of the Buyer, enforceable against the Buyer, or its assigns or successors in interest, in accordance with its terms.  Buyer has the absolute and unrestricted right, power and authority to execute and deliver this Agreement and the Buyer's Closing Documents to which it is a party and to perform its obligations under this Agreement and the Buyer's Closing Documents, and such action has been duly authorized by all necessary action by Buyer's members and management.

(b)    Neither the execution and delivery of this Agreement nor the consummation or performance of any of the contemplated transactions therein will, directly or indirectly (with or without notice or lapse of time):

(i)    Breach (a) any provision of any of the governing documents of Buyer or (b) any resolution adopted by the management or the members of Buyer;

(ii)    Breach or give any governmental body or other person the right to challenge any of the contemplated transactions or to exercise any remedy or obtain any relief under any legal requirement or any order to which any of the Seller entities, or any of the Assets, may be subject;

(iii)    Contravene, conflict with or result in a violation or breach of any of the terms or requirements of, or give any governmental body the right to revoke, withdraw, suspend, cancel, terminate or modify, any governmental authorization that is held by Seller or that otherwise relates to the Assets or to the business of Buyer;

4.3.    *Brokers or Finders*.    Neither Buyer nor any of its representatives have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

4.4.    *License Agreement*.    Buyer agrees to enter into a Franchise Agreement with Seller consonant with the Seller's current Uniform Franchise Offering Circular.

5.    **Contingencies.**  This Agreement is subject to and conditional upon the following ("**Conditions**"):

5.1.    This transaction is for the Assets, and Seller acknowledges that Buyer will not assume any liability, other than those pro-rated at Closing.

4

6.      **Closing.**

6.1.    *Time and Place.*   The Closing of the transaction contemplated herein (the "**Closing**") shall take place at the corporate offices of Seller at 3100 S. Airport Way, Seattle, Washington on or before September 1, 2008 (the "**Closing Date**").

6.2.    *Buyer's Conditions of Closing.*   Buyer's obligation to purchase the Assets and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

(a)     All of Seller's representations and warranties in this Agreement shall have been accurate in all material respects as of the date of this Agreement, and shall be accurate in all material respects as of the time of the Closing as if then made; and

(b)     Seller shall have obtained any required release of any security interest in the Assets.

6.3.    *Seller's Conditions of Closing.*   All of Buyer's representations and warranties in this Agreement shall have been accurate in all material respects as of the date of this Agreement and shall be accurate in all material respects as of the time of the Closing as if then made.

6.4.    *Documents of Transfer.*   At the Closing, Seller shall deliver to Buyer, against delivery of the Purchase Price, a duly executed bill of sale (the "**Bill of Sale**") in a form to be agreed upon by the parties.

6.5.    *Physical Possession.*   At the Closing, Seller shall deliver actual physical possession of all Assets.

7.      **Covenants and Agreements of Seller and Buyer.**   In addition to their respective agreements set forth elsewhere in this Agreement, Buyer and Seller covenant and agree as follows:

(a) *Transfer of Warranties.*   Seller agrees that any and all operating instructions, maintenance instructions or manuals on equipment and other personal property, if any and if transferable, will be transferred to Buyer at the Closing.

(b) *Prorations; Utilities and Taxes.*   All property rent, personal property taxes and assessments, and common area maintenance reconciliations with respect to the Leases shall be prorated as of the Closing. All other reasonable and customary charges shall be prorated as of the Closing, including but not limited to telephone and utilities.

8.      **Indemnification.**

8.1     *Survival.*   The representations, warranties, covenants and agreements of the parties contained in this Agreement or in any certificate or agreement delivered in accordance with this Agreement shall survive the execution and delivery of this Agreement, any investigation

5

by or on behalf of any party, and the consummation of the transactions contemplated by this Agreement.

**8.2** *Indemnification By Seller.* Seller agrees to indemnify Buyer, and any of Buyer's subsidiaries, affiliates, directors, officers, employees and agents, and hold each of them harmless from and against all losses, costs, expenses, damages or liabilities, including reasonable attorneys' fees (collectively, "Damages"), incurred by any of them as the result of or directly related to: (a) any breach or inaccuracy of any representation or warranty of Seller made in this Agreement, (b) any failure by Seller to fulfill any of its covenants or other agreements contained in this Agreement or in any agreement delivered pursuant to this Agreement, (c) any liability or obligation of Seller to any third party not expressly assumed by Buyer in accordance with the terms of this Agreement, (d) Seller's conduct of the Business before the Closing including without limitation any amounts owed to trade creditors, or (e) all federal, state or local taxes measured by or with respect to the income of Seller (including any recapture of tax credits, depreciation, or other tax benefits), resulting from the consummation of the transactions contemplated in this Agreement.

**8.3** *Indemnification By Buyer.* Buyer will indemnify Seller and hold it harmless from and against all Damages incurred by Seller as a result of or directly related to: (a) any breach or inaccuracy in any representation or warranty of Buyer made in this Agreement, (b) any failure by Buyer to fulfill any of its covenants or other agreements contained in this Agreement or in any agreement delivered pursuant to this Agreement, or (c) Buyer's use of the Assets after the Closing.

**8.4** *Indemnification Procedures.*

**8.4.1** *Claim Notice.* Any claim for indemnification under this Section 8 must be made in writing, with notice delivered by the party seeking indemnification to the party from whom indemnification is sought within the Indemnification Period. The claim notice must specify in reasonable detail the nature and estimated amount of the Damages.

**8.4.2** *Third-Party Claims.* If the Damages specified in the claim notice relates to a third-party claim, the indemnifying person shall have fifteen (15) days after its receipt of the claim notice to notify the indemnified person whether the indemnifying person agrees that the claim is subject to indemnification pursuant to this Section 8 and whether the indemnifying person elects to defend such third-party claim at its own expense. If the claim relates to a third-party claim that the indemnifying person elects to defend, the indemnifying person shall control the defense or settlement of the claim and the indemnified person shall not consent to the entry of any judgment or settle the claim and shall reasonably cooperate with such defense or settlement. The indemnified person shall, however, be entitled to participate in the defense or settlement of such a third-party claim through its own counsel and at its own expense and shall be entitled to approve or disapprove any proposed settlement that would impose a duty or obligation on the indemnified person. If the indemnifying person does not timely elect to defend a third-party claim, or if the indemnifying person fails to conduct such defense with reasonable diligence, the indemnified party may conduct the defense of, or settle, such claim at the risk and expense of the indemnifying person. If the indemnifying person does not timely elect to defend a third-party claim, it can later assume the defense of such claim. In such event, the indemnifying person will reimburse the indemnified person for all costs and expenses of defense (including attorney fees) incurred by the indemnified person to defend the claim through the date the defense is assumed.

**8.4.3** *Claims Other Than Third-Party Claims.* If the claim does not relate to a third-party claim, the indemnifying person shall have thirty (30) days after receipt of the claim notice to notify the indemnified person in writing whether the indemnifying person accepts

6

liability for all or any part of the claim and the method and timing of any proposed payment. If the indemnifying person does not so notify the indemnified party, the indemnifying person shall be deemed to have accepted liability for all Damages described in the claim notice if: (a) the claim notice contains a statement that failure to respond will constitute acceptance of liability, and (b) the indemnified person sends a second claim notice by certified mail giving the indemnifying person an additional ten (10) days in which to respond and the indemnifying person does not deny liability within the ten-day period.

> (i)     Seller agrees to indemnify, defend and hold harmless Buyer from and against any and all claims, liabilities, losses, damages or expenses whether known or unknown which arise from Seller's past operation and ownership of the Business prior to the Closing.

> (ii)    Buyer agrees to indemnify, defend and hold harmless Seller from and against any and all claims, liabilities, losses, damages or expenses whether known or unknown which arise from Buyer's operation and ownership of the Business after the Closing.

9.     **Additional Acts or Documentation.** Seller and Buyer agree to execute and deliver such additional documents and instruments and take such actions as may be normal and customary to carry out the full intent and purpose of this Agreement.

10.    **Notices.** All notices required or permitted to be given hereunder shall be in writing and either delivered or sent by certified mail, return receipt requested, postage prepaid, to the parties at the following addresses:

| | |
|---|---|
| Seller: | Tully's Coffee Corporation<br>3100 S. Airport Way<br>Seattle, WA 98134<br>Attn: Andy Wynne, CFO |
| Buyer: | JH Development, Inc.<br>6281 Beach Blvd., Ste. 156<br>Buena Park, CA 90621<br>Attn: Young Ill Hwang, CEO |

11.    **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors in interest, but in no event shall any party be relieved of its obligations hereunder, without the express written consent of the other party, except as expressly provided herein.

12.    **Severability.** To the full extent possible each provision of this Agreement shall be interpreted in such fashion as to be effective and valid under applicable law. If any provision of this Agreement is declared void or unenforceable, such provision shall be deemed severed from this Agreement, which shall otherwise remain in full force and effect.

13.    **Governing Law and Venue.** This Agreement shall be deemed to be made under, and shall be construed in accordance with and shall be governed by, the internal laws of the State of Washington. Suit to enforce any provision of this Agreement or to obtain any remedy, with respect hereto, must be brought in a court of competent jurisdiction in King County, Washington; and each party hereto expressly and irrevocably consents to the jurisdiction of said court.

7

14.     **Entire Agreement; Captions**. This Agreement represents the entire Agreement and understanding of the parties. Captions and headings are for convenience only and shall not alter any provision or be used in construing this Agreement. Buyer's signatures needed for this Agreement may be in a form of facsimile and deemed to be original.

15.     **Time**. Time is of the essence of this Agreement and each and every provision hereof. Any extension of time granted for the performance of any duty under this Agreement shall not be considered an extension of time for the performance of any other duty under this Agreement.

16.     **Legal Questions and Attorney's Fees**. Any costs or charges incurred by any of the parties hereto for services by their attorneys, accountants or other professional advisors in connection with the preparation and execution of this Agreement and the closing of this transaction shall be borne and paid by the party incurring same.

17.     **Default and Remedies**. In the event of any anticipatory or other breach of this Agreement by any party hereto, or upon the failure of this transaction to Close due to the wrongful actions or failures to act of either the Buyer or Seller hereto, then this Agreement shall be deemed to be in default. In that event, the non-defaulting or non-breaching party may immediately cease performance and avail themselves of any and all remedies available hereunder or at law for such breach or default, including, in the case of default by Seller, Buyer's right to specific performance and, in the case of default by Buyer, Seller may pursue all available legal remedies against Buyer.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

        **BUYER:**
        JH Development, LLC

By: _____
        Young Ill Hwang
        CEO

        **SELLER:**
        Tully's Coffee Company

By: _____
Print Name: _____
    Its: _____

8

Schedule 1.1
Furniture, Fixtures, Equipment, Other Tangible Personal Property

| Location | Items |
|---|---|
| Cedars Sinai | |
| Santa Monica | |
| Lake Forest | |
| Newport Beach | |
| Irvine | |

9

EXHIBIT A, PAGE 60

Schedule 1.4
Leases

| Location | Landlord |
|---|---|
| Cedars Sinai | |
| Santa Monica | |
| Lake Forest | |
| Newport Beach | |
| Irvine | |

10

EXHIBIT A, PAGE 61

# EXHIBIT

## D

EXHIBIT A, PAGE 62
**EXHIBIT D**



**FRANCHISE AGREEMENT**..................................................................................................................................*1*

*Article 1 - License And System*.........................................................................................................................*1*
   1.01 Grant Of License. ...................................................................................................................................1
   1.02 Location And Territory. ..........................................................................................................................2
   1.03 Licensed Business. ................................................................................................................................2
   1.04 System And Marks. ...............................................................................................................................3
   1.05 Manual. ..................................................................................................................................................3
*Article 2 – Franchise Fees And Marketing*.....................................................................................................*3*
   2.01 Initial Fee. .............................................................................................................................................3
   2.02 Royalties. ...............................................................................................................................................4
   2.03 Marketing Fee. .......................................................................................................................................4
   2.04 Gross Revenues. ....................................................................................................................................4
   2.05 Local Marketing. ...................................................................................................................................4
   2.06 Local Marketing Cooperative. ..............................................................................................................5
   2.07 Grand Opening. .....................................................................................................................................5
*Article 3 – Reports And Audits* .......................................................................................................................*5*
   3.01 Records And Reports. ...........................................................................................................................5
   3.02 Failure to Report. ..................................................................................................................................5
   3.03 Audits And Inspections. .......................................................................................................................5
   3.04 Contact With Others. .............................................................................................................................6
*Article 4 – Training* ..........................................................................................................................................*6*
   4.01 Initial Training. .....................................................................................................................................6
   4.02 Manager Training. .................................................................................................................................6
   4.03 Subsequent Training. ............................................................................................................................6
   4.04 Training Materials. ................................................................................................................................6
   4.05 No Warranty of Success. ......................................................................................................................6
*Article 5 – Trade Secrets And Confidentiality*..............................................................................................*7*
*Article 6 – Pre-Opening Obligations*..............................................................................................................*7*
   6.01 Premises And Lease. .............................................................................................................................7
   6.02 Specifications. .......................................................................................................................................7
   6.03 Appearance Of Premises. .....................................................................................................................8
   6.04 Required Equipment. .............................................................................................................................8
*Article 7 – Operation Of Licensed Business* .................................................................................................*8*
   7.01 Independent Contractor. ........................................................................................................................8
   7.02 Personal Participation. ..........................................................................................................................8
   7.03 Retail Prices. .........................................................................................................................................8
   7.04 Compliance With Laws. ........................................................................................................................8
   7.05 Franchisee Business Operation. ...........................................................................................................8
   7.06 Restrictions On Sources Of Products And Services. ............................................................................9
   7.07 Minimum Hours. .................................................................................................................................10
   7.08 Signs. ...................................................................................................................................................11
   7.09 Computer System. ...............................................................................................................................11
   7.10 Communications Equipment and Systems. .........................................................................................11
   7.11 Equipment Maintenance. ....................................................................................................................11
   7.12 Warranties. ..........................................................................................................................................11
   7.13 No Pirating Of Personnel. ...................................................................................................................11
   7.14 Health Code Violation Step-In Rights. ...............................................................................................12
   7.15 Customer Payment Processing. ...........................................................................................................12
*Article 8 – Indemnity And Insurance*...........................................................................................................*12*
   8.01 Indemnity. ...........................................................................................................................................12
   8.02 Insurance. ............................................................................................................................................12
*Article 9 – Renewal* .......................................................................................................................................*13*
   9.01 Conditions Of Renewal. .....................................................................................................................13
*Article 10 - Continuation*...............................................................................................................................*13*

*initials*

**EXHIBIT A, PAGE 63**



*Article 11 - Entity Franchisee*..................................................................................................*13*
   11.01 Entity Definition...........................................................................................................13
   11.02 Founding Document Restriction. ...............................................................................14
   11.03 Liability Of Owner(s). .................................................................................................14
   11.04 Restriction On Certificates Of Ownership..................................................................14
   11.05 Additional Requirements Of Entity Franchisee. .........................................................14
*Article 12 - Assignment Or Transfer.* ......................................................................................*14*
   12.01 Prior Consent. .............................................................................................................14
   12.02 Conditions Of Assignment. .........................................................................................14
   12.03 Assignment To An Entity. ............................................................................................15
   12.04 Approval Process. ........................................................................................................15
   12.05 Transfer By Franchisor.................................................................................................15
   12.06 No Sublicensing. ..........................................................................................................16
*Article 13 - Death Or Incapacity* .............................................................................................*16*
   13.01 Alternatives Upon Death Or Incapacity. ....................................................................16
   13.02 Effect Of Failure To Comply. ......................................................................................16
   13.03 Incapacity Defined. ......................................................................................................16
*Article 14 - Successors And Assigns* ........................................................................................*16*
*Article 15 - Termination* ...........................................................................................................*16*
*Article 16 - Competition With Franchisor* ...............................................................................*18*
   16.01 Competing Business Activities During Term. ..............................................................18
   16.02 Competing Business Activities After Term. .................................................................18
*Article 17 - Effect Of Termination* ...........................................................................................*19*
   17.01 Loss Of Rights...............................................................................................................19
   17.02 Change Of Identity. ......................................................................................................20
   17.03 Changeover Procedure.................................................................................................20
   17.04 Continuing Royalties.....................................................................................................20
   17.05 Option To Purchase Certain Assets..............................................................................20
   17.06 Payment And Terms. ....................................................................................................20
   17.07 Survival Of Terms. .......................................................................................................21
*Article 18 – Release From Franchisee Obligations.* .................................................................*21*
   18.01 Release From Continuing Obligations. .......................................................................21
*Article 19 - Arbitration of Disputes.* ........................................................................................*21*
   19.01 Agreement to Arbitrate.................................................................................................21
   19.02 Conduct of Arbitration..................................................................................................21
   19.03 Conditions Precedent to Arbitration............................................................................21
   19.04 Limited Exceptions to Arbitration and Mediation........................................................22
*Article 20 - Representations Of Franchisee.* .............................................................................*22*
   20.01 Representations ............................................................................................................22
*Article 21 - Miscellaneous Provisions* ......................................................................................*22*
   21.01 Nonwaiver.....................................................................................................................22
   21.02 Attorneys Fees...............................................................................................................22
   21.03 Severability. ..................................................................................................................22
   21.04 Warranty Of Authority. ................................................................................................23
   21.05 Estoppel Certificate.......................................................................................................23
   21.06 Paragraph Headings.....................................................................................................23
   21.07 Recitals..........................................................................................................................23
   21.08 No Third Party Beneficiary. ..........................................................................................23
   21.09 Choice Of Law. .............................................................................................................23
   21.10 Notices...........................................................................................................................23
   21.11 Entire Agreement. ........................................................................................................23
   21.12 Modification..................................................................................................................23
   21.13 Effective Date................................................................................................................24
   21.14 Time Of Essence............................................................................................................24
*Article 22 - Business Risk* ........................................................................................................*24*
   22.01 No Promises. .................................................................................................................24
   22.02 Receipt. .........................................................................................................................24

**EXHIBITS**......................................................................................................................... **A-1**

A.   LOCATION OF LICENSED BUSINESS .....................................................................................A-1
B.   TERRITORY ........................................................................................................................B-1
C.   REQUIRED EQUIPMENT ......................................................................................................C-1

Tully's
**FRANCHISE AGREEMENT**
OC-05B
Page ii

*initials*

D.  ITEMS SUBJECT TO SPECIFICATIONS ............................................................................................................ D-1
E.  LEASE CONDITIONAL ASSIGNMENT AGREEMENT ............................................................................... E-1
F.  ASSIGNMENT OF TELEPHONE NUMBERS ................................................................................................ F-1
G.  PERSONAL GUARANTY ................................................................................................................................... G-1
H.  MASTER LEASE ................................................................................................................................................. H-1
I.  TRADE SECRETS & CONFIDENTIALITY AGREEMENT ......................................................................... I-1
J.  MUTUAL TERMINATION OF FRANCHISE AGREEMENT AND RELEASE ....................................... J-1
K.  CONSENT, WAIVER AND RELEASE FOR TRAINING ............................................................................ K-1
L.  RELEASE FROM CONTINUING OBLIGATIONS ....................................................................................... L-1
M.  CONFIDENTIALITY AGREEMENT – ADDITIONAL INFORMATION .............................................. M-1
N  Addendum to Tully's Franchise Agreement........................................................................................... N-1

_initials_



## Franchise Agreement

This Agreement is made and entered into by and between **Tully's Coffee Corporation,** a Washington corporation, d.b.a. "Tully's" (hereinafter "Franchisor") and **JH Development, LLC,** a California limited liability company (hereinafter "Franchisee").

### RECITALS

WHEREAS Franchisor has developed a unique system for identifying, operating and marketing retail coffee outlets offering and selling at retail a menu of specialty espresso and coffee drinks, teas, baked goods, ice cream products, other complementary food and beverage items and related accessaries and supplies, each operating under the Marks and using Franchisor's methods (hereinafter the "System");

WHEREAS Franchisor owns the trade name "Tully's" and related logos and marks and trade dress as more fully described in this Agreement (hereinafter the "Marks");

WHEREAS, as between Franchisor and Franchisee, Franchisor is the sole and exclusive owner of all goodwill associated with and to become associated with the Marks, the value of which Franchisee acknowledges;

WHEREAS Franchisee recognizes the advantages and value of the System and Marks and desires to obtain a license for a "Tully's" business (hereinafter the "Licensed Business");

WHEREAS Franchisee recognizes the necessity and value of maintaining high standards and uniformity of appearance, image, products, services and customer relations in conformity with the System as Franchisor may reasonably modify it from time to time;

WHEREAS Franchisee is aware of the risks, business and otherwise, associated with owning a Tully's Licensed Business and has independently evaluated those risks without relying upon any representations from Franchisor or Franchisor's agents regarding revenues, profits or probability of success, excepting only those representations and accompanying cautions contained in Franchisor's Uniform Franchise Offering Circular — revenues, profits or probability of success being affected primarily by factors beyond Franchisor's control, including Franchisee's skill, personality, diligence and dedication and general regional or local economic or demographic conditions; and

WHEREAS, Franchisor, in reliance upon Franchisee's representations, is willing to provide certain training and other services and to grant a license, but only on the terms of this Agreement, which terms Franchisee understands and accepts and both parties acknowledge to be reasonable and material;

NOW THEREFORE, for and in consideration of the mutual covenants herein set forth, and other good and valuable consideration, the receipt and sufficiency of which each party hereby acknowledges, and each party fully intending to be legally bound hereby, Franchisor and Franchisee mutually agree as follows:

### ARTICLE 1 - LICENSE AND SYSTEM

#### 1.01  Grant Of License.

1.01.01  Subject to the terms and conditions of this Agreement, Franchisor grants to Franchisee a non-exclusive license to operate one (1) Licensed Business using the System and Marks for a period of ten (10) years from and after the Effective Date of this Agreement, said Licensed Business to be located only at the location specified in Exhibit A hereto, or at such other location within the Territory as Franchisor may approve in writing. Franchisee, based upon Franchisee's own research and knowledge, shall select one of the available or proposed locations from the selection of locations then available within 180 days after signing this Agreement and that location shall be accurately stated in Exhibit A. Notwithstanding anything herein to the contrary, if the Licensed Business is to be located upon real property subject to a master lease under which Franchisor or a related company is the primary lessee, this Agreement shall terminate without further notice upon the earlier termination or expiration of the current term of any applicable master lease for the Premises. Franchisor is under no obligation to extend or

Tully's
**FRANCHISE AGREEMENT**
OC-05B
Page 1

exercise any option to extend any master lease. If a master lease is involved, a copy of the master lease is attached as Exhibit H to this Agreement. If there is no master lease, this Agreement shall terminate upon expiration or termination of Franchisee's lease (a) upon Franchisee's written election; or (b) upon Franchisor's election if Franchisee does not obtain an acceptable lease at an approved location at least (90) days before expiration of Franchisee's lease. Franchisee shall not move Franchisee's Premises without Franchisor's prior written approval.

### 1.02 Location And Territory.

1.02.01  Except as specifically permitted by this Agreement, Franchisee's Licensed Business shall be the only Licensed Business to operate within the geographical territory described in Exhibit B hereto (the "Territory"). Franchisor will not locate or open a competitive Licensed Business in the Territory, either company-owned or franchised, during the term of this Agreement, so long as Franchisee is not in breach of this Agreement. However, there shall be no geographic restrictions upon where customers may come from for any Tully's business, company-owned or franchised, and there shall be no geographic restrictions upon where Franchisor, any related company, Franchisee or any other franchisee may solicit customers.

1.02.02  Exclusions from Territory. The following, and any substantially similar locations, shall be excluded from Franchisee's Tully's Territory:  Wholesale Accounts (including retailers who serve Franchisor's products, but do business under a different name), university and college campuses; regional shopping malls; grocery stores and supermarkets; office building complexes of more than 500,000 square feet, sports stadiums and similar facilities; regional and county fairs; special events; and temporary locations (less than a month). As to such excluded locations, Franchisor shall have the right, directly or indirectly, to sell and distribute goods and services, including those normally offered by Franchisee and using the Marks, without compensation to Franchisee or any other franchisee(s). Franchisor may, directly, indirectly, or through a franchisee or licensee offer products and services under the same or a different trade name or trademark, including within Franchisee's Territory through alternative distribution methods, including through catalogs, mail order and through electronic media, including television, radio, the "Internet" and through other new or emerging commercial technological media. Franchisor shall have no obligation to share any revenues from alternative distribution activities with Franchisee. Without limiting the foregoing, Franchisee shall not, without Franchisor's prior written approval, which approval may be withheld for any reason whatsoever, use the Marks or any part of the Marks or anything similar to the Marks as part of a domain name, in a meta tag, or in any other manner in connection with any commerce on the Internet or similar media. Franchisee shall not use the Marks in or market through alternative distribution methods without Franchisor's prior written approval, which approval may be withheld for any reason whatsoever.

1.02.03  Modifications of Territory. The parties agree that the estimated population of the Territory contained in Exhibit B is a reasonable estimate of the population of the Territory based upon available governmental data. In the event the population of the Territory increases by fifty percent (50%) or more from the estimated population contained in Exhibit B, based upon reliable governmental data (United States Bureau of the Census or successor if in the United States), Franchisor shall have the option of dividing Franchisee's Territory and creating a new Territory, which may include portion(s) of the territories of other franchisees. If, at the time Franchisor exercises the option to modify Franchisee's Territory, Franchisee is in full compliance with all of the terms of this Agreement and has had no notices of default within the prior twelve calendar months, then Franchisee shall have a sixty (60) day first right of refusal to license and operate another Tully's Licensed Business in the newly created territory.  In such event, for any such additional Tully's Licensed Business Franchisee shall execute the then current form of Franchise Agreement, which may differ in material ways that are not reasonably foreseeable at this time, but may include material differences in territorial sizes and boundaries and economic terms, including the amounts of royalties and marketing fees or entirely new categories of fees or mandatory expense, and Franchisee shall pay the then-current Initial Fee as required by the then current form of Franchise Agreement. If Franchisor's modification of Territory boundaries reduces the size of more than one franchisee's Territory, the franchisees shall receive rights of refusal in the order of the percent(s) of population severed from their respective territories as determined by Franchisor. If the territories of two or more franchisees are reduced by substantially equal percentages of population, the franchisees will receive rights of refusal in the order in which they executed their original franchise agreements for the affected territories.

### 1.03 Licensed Business.

1.03.01  The term "Licensed Business" means a business in which the Franchisee engages in the business of offering and selling at retail a limited menu of specialty espresso and coffee drinks, teas, baked goods, ice cream products, other complementary food and beverage items and related accessaries and supplies under the Marks and using the Franchisor's methods (hereinafter the "System"). Franchisor shall have the right to add or delete or change product and service offerings at any time and Franchisee agrees to comply with such changes.

Tully's
**FRANCHISE AGREEMENT**
OC-65B
Page 2

_____|_____
*initials*

*1.04 System And Marks.*

1.04.01 Franchisee agrees to operate the Licensed Business only according to the System and only under the Marks pursuant to the Manual. Franchisee acknowledges that Franchisor owns all rights to the System and the Marks and Franchisee has only such rights as this Agreement grants. For purposes of this Agreement, the "System" includes the rights and obligations set forth in this Agreement, the Operating Manual furnished to the Franchisee as amended from time to time, Franchisor's name, training, recipes, formulas, methods of operation, reputation, advertising, system and similar benefits pursuant to which the Franchisee operates the Licensed Business. Franchisor's unique trade dress is part of the Marks. The Marks include the name "Tully's" and such other business names, logos and product names as Franchisor from time to time designates.

1.04.02 Unless otherwise first approved by Franchisor in writing or unless otherwise required by applicable law, Franchisee agrees to do business at the Premises only under the Marks. Franchisee shall not use the Marks in any manner not specifically approved by Franchisor, including, without limitation, as part of any domain name or other address on any portion of the Internet or any new medium, including as part of any meta tag(s) or similar use.

1.04.03 Franchisee shall immediately notify Franchisor, in writing, if Franchisee learns of any attempt by any person to infringe the Marks or to wrongfully appropriate the System or any part of it. Franchisor may, in its sole discretion, take whatever action it deems appropriate to protect or defend the Marks or System but is not obligated to take any action whatsoever. Franchisee agrees to fully cooperate with Franchisor in any action anticipated by or taken by or on behalf of Franchisor. Franchisee understands that it may become necessary, in Franchisor's sole discretion, to change, totally or in part, the Marks, as a result of litigation, merger, business changes or otherwise. In that event, Franchisee agrees to immediately adopt the new or revised Marks.

1.04.04 Franchisor may change the System or any part of the System at any time, and as changed it shall remain the System pursuant to this Agreement. Franchisor shall own any improvements or changes in the System whether developed by Franchisor, by Franchisee or by other franchisee(s) and shall have the right to adopt and perfect such improvements or changes without compensation to Franchisee or other franchisees. If Franchisor modifies the System, Franchisee shall, at Franchisee's own expense except to the extent specifically provided in this Agreement, adopt and use such modification(s) as if it were part of the System at the time of execution of this Agreement.

1.04.05 Franchisee agrees to operate no other business whatsoever, including coin-operated devices, or provide any services in or about the Premises of the Licensed Business or otherwise in connection with the System or Marks without first obtaining Franchisor's written approval; provided that, Franchisee may provide any service(s) or product(s) permitted according to the Manual. Franchisee acknowledges that Franchisor owns, in connection with the Marks, all goodwill associated with or to become associated with the telephone numbers and telephone listings and agrees to execute an Assignment of Telephone Numbers in the form of Exhibit F, attached.

*1.05 Manual.*

Franchisor agrees to loan to Franchisee during the term of this Agreement one or more operations manuals (the "Manual"), together with such updates and modifications as Franchisor may from time to time provide to Franchisee. Franchisor may make any changes or modifications in the Manual as in Franchisor's sole judgment are desirable. Franchisee agrees that if there should, at any time, be a discrepancy between the terms of Franchisee's copy of the Manual and the master copy maintained in Franchisor's offices, the terms of the master copy shall prevail. Franchisee agrees, at all times, to conform to the Manual in all respects including to obtain any equipment, fixtures, personnel or technology necessary to do so. The Manual is and shall at all times remain the property of Franchisor and shall be returned to Franchisor upon expiration, termination or nonrenewal of this Agreement for any reason. Franchisee agrees not to make it available to or permit another to make any copies of the Manual or any portion thereof without Franchisor's prior written consent. Franchisee acknowledges and agrees that the fair value of the Manual is at least Five Thousand Dollars ($5,000.00).

## ARTICLE 2 - FRANCHISE FEES AND MARKETING

*2.01 Initial Fee.*

The Initial Fee for the Tully's Franchise is Twenty Thousand Dollars ($20,000.00). The Initial Fee is not refundable except if through no fault of Franchisee, Franchisor determines that Franchisee has not successfully completed the initial training, then Franchisor will refund up to one half of the Initial Fee, but not more than the difference between the amount of the Initial Fee and Franchisor's actual expenses incurred to recruit and train Franchisee and to review and evaluate potential site(s), if applicable. If Franchisee acquires an existing Tully's business from Franchisor in connection with this franchise, Franchisee will pay the fair market going concern value of the assets purchased pursuant to a separate asset purchase and sale agreement to be negotiated, in addition to the Initial Fee. If the parties are unable to reach an agreement on the purchase and sale of assets of an existing operating business within ninety days following the date of this Agreement, either party may terminate this

Tully's
**FRANCHISE AGREEMENT**
OC-6SB
Page 3

*initials*

**EXHIBIT A, PAGE 68**

Agreement by giving not less than ten business days notice to the other. Termination shall be pursuant to the terms of Articles 17 and 18.

2.02 Royalties.

Franchisee shall pay to Franchisor a weekly royalty in an amount equal to the greater of five percent (5%) of Gross Revenues or $300.00. The royalties are payable weekly by Electronic Funds Transfer. Funds must be in Franchisee's designated bank account in time so that Franchisor can obtain them on or before 5:00 PM in Franchisee's time zone on Tuesday of the week following the week on which the Royalties are based. Franchisor may, upon thirty (30) days prior written notice require Franchisee to pay Royalties by check, pre-authorized check, electronic funds transfer or other mechanism or to pay on a different periodic basis. If Franchisee owns more than one Licensed Business, Franchisee shall report and pay royalties for each Licensed Business independently, unless otherwise directed by Franchisor.

*2.03 Marketing Fee.*

2.03.01 Franchisee shall pay to Franchisor a weekly Marketing Fee in the amount equal to the greater of two percent (2%) of Gross Revenues or $125.00. Franchisor may reduce or discontinue the Marketing Fee at any time and may, thereafter, reinstate it upon a new thirty day Notice. Franchisee shall pay the Marketing Fee at the same time and in the same manner as Royalties. If Franchisee owns more than one Licensed Business, Franchisee shall report and pay the Marketing Fee for each Licensed Business independently, unless otherwise directed by Franchisor.

2.03.02 Franchisor may, in Franchisor's sole discretion, upon at least sixty days prior written notice, increase the Marketing Fee up to a maximum of four percent (4%) of Gross Revenues.

2.03.03 Franchisor shall maintain all marketing fees collected, net of any taxes Franchisor is required to pay on account of having collected the marketing fees, in one or more bank accounts separate from Franchisor's regular account(s). Franchisee authorizes Franchisor to commingle Franchisee's marketing fees with those paid by other franchisees. Franchisor will provide an unaudited annual accounting to all franchisees as to the aggregate amount of Marketing Fees collected and their use and application by general category, which accounting will be prepared within ninety days following the end of Franchisor's fiscal year and will be provided to Franchisee upon written request. Franchisee acknowledges and agrees that each such accounting is a Trade Secret and shall be treated as such according to this Agreement. Except as herein specifically provided, Franchisee waives all compliance with the Uniform Trust Accounting Act and related or similar laws to the broadest extent permitted by law.

2.03.04 Franchisor shall use marketing fees collected, net of taxes and governmental fees, for advertising, marketing and promotion for the benefit of the System. Selection of advertising and promotion location, scope, content, copy, timing and approach shall be by Franchisor and in Franchisor's sole discretion. Franchisor may use some of the funds, in its discretion, for market research, production and administration of the marketing program. Franchisor will attempt to benefit all of Franchisor's franchisees through the marketing program over all; however, not every element of the advertising and promotion program will necessarily directly benefit any specific franchisee. In making its marketing decisions, Franchisor will consider but not be bound by advice from any advisory committee(s) of franchisees recognized by Franchisor.

2.03.05 Franchisor shall have no duty to conduct any marketing program and if Franchisor does conduct a program, Franchisor makes no representations or warranties regarding the nature of the marketing to be conducted or about how it will affect Franchisee's revenue.

*2.04 Gross Revenues.*

The term "Gross Revenues" shall mean the full the price of all goods and services sold by Franchisee from or relating to the Licensed Business, whether or not Franchisee has received cash or other consideration. The only thing not included in Gross Revenues is taxes or fees Franchisee is required to collect on behalf of the government and which Franchisee actually remits. Gross Revenues are calculated at the time Franchisee sells the goods or services, without regard to when the Franchisee receives or expects to receive cash or other consideration therefore.

*2.05 Local Marketing.*

Franchisee shall participate, at Franchisee's expense, in all coupon and discount programs adopted by Franchisor. In addition to the Marketing Fees paid pursuant to paragraph 2.03 and in addition to any coupons and similar discounts offered, Franchisee shall spend, on an ongoing basis, not less than one percent (1%) of Gross Revenues on local marketing. Any funds contributed to a local marketing cooperative shall be credited against this requirement. As part of its Local Marketing obligation, each Franchisee is required to participate in and pay its pro rata share of the cost of any telephone yellow pages advertising within its market area as specified by Franchisor.

Tully's
**FRANCHISE AGREEMENT**
CC459
Page 4

                                                    |
                                               *initials*

**EXHIBIT A, PAGE 69**

Franchisee shall place and pay for such additional marketing as Franchisee deems necessary and appropriate. Franchisee shall be responsible to assure that all marketing so placed complies with the Manual and serves to enhance and not detract from or harm the Marks and the goodwill attached and to become attached thereto. Franchisee shall promptly send to Franchisor copies of all advertising copy and media used. In the event Franchisor deems any advertisement or marketing technique to be not in compliance with this paragraph, Franchisee shall, immediately upon receipt of a written notice from Franchisor, cease using the subject advertisement or marketing technique and shall thereafter fully comply with this paragraph. If Franchisee violates this paragraph more than two times in any twelve month period, Franchisor may, in addition to all other remedies available pursuant to this Agreement, require Franchisee to obtain prior written approval of copy and marketing technique for all or certain categories of marketing.

### 2.06 Local Marketing Cooperative.

If at least two-thirds (based upon one vote per Tully's outlet without regard to ownership) of the Tully's outlets (franchised and company-owned) in a marketing area, as determined by Franchisor, vote to form a local marketing cooperative, Franchisee agrees to participate in said cooperative and to contribute such sums thereto as may be assessed by a majority vote of the cooperative. Except by unanimous consent, no Local Marketing Cooperative shall make assessments greater than 5% of Gross Revenues. Funds contributed to any local marketing cooperative shall be in addition to the Marketing Fee paid pursuant to paragraph 2.03.

### 2.07 Grand Opening.

Franchisee shall, within six months after the date the Licensed Business is first open for business, publicize and conduct a grand opening consistent with Franchisor's guidelines. The grand opening shall be appropriate for Franchisee's territory, location, community, competitive environment and similar factors.

## ARTICLE 3 - REPORTS AND AUDITS

### 3.01 Records And Reports.

Franchisee shall at all times maintain true and accurate business records in the manner specified by Franchisor. Franchisee shall, on a weekly basis or at such other intervals as specified by Franchisor, provide Franchisor with such report(s), in the form(s) specified by Franchisor, as Franchisor may require, and at such times as Franchisor may require, including, but not limited to, reports of Gross Revenues, reports of business expenses and overhead, copies of detailed purchase invoices, number and type of transactions, identity of vendors, the amount of marketing expenditures, copies of health department inspection reports, daily sheets and cash register summary tapes and weekly or monthly sales summary. By submitting any reports to Franchisor, Franchisee is certifying that they are true and correct. Within ninety (90) days following the end of each calendar year, Franchisee shall provide Franchisor with a copy of Franchisee's balance sheet and an income and expense statement for the year. At the time they are filed, Franchisee shall provide Franchisor with copies of Franchisee's federal income tax return(s) and state and local excise tax returns, if applicable, together with all exhibits and schedules thereto and all amendments thereafter. Franchisor is authorized to rely upon such reports and financial documents and to disclose them to governmental authorities as and if properly requested. Franchisor may use data from the reports and financial documents in composite or statistical form for any purpose in Franchisor's sole discretion. Franchisor is authorized to obtain or verify the information and reports described herein by electronic means from Franchisee's computer(s), at any time, without prior notice, at Franchisor's sole election. Franchisee shall retain all business records for at least five (5) years or such longer period of time as may be required by applicable law.

### 3.02 Failure to Report.

If Franchisee fails, for any reason, to timely deliver to Franchisor any required report with all required information, Franchisor is authorized, without further notice, to assess Royalties and Marketing Fees for each relevant week and effect an electronic funds or other transfer of such funds calculated as the greater of (a) Franchisee's average weekly Royalties and Marketing Fees over the prior twelve months, (b) the average weekly Royalties and Marketing Fees of all similar franchisees within Franchisee's region as defined by Franchisor, or (c) $850.00 per week. Franchisee hereby authorizes Franchisee's bank to make such transfers upon Franchisor's request. No action taken under this sub-paragraph shall constitute a cure of any breach by Franchisee, an election of remedies by Franchisor or act, in any way, to limit Franchisee's liability to pay fees under this Agreement.

### 3.03 Audits And Inspections.

Franchisor shall have the right, at any time, to enter the Premises (either physically or electronically) for purposes of auditing the accuracy of reports submitted and to otherwise verify compliance with the terms and conditions of this Agreement. Should any audit or inspection reveal that Franchisee has underreported the amount of Gross Revenues, Franchisee shall

Tully's
**FRANCHISE AGREEMENT**
OC-63B
Page 5

_initials_

**EXHIBIT A, PAGE 70**

immediately pay to Franchisor the additional amount of royalties and other fees payable on account of the underreporting, plus interest thereon at the rate of one and one-half percent per month, but not more than the maximum interest allowed by applicable law. If an audit or inspection reveals that Franchisee has underreported Gross Revenues by three (3) percent or more for any week, then Franchisee shall also pay, immediately, the cost of the audit or inspection. In all other cases, Franchisor shall bear the entire cost of the audit or inspection, including incidental costs. Should Franchisee at any time cause an audit to be made of Franchisee's Licensed Business, Franchisee shall cause a copy of the report of said audit to be delivered to Franchisor without any cost or expense to Franchisor.

### 3.04 Contact With Others.

Franchisor shall have the right, in Franchisor's sole discretion and without further notice to Franchisee or to any other person or entity, to contact any of Franchisee's customers, landlord, accountant, vendors, or other persons within Franchisee's Territory or otherwise for the purpose of verifying the accuracy of any information submitted by Franchisee, for quality assurance or for any other purpose not inconsistent with this Agreement.

## ARTICLE 4 - TRAINING

### 4.01 Initial Training.

As a condition subsequent to this Agreement, Franchisee and Franchisee's designated manager, if applicable, shall successfully complete Franchisor's initial training program. The initial training program will be approximately 60 to 80 clock hours in length and shall be conducted at such location(s) as Franchisor specifies. The initial training may be conducted, in whole or in part, in an existing Tully's outlet owned by Franchisor, an affiliate of Franchisor or another franchisee. Franchisee and Franchisee's manager, if applicable, will be required to execute a consent, waiver and release in the form of Exhibit K before beginning training, relieving Franchisor or other franchisees who might be involved in the training of liability for wages, benefits, and for injury, damages or harm that might occur while training in the facilities of Franchisor or another franchisee. Franchisee shall be responsible for all salaries, compensation, benefits, and living and travel expenses of trainees. After the initial training, Franchisor will be available for such reasonable consultation as Franchisor deems appropriate. Franchisor reserves to itself the exclusive right to determine whether Franchisee and other trainees have satisfactorily completed the training program. If Franchisee and Franchisee's designated manager, if applicable, do not satisfactorily complete the initial training program, Franchisor may terminate this Agreement. Franchisee acknowledges that such failure to satisfactorily complete the initial training program is grounds for termination of this Agreement.

### 4.02 Manager Training.

At all times, Franchisee or Franchisee's manager in charge of operating the Licensed Business shall be an individual who has successfully completed Franchisor's manager training program and who otherwise meets Franchisor's manager criteria. Any new manager shall successfully complete Franchisor's manager training program within 60 days after assuming the role of manager. Unless otherwise agreed in writing by Franchisor, Franchisee or Franchisee's manager(s) shall bear the reasonable cost of training additional managers after the first manager trained. In all cases, Franchisee shall be solely responsible for any salaries, compensation, benefits and living and travel expenses of trainees.

### 4.03 Subsequent Training.

Franchisor may require Franchisee and Franchisee's manager to attend additional training at a location determined in Franchisor's sole discretion. Franchisee shall pay Franchisor's usual fee(s) for such mandatory training. Franchisee shall, in any event, be solely responsible for all salaries, compensation, benefits, and living and travel expenses of trainees.

### 4.04 Training Materials.

Franchisor may, from time to time, provide or make available to Franchisee training materials and equipment for providing training for Franchisee's manager(s) and employees. Franchisor may charge a reasonable fee for such materials and equipment. Franchisee agrees that all such materials are Trade Secrets pursuant to this Agreement. Franchisee agrees to require all of its managers and employees, as applicable, to successfully complete any such training program(s) if Franchisor designates them as mandatory.

### 4.05 No Warranty of Success.

Franchisor's determination that Franchisee or Franchisee's manager(s) or employee(s) have successfully completed any training shall not be a warranty or representation that the person can or will successfully operate the Licensed Business or any aspect thereof.

Tully's
**FRANCHISE AGREEMENT**
OC-05B
Page 6

_____
*initials*

## ARTICLE 5 - TRADE SECRETS AND CONFIDENTIALITY

Franchisee will have access during the course of this Agreement to trade secrets that are the property of Franchisor. Trade Secrets include, but are not limited to, the System, the Manual, formulas, recipes, methods, customer lists and related information, vendor and pricing lists and policies, the Training, and other programs, techniques and policies as they may be developed by Franchisor from time to time. Franchisee acknowledges that the Trade Secrets derive independent economic value from not being generally known to, and not readily ascertainable by proper means by, other persons who could obtain economic value from their disclosure or use. Franchisee agrees to not disclose or in any way make available to any unauthorized person(s) any Trade Secret(s) or any information regarding any Trade Secret(s) or any proprietary information made available to Franchisee by Franchisor. Franchisee shall hold all such information in complete confidence. Franchisee will not disclose any Trade Secrets whatsoever to any person(s) not employed by or under contract with Franchisee. Franchisee will disclose Trade Secrets only to those employees and agents of Franchisee with a legitimate need to know, each of whom Franchisee warrants will be subject to this article. Franchisee shall cause every manager and every employee who has access to Trade Secrets to sign a Confidentiality and Nondisclosure Agreement in the form prescribed by Franchisor, the current form of which is Exhibit I hereto. Franchisee agrees that Franchisor shall have sole discretion in determining what items or information are Trade Secrets and that any items or information designated Trade Secrets by Franchisor in the Manual or otherwise in writing shall be treated as Trade Secrets under this Agreement whether or not such items or information would be trade secrets under any other applicable legal or other definition(s), including any applicable statutes. In addition to all other remedies available to Franchisor, upon proof of violation of this Article by Franchisee, Franchisee agrees that Franchisor shall be entitled to liquidated damages in an amount equal to the greater of: (a) the sum of the average weekly Royalty Fees and the average weekly Marketing Fees paid or payable by Franchisee during the preceding twelve months, multiplied by the number of weeks, or portion thereof, during which Franchisee was in violation of this Article or (b) one hundred percent of the gross revenues received or receivable by Franchisee or any transferee of any Trade Secrets during every day, or portion thereof, during which Franchisee was in violation of this Article. Franchisee acknowledges and agrees that, in the event of Franchisee's violation of this Article, proof of actual damages would be difficult and that the formula for calculating liquidated damages contained herein is a reasonable estimate of what actual damages would be. The foregoing formula does not result in a penalty.

## ARTICLE 6 - PRE-OPENING OBLIGATIONS

### 6.01 Premises And Lease.

6.01.01  Franchisee shall be solely responsible for selecting the location for the Licensed Business (hereinafter "the Premises"). Franchisee, within 180 days after signing this Agreement, shall select a location, subject to Franchisor's approval. Franchisor will attempt to provide to Franchisee any information in its possession regarding the Premises, proposed Premises and any known alternative Premises within Franchisee's area of interest. Such information is provided by Franchisor without warranty as to its accuracy or completeness or otherwise. Franchisor has no special expertise in such matters. Franchisee shall not sign a lease, sub-lease or other obligation until after Franchisee has received Franchisor's approval of the Premises and lease or sub-lease in writing, which approval shall be deemed to have been given if Franchisor has not notified Franchisee within ten (10) days following Franchisor's receipt from Franchisee of a copy of the proposed lease or sub-lease and such other information about the proposed Premises as Franchisor may require. Approval of the Premises or the lease or sub-lease by Franchisor does not constitute a representation or warranty by Franchisor that the Premises will be good and does not constitute a legal or other opinion as to any term of the lease or sub-lease. Franchisor may, in Franchisor's discretion, condition approval upon execution of the Lease Conditional Assignment Agreement by Franchisee and Franchisee's landlord in the form of Exhibit E, attached. If Franchisee fails to select an approved location within 180 days, Franchisor shall have the option of terminating this Agreement. Franchisee acknowledges and agrees that failure to select an approved location within 180 days is cause for Termination of this Agreement.

6.01.02  In some instances, Franchisor may have already entered into a master lease for the Premises. In such event, Franchisee shall execute a sublease or assignment agreement, as appropriate, subject to the same terms and conditions as the master lease. The sublease or assignment may provide Franchisee shall pay rent and other obligations directly to the master landlord.

### 6.02 Specifications.

Franchisee's Licensed Business shall operate only from Premises meeting Franchisor's specifications. Franchisee understands and agrees that, although all Tully's Licensed Business will follow a consistent theme, the details of their design will differ in many cases, based upon location requirements, landlord requests, and unique features of the community. Franchisor will consider Franchisee's requests for features for Franchisee's Licensed Business, but is not obligated to follow those requests. Franchisee shall be obligated to update the design of Franchisee's Licensed Business at Franchisee's expense not

Tully's
**FRANCHISE AGREEMENT**
OC458
Page 7

_initials_

**EXHIBIT A, PAGE 72**

more than once every three years. Franchisee may change or update the design of Franchisee's Licensed Business, subject to Franchisor's prior written approval, at any time, at Franchisee's expense.

### 6.03 Appearance Of Premises.

Franchisee acknowledges that not every Tully's Licensed Business will be required to have identical decor, color schemes and layout. Franchisee agrees to accept Franchisor's subjective evaluation as to what would keep the Premises in compliance with Franchisor's standards. Franchisee agrees, at Franchisee's sole cost and expense, to maintain the Premises, including, but not limited to equipment, displays, fixtures, and interior and exterior decor in accordance Franchisor's standards throughout the term of this Agreement

### 6.04 Required Equipment

Franchisee shall acquire and install, at Franchisee's sole expense the Required Equipment. The current list of Required Equipment is contained in Exhibit C. Franchisee understands that the specific list of Required Equipment may be different for Franchisee's Licensed Business than for other franchisees or company-owned Licensed Business on account of differences in the Premises, lease terms, demographics or otherwise and that Franchisor shall have the right to modify the list of Required Equipment in the Manual or otherwise in writing.

## ARTICLE 7 - OPERATION OF LICENSED BUSINESS

### 7.01 Independent Contractor.

Each party to this Agreement is and shall remain an independent contractor and shall control the manner and means of operation of its respective business and shall exercise complete control over and responsibility for all labor relations and the conduct of its agents and employees. Neither party shall be considered or held out to be agent(s), joint venturers, partners or employee(s) of the other, except as specifically authorized by this Agreement. Neither party shall negotiate or enter into any agreement or incur any liability in the name of or on behalf of the other unless, and to the extent, specifically authorized by this Agreement. Franchisee shall prominently display signs at all times in the manner specified by Franchisor, indicating the name of the Franchisee and stating that the Licensed Business is independently owned and operated. Franchisee's business forms that bear the Marks shall contain Franchisee's name and a statement that the Licensed Business is independently owned and operated in such form as Franchisor may specify.

### 7.02 Personal Participation.

Throughout the term of this Agreement, Franchisee shall either devote Franchisee's full time and effort to actively managing the Licensed Business or delegate its management to a responsible person. Notwithstanding any delegation of authority hereunder, Franchisee shall reserve and exercise ultimate authority and responsibility with respect to the operation and management of the Licensed Business. If Franchisee employs a manager to run the day to day operations, the manager shall be required to attend and successfully complete Franchisor's training program prior to taking over full day-to-day responsibilities, at Franchisee's sole cost and expense (except for Franchisee's first manager whom Franchisor will train at no additional charge to Franchisee for the training). Franchisee shall devote such time and effort to the Licensed Business as Franchisee determines, but shall reserve and exercise ultimate authority and responsibility with respect to the operation and management of the Licensed Business.

### 7.03 Retail Prices.

Franchisor may recommend prices and pricing strategies for products and services. Franchisee is obligated to follow such price recommendations to the extent such obligation is consistent with applicable law and is otherwise solely responsible for establishing franchisee's own retail prices at such levels as franchisee deems appropriate.

### 7.04 Compliance With Laws.

Franchisee shall be solely responsible, at Franchisee's sole cost and expense, for obtaining and maintaining all necessary or required permits and licenses in order to operate the Licensed Business. Franchisee is solely responsible for strictly complying with each and every law, ordinance and regulation applicable to the Licensed Business, including, but not limited to, licensing, health, safety, environmental, consumer and labor regulations. Franchisee shall timely pay all applicable taxes as they come due, but may challenge the amount or applicability thereof; provided, that Franchisee hereby agrees to indemnify, hold harmless and defend Franchisor from any and all liabilities for taxes based upon Franchisee's operations.

### 7.05 Franchisee Business Operation.

Franchisee understands and acknowledges that every detail of the System and of the operation of the Licensed Business is important to Franchisee, Franchisor and other Tully's franchisees in order to maintain and further develop high and uniform

Tully's
**FRANCHISE AGREEMENT**
OC-05B
Page 8



_initials_

**EXHIBIT A, PAGE 73**

operating standards, to increase the demand for services sold by Franchisor and all franchisees, to enhance the image of Franchisor and the Marks, and to protect Franchisor's reputation and goodwill. Therefore, Franchisee agrees that:

7.05.01 Compliance with Manual. Franchisee shall operate the Licensed Business in conformity with such uniform methods, standards and specifications as Franchisor may prescribe, in the Manual or otherwise, to insure that the highest degree of quality and service is uniformly maintained. Franchisee shall acquire and maintain, at all times, all equipment and software required by Franchisor for operation of the Licensed Business. Franchisee shall offer all of the goods and services designated by Franchisor and no others without the written consent of Franchisor, which consent Franchisor may withhold for any reason.

7.05.02 Image. Franchisee shall, at all times, work to protect and enhance Franchisor's image and, specifically, shall maintain employees or workers in the Licensed Business whose appearance, attire, attitude, reputation and demeanor are consistent with Franchisor's image. All persons working in the Licensed Business shall, at all times, wear the uniform(s) and other designated or authorized apparel, if any specified by Franchisor, at Franchisee's expense. Franchisee acknowledges and agrees that Franchisor shall have sole discretion in determining what constitutes Franchisor's image, and further acknowledges that said image is constantly evolving as markets change and evolve.

7.05.03 Business Dealings. Franchisee shall not, at any time, engage in any business dealings in relation with the Licensed Business or the Franchise which are unethical, dishonest or otherwise could cause harm to the Marks, Franchisor, the goodwill associated with the Marks, or to any customer or vendor of Franchisee.

7.05.04 Maintenance. Franchisee shall, at Franchisee's sole cost and expense, maintain the Premises in the highest degree of sanitation, repair and condition, and in connection therewith shall make such additions, alterations, repairs and replacements thereto (but no others without Franchisor's prior written consent) as may be required for that purpose, including without limitation, such periodic cleaning, repainting, repairs to impaired equipment and replacement of obsolete signs and equipment as Franchisor may reasonably direct.

7.05.05 Refurbishing. At Franchisor's request, which shall not be more often than once every three (3) years, Franchisee shall replace or update the Premises at Franchisee's sole expense, to conform to the design, trade dress, color schemes and presentation of the Marks consistent with Franchisor's then-current image, including, without limitation, such internal changes and redecoration and such modifications to existing equipment as may be necessary in Franchisor's sole judgment.

7.05.06 Advisory Committees. Franchisee shall participate, at Franchisee's sole expense, in local, regional and national franchisee advisory committees or councils if established or sanctioned by Franchisor.

7.05.07 Participation in Special Programs. Franchisor from time to time may make limited term programs available to some or all of its Licensed Business ("Special Programs"). Special Programs may include (but are not limited to) certain new products and services, temporary or special product offerings, promotions involving special price recommendations, and market tests. Franchisor shall determine which, if any, Special Programs will be offered to Franchisee, and whether Franchisee's participation is optional or required for each particular Special Program, and will notify Franchisee accordingly. Franchisee will comply with the requirements established by Franchisor for participation in each Special Program that Franchisee is required to participate in, or for which it elects participation.

*7.06 Restrictions On Sources Of Products And Services.*

7.06.01 Specifications. As to all equipment, fixtures, supplies and inventory ("Items") necessary to operate the Licensed Business, except as otherwise specified herein, Franchisee may purchase them from the vendor of Franchisee's choice, but the Item(s) must meet Franchisor's specifications, if any. The current list of Items subject to specifications is included as Exhibit D. Franchisor reserves the right to change the list of Items that Franchisee must purchase in accordance with specifications. Franchisor reserves the right to require Franchisee to purchase only from suppliers that Franchisor has approved.

7.06.02 Items Bearing Marks and Proprietary Items. Franchisee shall purchase only from Franchisor or a supplier approved by Franchisor all Items used to start or operate the Licensed Business that contain or bear the Marks or that are proprietary to Franchisor, including all coffee products. In addition, Franchisee shall purchase from a supplier approved by Franchisor, all signs used to identify the Licensed Business.

7.06.03 Other Suppliers. Franchisor will approve other suppliers of non-proprietary items if Franchisee or the supplier request the approval in writing and if the supplier demonstrates to the satisfaction of Franchisor that it is financially capable and can provide Item(s) or service(s) that meet Franchisor's standards and that it is willing and able to protect Franchisor's proprietary information. Franchisor may charge a reasonable fee to cover its costs in evaluating a proposed supplier. Franchisor will normally make its decision within thirty days after it receives all of the requested information and any requested

Tully's
**FRANCHISE AGREEMENT**
OC-658
Page 9

_____
*initials*

samples. Franchisor reserves the right to later withdraw approval of any supplier whose performance falls below Franchisor's standards.

7.06.04 Unspecified Products. Franchisee may obtain any Item used in the Licensed Business that Franchisee is not required to purchase in accordance with specifications or from an approved supplier from any source, so long as the Item is consistent with Franchisor's image. Should Franchisor later publish specifications or require use of an approved supplier, Franchisee shall comply with that requirement.

7.06.05 Inventory. Franchisee shall, at all times, maintain a sufficient inventory of Items so that the Licensed Business can operate at maximum capacity.

7.06.06 Training and Other Services. Certain services may be available to Franchisee only through Franchisor or an affiliate, including mandatory training. Franchisee will be required to pay the usual price for any of these services, unless otherwise provided in this Agreement.

7.06.07 Proprietary Items. Proprietary Items are Items that contain one or more unique characteristics or ingredients which are either not known to the general public or which are subject to protection as intellectual property or Trade Secrets, and can include preparation methods, packaging, trademarks or containers. Patented or patentable Items are Proprietary Items. Franchisor's Proprietary Items currently include coffee prepared with proprietary roasting and other methods, recipes, and accessories and supplies bearing Franchisor's Marks, which Franchisee is authorized to use or sell only pursuant to this Agreement. Franchisor or its Affiliate(s) may develop additional Proprietary Items in the future. Franchisor or an Affiliate will (i) manufacture, supply and sell Proprietary Items to franchisees of Franchisor, and/or (ii) disclose the formulae for and methods of preparation of the Proprietary Items to one or more supplier(s) who will be authorized by Franchisor to manufacture Proprietary Items to Franchisor's precise specifications and sell Proprietary Items to franchisees of Franchisor and/or (iii) license Franchisee to use them pursuant to this Agreement. If required, Franchisee shall purchase and use Proprietary Items from Franchisor or from supplier(s) so authorized by Franchisor. Franchisor or its Affiliate(s) will derive revenue and profits from Franchisee's purchases of any Proprietary Items. Subject to this Agreement, Franchisor or its Affiliate(s) may distribute Proprietary Items through alternative channels of distribution, including near Franchisee's location.

7.06.08 Possible Proprietary Software. Franchisor may develop and design or acquire custom or customized Software. If developed or acquired, the Software will be Trade Secrets of Franchisor. Franchisee will be required to comply with Franchisor's requirements and specifications regarding the Software. Franchisor will license the Software to Franchisee at its current rates. Franchisor or its Affiliate(s) may distribute Proprietary Software through alternative channels of distribution, including near Franchisee's location and to competitors of Franchisee.

7.06.09 Tully's Products. Franchisor will sell to Franchisee the coffees and other Tully's products that are commonly purchased from Franchisor by other restaurant and food service operators. Franchisee shall offer and sell only Tully's branded coffee and related products. At its option, Franchisor may reformulate, re-price, modify, discontinue or replace any Tully's Product. At Franchisor's option it may (but shall not be required to) offer new products to Franchisee and may make them mandatory for purposes of this Agreement.

7.06.10 Payment for Items. Franchisor shall establish terms of sale and credit policies for its customers, and may amend them from time to time. Franchisor shall notify Franchisee of the sale and credit terms applicable for Franchisee's purchases of Items from Franchisor. From time to time, Franchisor may, in its discretion, evaluate the credit history, financial statements and other business information regarding Franchisee, and may reduce the credit limit allowed for Franchisee, modify its terms of sale and credit for Franchisee, require that Franchisee pre-pay for Items and/or pay COD for Items. Franchisor may require that Franchisee pay by check, pre-authorized check, electronic funds transfer or other means. Payments to Franchisor for such Items shall be considered moneys owed to Franchisor under this Agreement. Franchisee shall comply with additional terms and conditions relating to the purchase of Items and goods as set forth in the Manual. Other suppliers of Items shall, in their respective discretion, separately establish and maintain sales and credit policies applicable to Franchisee, and may require that Franchisee pre-pay for Items and/or pay COD for Items, and may require that Franchisee pay by check, pre-authorized check, electronic funds transfer or other means.

*7.07 Minimum Hours.*

Franchisee shall keep the Premises open to the public every day of the year unless otherwise specified by Franchisor or agreed in writing by Franchisor or unless required by law or by a lease approved pursuant to this Agreement. The normal minimum hours of operation shall be from 6:00 a.m. to 8:00 p.m., Monday through Saturday and 6:00 a.m. to 6:00 p.m. on Sundays; however, Franchisor, in its sole discretion may, from time to time specify different hours of operation. Franchisee may request different hours for good cause. The dates and hours of operation may not be the same for all Licensed Businesses or all franchisees, even in the same general area, because of local conditions. Franchisee shall have not less than ten business days to adjust to any increase in the minimum hours required by Franchisor for Franchisee's location.

Tully's
**FRANCHISE AGREEMENT**
OC-058
Page 10

*initials*

**EXHIBIT A, PAGE 75**

## 7.08 Signs.

Franchisee agrees to obtain, install and maintain on the Premises, appropriate signs bearing the Marks as specified by Franchisor. Any deviation from the required signage shall be subject to Franchisor's prior written approval.

## 7.09 Computer System.

Franchisee shall purchase specified computer hardware and software ("Computer System") for use in operation of the Licensed Business as required by Franchisor. This may be in addition to or integrated with the Point of Sale System. In addition, Franchisee may be required, from time to time, to purchase replacement hardware or software or software upgrades, all of which Franchisee shall install and use as required by Franchisor, including, without limitation, point of sale and communications software and hardware. If required, Franchisee will install and maintain and use, at Franchisee's expense, an always-on broadband Internet connection or other data line or communications facility as specified by Franchisor. Franchisee is free to obtain a Computer System and related components and services from any source as long as the equipment, software and service meets or exceeds Franchisor's specifications, and provided that Franchisee has purchased all required software licenses from authorized sources. Franchisee shall be solely responsible for maintenance, repair, upgrading and replacement of the Computer System. Without limiting the applicability of this paragraph, Franchisee shall, at all times, use and maintain the point of sale system and related equipment as required by Franchisor. Franchisee shall not block or attempt to block or limit Franchisor's access, including electronically, to any data or programs contained on Franchisee's Computer System and Franchisee shall maintain information relating to the Licensed Business only on the Computer System(s) to which Franchisor has access.

## 7.10 Communications Equipment and Systems.

Franchisee shall purchase and use in the Licensed Business communications equipment or systems and service as required by Franchisor and shall update or replace such equipment, systems and service as required, but not more than once per year. During any time that Franchisor makes available an Internet-based or similar communications system, Franchisee shall log into the system and check for messages on at least a daily basis and shall remain logged in continuously if required by Franchisor. Except as otherwise required or permitted by this Agreement or by applicable law, Franchisee shall use only the communications systems designated by Franchisor in communicating with Franchisor and other franchisees relating to the Licensed Business. Franchisor shall have a proprietary interest in all communications made through any communications systems maintained or provided by Franchisor. Franchisee acknowledges that the provisions of this paragraph 7.10 are reasonable and necessary and beneficial to the Tully's franchise system.

## 7.11 Equipment Maintenance.

Franchisee shall be solely responsible, at Franchisee's cost and expense, for maintaining, repairing, and replacing, when appropriate, all equipment required, recommended or permitted pursuant to this Agreement.

## 7.12 Warranties.

Franchisee shall not represent to any customer or the public that Franchisor provides any warranty as to the quality of any product or service, unless Franchisor has specifically authorized such warranty in writing. If Franchisee offers any warranties, they shall be subject to Franchisor's prior approval, they shall be in writing and shall clearly state, both in the warranty and in any promotional or advertising materials, that the warranty is available and will be honored only by Franchisee. Franchisee hereby indemnifies, holds harmless and agrees to defend Franchisor, its related companies and all other Tully's franchisees from any and all claims of whatever nature arising from any such additional warranties made by Franchisee. Franchisee shall participate in and comply with any warranty program that Franchisor may adopt from time to time.

## 7.13 No Pirating Of Personnel.

During the term of this Agreement and for a period of two (2) years following Termination or Nonrenewal of this Agreement for any reason whatsoever, Franchisee shall not: (a) induce, or attempt to induce any employee of Franchisor, an Affiliate or of any other franchisee to leave their current employer; (b) without the prior written approval of Franchisor (which may be conditioned upon the prior written approval of another franchisee and other proper conditions) hire or associate or offer to hire or associate any employee of Franchisor, an Affiliate, or of any other franchisee; or (c) without the prior written approval of Franchisor (which may be conditioned upon the prior written approval of another franchisee and other proper conditions) hire or associate or offer to hire or associate any former employee of Franchisor, an Affiliate, or of any other franchisee, who has, voluntarily or otherwise terminated his or her relationship with Franchisor, an Affiliate, or any other franchisee during the prior eighteen (18) calendar months. The terms of this paragraph 7.13 shall survive termination or nonrenewal of this Agreement for any reason. Any waivers of this paragraph 7.13 must be in writing and signed by the Franchisor.

Tully's
**FRANCHISE AGREEMENT**
OC-658
Page 11

*7.14 Health Code Violation Step-In Rights.*

Franchisee is solely responsible for complying, at all times, with all applicable health codes. Any violation of an applicable health code shall be a material breach of this Agreement whether or not it results in a citation by the applicable governmental authority. If Franchisee is in violation of any applicable health code, Franchisor shall have the right, but not the obligation, in addition to all other remedies available herein, to immediately take over management and operation of the Licensed Business for the benefit of and at the sole risk of Franchisee. Upon written notice from Franchisor, Franchisee shall immediately cooperate in turning over management, operation and control of the Licensed Business and Premises to Franchisor or Franchisor's designee. By assuming operation and management of the Licensed Business and control of the Premises, Franchisor shall not be deemed to have assumed liability for any liability or obligation of Franchisee, including for rent for the Premises. By exercising its step-in rights under this paragraph, Franchisor is not making an election of remedies or otherwise limiting its right to pursue any other remedies for breach of the Franchise Agreement. During any step-in period, Franchisor may charge a reasonable management fee. Any net profits remaining after paying current expenses, including management fees, past due amounts to Franchisor and to vendors shall be remitted monthly, one month in arrears, to Franchisee. Franchisor shall have no obligation to continue its operation under this paragraph for any period of time and may simultaneously proceed with any other remedies, including but not limited to termination.

*7.15 Customer Payment Processing.*

7.15.01   Acceptance of Customer Payments. As acceptable forms of customer payment tender, Franchisee shall accept cash and all third-party debit and credit cards specified in the Manual. Franchisee shall comply with all requirements established by the merchant agreements of the debit and credit card companies. Franchisee is encouraged to accept customer checks as a form of payment, subject to Franchisee's reasonable discretion regarding risk of loss for returned checks. Franchisee shall be responsible for all costs and risk of loss related to counterfeit, stolen, NSF and other rejected or returned payment types.

7.15.02   Prepayment Media Programs. Franchisor may from time to time offer programs that permit consumers to prepay for future purchase of products or services ("Prepayment Media"). The Prepayment Media may be in the form of fixed denomination coupons, gift certificates, gift cards, stored value payment cards, or other media. In its sole discretion, Franchisor may add, modify or discontinue one or all Prepayment Media. In its sole discretion, Franchisor shall determine which Prepayment Media may be offered by Franchisee to its customers, and which Prepayment Media must be accepted and redeemed by Franchisee as a form of payment from customers, and Franchisor may from time to time amend its determination. If Prepayment Media have been approved by Franchisor for offering or redemption by Franchisee, Franchisee shall process such transactions in compliance with the Manual (including the requirements for remittance of proceeds from Prepayment Media and for requesting reimbursement for redemption of Prepayment Media). Prepayment Media and the processing services related to Prepayment Media shall be purchased only from Franchisor or a supplier approved by Franchisor.

7.15.03   Payment Agreements and Processing. Franchisee shall establish its own banking relationships and shall negotiate and execute processing agreements for debit and credit cards. If Franchisee has been approved for participation in any Prepayment Media program, Franchisee may be required to enter into service agreements related to the processing of such transactions. Franchisee shall provide at its expense any approved equipment that is required for processing of payment transactions, and shall pay all costs related to its bank accounts and for the processing of its deposit and payment transactions.

## ARTICLE 8 - INDEMNITY AND INSURANCE

*8.01 Indemnity.*

Franchisee shall defend, hold harmless and indemnify Franchisor, its officers, directors, shareholders, agents, employees, landlords and related companies, and its franchisees other than Franchisee, from any and all losses, claims, damages, liabilities, or expenses of any kind or nature, including fines, penalties, interest, attorneys' fees, and all other types of costs or expenses, arising directly or indirectly from the acts or omissions (whether or not negligent or wrongful) of Franchisee or of any of Franchisee's manager(s), employees or agents in connection with the performance or breach of any obligation under this Agreement.

*8.02 Insurance.*

Franchisee shall purchase and maintain, at Franchisee's expense, throughout the term of this Agreement commercial general liability insurance, including bodily injury, property damage, personal injury, advertising injury, non-owned automobile, and broad form contractual coverage for liability assumed under this Agreement. Such insurance shall be on an occurrence basis and shall consist of combined single limit coverage of at least two million dollars per occurrence/$two million annual aggregate, including umbrella liability coverage. Franchisee shall purchase and maintain worker's compensation and employer's liability insurance with a reputable insurer with a Best rating of not less than "A" or with a state agency. Franchisee

*initials*

shall purchase and maintain, at Franchisee's expense, adequate commercial property insurance for the Premises, including business income and extra expense coverage. Franchisee shall provide Franchisor with one or more certificates of insurance evidencing such coverages and naming Franchisor as an additional insured as to each applicable policy. Such certificate(s) of insurance shall provide that the coverages under the respective policy(ies) may not be modified (except to increase coverage) or canceled until at least thirty (30) days prior written notice of such cancellation or modification has been given to Franchisor. Upon request by Franchisor, Franchisee shall provide Franchisor with a true copy of any insurance policy.

## ARTICLE 9 - RENEWAL

### 9.01 Conditions Of Renewal.

After expiration of the term of this Agreement, if Franchisor has made a business decision, in Franchisor's sole discretion, to continue the Tully's Franchise System in Franchisee's area, Franchisee will be permitted to renew Franchisee's Franchise Agreement, but only upon the following terms and conditions:

9.01.01  Franchisee must be current in payment of all fees and charges to Franchisor and any of its related companies and must not have made more than two late payments within the last three years for which Franchisor gave written notice(s) of breach, which notice(s) were not withdrawn by Franchisor;

9.01.02  Franchisee must not be in material breach of this Agreement or of any other agreement between Franchisor and Franchisee and must have substantially complied with the operating standards and other criteria contained in the Manual or otherwise communicated in writing by Franchisor;

9.01.03  Franchisee shall pay a renewal fee as established at the time by Franchisor, but which shall be not more than two thirds of the then-current Initial Fee, payable in full at the time of execution of the Franchise Agreement referred to in sub-paragraph 9.01.04;

9.01.04  Franchisee shall execute the then current form of Franchise Agreement, which may differ in material ways that are not reasonably foreseeable at this time, but may include material differences in territorial boundaries and economic terms, including the amount of royalties and advertising fees or entirely new categories of fees or mandatory expense;

9.01.05  Franchisee must maintain possession of the Premises identified in Exhibit A for the renewal term or obtain substitute premises approved by Franchisor;

9.01.06  Franchisee, at Franchisee's sole cost and expense, shall remodel or refurbish the Premises and otherwise modernize and renovate the Premises, signs and equipment to be consistent with the then current image of the System and to meet Franchisor's then current specifications;

9.01.07  Franchisee shall give written Notice to Franchisor at least six months, but not more than twelve months, prior to the end of the term of this Agreement of Franchisee's desire to renew; and

9.01.08  Franchisee must not, during the preceding term, have engaged in any business dealings in relation with the Licensed Business or the Franchisee which are unethical, dishonest or otherwise could cause harm to the Marks, Franchisor, any other franchisee, the goodwill associated with the Marks, or to any customer, client or vendor of Franchisee, Franchisor or of another franchisee.

## ARTICLE 10 - CONTINUATION

If, following the termination or expiration of this Agreement for any reason, whether voluntary or involuntary, Franchisee continues to operate the Licensed Business or occupy the Premises with the express or implied consent of Franchisor, but without a renewal franchise agreement, such continuation shall constitute a month-to-month extension of this Agreement and shall be terminable by either party upon the lesser of (a) thirty (30) days written notice or (b) such shorter notice by Franchisor as would otherwise be applicable in a termination for cause. Franchisee acknowledges and agrees that such continuation shall be good cause for termination of this Agreement. Both parties shall continue to be subject to all terms of this Agreement during any such continuation period.

## ARTICLE 11 - ENTITY FRANCHISEE

### 11.01 Entity Definition.

An "Entity" is any form of business organization except for a sole proprietorship and includes all kinds of corporations, limited liability companies, limited partnerships and general partnerships and any other form of business organization involving either multiple equity owners or which attempts to provide limited liability.

Tully's
**FRANCHISE AGREEMENT**
OC-008
Page 13

*initials*

**EXHIBIT A, PAGE 78**

### 11.02  Founding Document Restriction.

Except if Franchisee is a publicly traded company, if Franchisee is an Entity or becomes an Entity or if Franchisee transfers Franchisee's interest under this Agreement or any interest in the Licensed Business to an Entity, the founding document(s) of the Entity must provide as follows:

> This [insert type of Entity] shall not enter into any agreement or undertaking which would, directly or indirectly, limit any of the rights or obligations of the [insert type of Entity] or of any owner of the [insert type of entity] under the Tully's Franchise Agreement dated _____, _____.  Any such agreement or undertaking is void.

### 11.03  Liability Of Owner(s).

Except if Franchisee is a publicly traded company, each owner of an equity or other interest in any Entity franchisee (and any individual person who is an owner of an Entity which owns any equity interest in any Entity franchisees) shall personally guaranty this Agreement.  Any change in or addition of equity or other owner(s) shall be subject to the Assignment and Death and Incapacity provisions of this Agreement.

### 11.04  Restriction On Certificates Of Ownership.

Except if Franchisee is a publicly traded company, each and every document, if any, issued by any Entity franchisee evidencing ownership of an equity or other interest in the Entity must provide as follows:

> Ownership of this [insert type of Entity] is restricted and cannot be transferred, assigned, sold or encumbered except in strict compliance with the Tully's Franchise Agreement dated _____, _____.  Any other transfer or attempted transfer is void.

### 11.05  Additional Requirements Of Entity Franchisee.

Franchisee shall, upon Franchisor's request, provide Franchisor or its designee with true copies of such of Franchisee's Entity records and documents as Franchisor shall designate.  An Entity Franchisee shall, at all times, have one individual person who shall be the designated principal who shall have authority to act on behalf of the Entity in all respects under this Agreement.  The designated principal shall be the individual who is responsible for assuring compliance by the Entity with all of the terms of this Agreement.  Notwithstanding the requirement of a designated principal, Franchisor shall be entitled to rely upon the acts or words of any principal, employee or agent of an Entity Franchisee whom Franchisor understands to be acting or speaking on behalf of the Entity.

## ARTICLE 12 - ASSIGNMENT OR TRANSFER

### 12.01  Prior Consent.

Franchisee shall not assign, transfer, sell, sublease, sublicense or encumber (hereinafter collectively referred to as "Assign" or "Assignment"), in whole or in part this Agreement, the Franchisee, the Licensed Business, any option or first right of refusal relating to this Agreement, the Franchisee or the Licensed Business, the assets of the Licensed Business or the leasehold of the Licensed Business or represent to any person that such an Assignment has been made without Franchisor's prior written approval.  For purposes of this Paragraph 12.01, the terms "Assign" or "Assignment" shall include any assignment, transfer, sale or encumbrance of any shares of stock of a Franchisee that is a corporation, any partnership interest of a Franchisee that is a partnership, any membership interest of a Franchisee that is a limited liability company, and any equity or ownership interest or rights in any other form of entity.  Any attempted Assignment without Franchisor's prior written consent shall be void and a breach of this Agreement.  If, however, Franchisee is a publicly traded company, Franchisor's prior consent is not required for the transfer of stock or ownership interests so long as the transfer, when taken together with other transfers during a 24 month period, does not effect a change in actual control of a majority of shares or other ownership interests of the company.

### 12.02  Conditions Of Assignment.

As preconditions for obtaining Franchisor's consent to an Assignment, at least the following terms and conditions must be met:

12.02.01  Franchisee must be current in payment of all fees and charges to Franchisor and any of its related companies;

12.02.02  Franchisee must not be in material breach of this Agreement or of any other agreement between Franchisor and Franchisee;

12.02.03  Franchisee must have paid in full all debts in connection with the Licensed Business;

Tully's
**FRANCHISE AGREEMENT**
OC-05B
Page 14

_____|_____
_initials_

**EXHIBIT A, PAGE 79**



12.02.04 The assignee must have agreed to assume all of the obligations of the Licensed Business;

12.02.05 The assignee must execute a disclosure form containing a waiver and release of any claim against Franchisor for any amount(s) paid to, or representation(s) made by Franchisee or any omission by Franchisee to disclose facts, material or otherwise;

12.02.06 Franchisee must execute, at Franchisor's option, a mutual termination of this Agreement and a general release, or an assignment of this Agreement and a general release, and an agreement to defend, hold harmless and indemnify Franchisor from any claim by the assignee in form specified by Franchisor, the current version(s) of which are attached as Exhibit J;

12.02.07 The assignee must pay to Franchisor a Transfer Fee in the amount of Four Thousand, Five Hundred Dollars ($4,500) and execute, at Franchisor's option, the then current form of Franchise Agreement or an assumption of this Agreement (in any event providing for the same royalty and advertising fees as contained herein, for the balance of the term hereof);

12.02.08 The assignee must, in the sole opinion of Franchisor, successfully complete the then current initial training program at the assignee's sole cost and expense;

12.02.09 The assignee must have met the then current standards of Franchisor for experience, financial strength, reputation and character required of new or renewal Franchisees;

12.02.10 The assignee must obtain such approvals as may be required to assume occupancy and possession and the continuing obligations relating to the lease or possession of the Premises, unless a new location has been approved in writing by Franchisor; and

12.02.11 Franchisor must have been given at least thirty (30) business days written first right of refusal by Franchisee, upon the same terms as those agreed upon by Franchisee with any proposed assignee; provided, however, Franchisor may substitute cash of equivalent value for any non-cash term. In the event Franchisor waives or fails to exercise its right of first refusal, if Franchisee thereafter agrees to accept a revised offer, regardless of the nature of the revision, Franchisor shall have a new right of first refusal hereunder on the new terms.

*12.03 Assignment To An Entity.*

Notwithstanding the foregoing, if Franchisee is an individual or partnership, Franchisee may assign this Agreement to an Entity, as defined in Article 11, formed under the laws of the state where the Licensed Business is located, which is wholly owned by Franchisee; provided that the individual Franchisee shall first provide written notice of the assignment to Franchisor and shall personally guarantee the performance of this Agreement. If Franchisee is an Entity, Franchisee may assign this Agreement to another Entity, formed under the laws of the state where the Licensed Business is located, of the same or different form, which has exactly the same ownership, including percentages of ownership as Franchisee; provided that each of the individual equity or other owners of the new Entity shall personally guarantee the performance of the Agreement. The personal guarantee shall be in the form of Exhibit G hereto. No assignment under this paragraph shall change or limit the liability of any person or entity under this Agreement. Franchisee shall pay to Franchisor a processing fee of five hundred dollars ($500.00) for an assignment pursuant to this paragraph 12.03.

*12.04 Approval Process.*

Franchisor may use its own discretion in approving or rejecting prospective transferees in the same manner as if it was approving or rejecting any other new prospective franchisee, taking into consideration such factors as their financial ability, character, business reputation, experience and capability to conduct the type of business involved. The approval of one Assignment does not obligate Franchisor to approve any other or subsequent Assignment. If Franchisee is an Entity (other than a publicly traded company), notwithstanding any statute or agreement to the contrary, the addition, withdrawal or expulsion of any equity or other owner or the transfer, encumbrance or assignment of any equity or ownership or control interest of any equity or other owner or the dissolution or reorganization of the Entity for any reason is subject to the same considerations as any other Assignment.

*12.05 Transfer By Franchisor.*

There shall be no restriction upon Franchisor's right to encumber, transfer or assign this Agreement or the System. Following such a transfer or assignment, Franchisor shall have no further obligation or liability to Franchisee hereunder or otherwise so long as the assignee or transferee agrees to assume all of Franchisor's liabilities and obligations to Franchisee. Upon Franchisor's request, Franchisee shall execute and deliver a certificate to Franchisor, as described in Paragraph 21.05, in connection with an anticipated transfer or financing procedure by Franchisor. Franchisee agrees to accept any transferee of part or all of Franchisor's interests, including any subfranchisor, and perform for such transferee the same as for Franchisor. In the event of a termination or replacement of a subfranchisor, Franchisee shall again report to Franchisor directly or to such replacement subfranchisor as Franchisor may designate.

*initials*

12.06  No Sublicensing.

Franchisee shall not, directly or indirectly, sublicense or attempt to sublicense the Marks or the System or any part thereof to any person or entity for any purpose. Any attempted or purported sublicense shall be void.

## ARTICLE 13 - DEATH OR INCAPACITY

### 13.01  Alternatives Upon Death Or Incapacity.

In the event of the death or incapacity of an individual franchisee, or of any individual equity or other owner of an Entity franchisee, the heirs, beneficiaries, devisees or legal representatives of said individual shall, within ninety (90) days of such event:

13.01.01  Apply to Franchisor for the right to continue to operate the franchise and the Licensed Business for the duration of the term of this Agreement and any renewals hereof, which right to continue to operate will be granted upon the fulfillment of all of the conditions set forth in Article 12 of this Agreement (except that no transfer fee shall be required); or

13.01.02  Sell, transfer or convey Franchisee's interest to a third party in compliance with the provisions of Article 12 of this Agreement; provided, however, in the event a proper and timely application for the right to continue to operate has been made and rejected, the ninety (90) days to sell, transfer or convey shall be computed from the date of said rejection. For purposes of this paragraph, Franchisor's silence on an application to continue to operate through the ninety (90) days following the event of death or incapacity shall be deemed a rejection made on the last day of such period.

### 13.02  Effect Of Failure To Comply.

In the event of the death or incapacity of an individual franchisee, or any owner of an equity or other interest in an Entity franchisee where the provisions of this Article have not been fulfilled within the time provided, all rights granted to Franchisee under this Agreement shall, at the option of Franchisor, terminate and the parties shall proceed according to and have the rights provided for in Articles 17 and 18.

### 13.03  Incapacity Defined.

For purposes of this Agreement, "incapacity" is the inability of Franchisee to operate or oversee the operation of the Licensed Business on a regular basis and in the usual manner by reason of any continuing physical, mental or emotional disability, chemical dependency or other similar limitation which has continued or will more likely than not continue for a period of 60 consecutive days or more. Franchisee shall advise Franchisor in writing, immediately, upon receipt of advice from any physician or other professional that Franchisee or a principal of an Entity franchisee has an incapacity. However, Franchisee's failure or inability to advise Franchisor of Franchisee's incapacity shall not limit Franchisor's rights under this sub-paragraph. Any dispute as to the existence of an incapacity as defined herein shall be resolved by majority decision of three (3) licensed medical physicians practicing in the state in which the Licensed Business is located, with each party selecting one (1) physician, and the two (2) physicians so designated selecting the third physician. The determination of the majority of the three (3) physicians shall be binding upon the parties and all costs of making said determination shall be borne by the party against whom it is made. Notwithstanding the foregoing, if any insurance company pays to the Franchisee or Franchisee's Entity any disability benefits for 60 consecutive days, or more, of disability, the Franchisor may regard that as conclusive evidence of incapacity.

## ARTICLE 14 - SUCCESSORS AND ASSIGNS

This Agreement shall bind and inure to the benefit of the successors, permitted transferees and assigns, personal representatives, heirs and legatees of the parties hereto.

## ARTICLE 15 - TERMINATION

Franchisor may terminate this Agreement as follows:

15.01     Franchisor may terminate this Agreement upon at least thirty days notice and opportunity to cure (or longer if required by law) if Franchisee is in breach of any term of this Agreement or of any other agreement between Franchisee and Franchisor or any affiliate of Franchisor.

15.02     Franchisor may terminate this Agreement upon at least 72 hours notice and opportunity to cure (or longer if required by law) for occurrence of any one or more of the following events (each of which Franchisee acknowledges is good cause for termination and a material breach of this Agreement), notwithstanding that Franchisor may have the option to give a longer notice and cure period pursuant to other provisions of this Agreement:

Tully's
**FRANCHISE AGREEMENT**
OC-65B
Page 16


*initials*

i.  Franchisee fails to pay or deposit when due, and in the manner prescribed by Franchisor, any moneys owed to Franchisor or any of its related companies or to another Tully's franchisee;

ii.  Franchisee files a voluntary petition in bankruptcy or has an involuntary petition filed against Franchisee, Franchisee makes an assignment for the benefit of creditors, or a receiver or trustee is appointed;

iii.  Franchisee violates or attempts to violate any of the Assignment provisions of this Agreement;

iv.  Franchisee vacates, deserts, or otherwise abandons all or any substantial portion of the Premises or equipment, or abandons the Licensed Business for more than 24 hours (whether or not Franchisee intends to abandon);

v.  Franchisee sublicenses or attempts to sublicense the Marks or the System in violation of this Agreement;

vi.  Franchisee is an Entity and an impasse exists between equity or other owners or there is any change in the ownership of any interest in the Entity without having first complied with the provisions of this Agreement;

vii.  Franchisee fails to timely permit any audit or inspection by or on behalf of Franchisor;

viii.  Franchisee violates or fails to comply with any law, rule, regulation, ordinance or order relating to the operation of the Licensed Business (including any health codes, rules or regulations) or fails to obtain and continue any license, permit or bond necessary, in Franchisor's opinion, for Franchisee's operation of the Licensed Business;

ix.  Franchisee is convicted of or pleads guilty or "Nolo Contendere" to any felony;

x.  Franchisee fails to operate the Licensed Business under the Marks or fails to properly display the Marks at all times in full compliance with this Agreement and the Manual;

xi.  Franchisee engages in any business dealings in relation with the Franchise, the Licensed Business or the Franchisee which are unethical, dishonest or otherwise could cause harm to the Marks, the System, Franchisor, other franchisees, the goodwill associated with the Marks, or to any customer, client or vendor of Franchisee or any other franchisee or the Franchisor;

xii.  Franchisee fails or refuses to timely execute and deliver a truthful certificate pursuant to paragraph 21.05;

xiii.  Franchisee fails to maintain insurance or workers compensation coverage;

xiv  Franchisee fails to execute the then-current form of franchise agreement offered by Franchisor as a condition of renewal or to otherwise comply with the renewal requirements upon expiration of the current term of this Agreement or during any Continuation period; or

xv.  Any other agreement, including any other Franchise Agreement to which Franchisee is a party, between Franchisee and Franchisor or between Franchisee and any of Franchisor's related companies is terminated for cause.

15.03  Franchisor may terminate this Agreement without giving notice or opportunity to cure upon occurrence of any one or more of the following events (each of which Franchisee acknowledges is good cause for termination and a material breach of this Agreement), notwithstanding that Franchisor may have the option to give a longer notice and a cure period pursuant to other provisions of this Agreement:

i.  Upon three willful and material breaches of the same term of this Agreement occurring within a twelve-month period;

ii.  Franchisee is adjudicated a bankrupt or insolvent;

iii.  Franchisee makes an assignment for the benefit of creditors or similar disposition of the assets of the Licensed Business;

iv.  Franchisee voluntarily abandons the Licensed Business; or

v.  Franchisee is convicted of or pleads guilty or no contest to a charge of violating any law relating to the Licensed Business.

15.04  Notwithstanding any right of Franchisor to terminate this Agreement, pursuant to this Agreement or otherwise, Franchisor may, in Franchisor's sole discretion, elect to not terminate this Agreement and to, in lieu thereof, impose limitations on Franchisee, including, but not limited to, revocation of Franchisee's Territorial rights, and revocation of Franchisee's rights to acquire or offer and sell certain products and services. Franchisor's election to not terminate this Agreement pursuant to this paragraph shall not constitute an election of remedies and Franchisor may, thereafter, terminate this Agreement on account of the same or any other event(s) of default as set forth herein.

Tully's
**FRANCHISE AGREEMENT**
OC-05B
Page 17

_____
_initials_

## ARTICLE 16 - COMPETITION WITH FRANCHISOR

### 16.01  Competing Business Activities During Term.

During the term of this Agreement, Franchisee shall not engage, directly or indirectly, either personally or as an employee, partner, member, manager, franchisor, franchisee, agent, consultant, shareholder, director, officer, advisor or otherwise, in any other business the same as or similar to that defined under "Licensed Business" herein or which is or would directly or indirectly compete with the Licensed Business or otherwise with the business of Franchisor or with any other franchisee of Franchisor. This prohibition includes, but is not limited to, any wholesale or retail business offering and selling espresso, coffee drinks, teas, baked goods, ice cream products, other complementary food and beverage items, or related accessaries. Franchisee shall not operate any other business from the Premises. Franchisee shall not use nor permit to be used any Trade Secret(s) of Franchisor or the Marks or anything resembling the Marks in connection with any other business, whether or not such other business is owned, controlled by or associated with Franchisee.

### 16.02  Competing Business Activities After Term.

16.02.01  Franchisee covenants and agrees that, for a period of twenty-four (24) months following the effective date of any termination, expiration or non-renewal ("the Termination Date"), Franchisee will not, individually or together with another, directly or indirectly, on its own behalf or on behalf of or through any other person, sole proprietorship, or Entity, do any of the following:

a.  Compete with Franchisor or any franchisee of Franchisor within a twenty mile radius of the boundary of Franchisee's designated Territory, as it existed immediately before the Termination Date, in the operation of any retail business offering and selling a limited menu of specialty espresso and coffee drinks, teas, baked goods, ice cream products, other complementary food and beverage items and related accessories and supplies, any aspect of such Licensed Business as it exists on the Termination Date, or any business substantially similar thereto or tending to compete for the same customers as Franchisor or its Franchisees ("Prohibited Activities);

b.  Solicit, take away, or divert, and/or influence or attempt to influence any customers, franchisees, vendors, clients, and/or patrons of Franchisor or of any franchisee of Franchisor, which customers, franchisees, vendors, clients, and/or patrons were served by Franchisor or a franchisee of Franchisor at any time during the four (4) years preceding the Termination Date, to transfer or divert their business or patronage from Franchisor or Franchisor's franchisee(s) to any other person or Entity engaged in the Prohibited Activities or anything similar to the Licensed Business;

c.  Solicit or attempt to hire any person who was an employee of Franchisor or of any other franchisee of Franchisor during the one (1) year period ending on the Termination Date, or attempt to influence any such person to terminate his employment with Franchisor or Franchisor's franchisee(s).

16.02.02  Franchisee covenants and agrees that, at no time will Franchisee, directly or indirectly, disclose or cause or permit to be disclosed, sell, or otherwise transfer to any party other than Franchisor, including, but not limited to, a person or Entity, for or not for consideration, the Trade Secrets, or any part thereof;

16.02.03  Franchisee covenants and agrees that, for a period of twenty-four (24) months from the Termination Date, Franchisee will not, individually or together with another, directly or indirectly, through others or on its own behalf, hold any ownership or have a financial or other interest in, be employed by, or otherwise have any ownership or management relationship with, any person or Entity, either as principal, broker, member, agent, stockholder of any class, or as a partner, officer, director, trustee, franchisee, franchisor, employee, consultant, lender, guarantor, member of a board of directors or board of trustees, or in any other capacity, which does any of the following:

a.  Competes with Franchisor or any franchisee of Franchisor;

b.  Solicits, takes away, or diverts, and/or influences or attempts to influence any customers, clients, franchisees, vendors, and/or patrons of Franchisor or of any other franchisee of Franchisor, which customers, clients, franchisees, vendors, and/or patrons were served by Franchisor or any franchisee of Franchisor at any time during the four (4) years preceding the Termination Date, to transfer or divert their business or patronage from Franchisor or any other franchisee to any other person or Entity engaged in the Prohibited Activities or anything similar to the Licensed Business;

c.  Solicits or attempts to hire any person who was an employee of Franchisor or of any other franchisee of Franchisor during the two (2) year period ending on the Termination Date, or attempts to influence any such person to terminate his employment with Franchisor or any franchisee of Franchisor.

16.02.04  Franchisee covenants and agrees that, at no time will Franchisee, directly or indirectly, through others or on its own behalf, hold any ownership or have a financial or other interest in, be employed by, or otherwise have any ownership or management relationship with, any person or Entity, either as principal, broker, agent, stockholder of any class, or as a member,

Tully's
**FRANCHISE AGREEMENT**
cc-658
Page 18

_initials_

**EXHIBIT A, PAGE 83**

partner, officer, director, trustee, franchisee, Franchisor, employee, consultant, lender, guarantor, member of a board of directors or board of trustees, or in any other capacity, which, discloses or causes to be disclosed, sells, or otherwise transfers to any party other than Franchisor, including, but not limited to, a person, sole proprietorship, partnership, joint venture, firm, limited liability company, corporation, trust, or other Entity, for or not for consideration, the Trade Secrets, or any part thereof;

16.02.05 Franchisee acknowledges and agrees that the periods of time of this covenant and the geographical areas of restriction imposed by this covenant are fair and reasonable and are reasonably required for the protection of Franchisor and its franchisees. Franchisee would desire at least this same protection against competitive activities by another former franchisee whose franchise agreement was either expired, terminated or non-renewed. Franchisee agrees that, in the event a court or arbitrator should determine any part of this covenant to be excessively broad, unenforceable, and/or invalid, the remaining parts hereof shall nevertheless continue to be valid and enforceable as though the invalid portions were not a part hereof. Franchisee further agrees that, in the event that any of the provisions of this Agreement relating to the geographic area of restriction or the periods of time of the covenants shall be deemed to exceed the maximum area or periods of time which a court of competent jurisdiction would deem enforceable, the geographic area or periods of time shall, without further action on the part of any person, be deemed to be modified, amended and/or limited, to the maximum geographic area or time periods which a court of competent jurisdiction would deem valid and enforceable in any jurisdiction in which such court shall be convened. Any such modification shall apply only in the jurisdiction of the deciding court or in the state where the arbitrator made the decision.

16.02.06 It shall not be a violation of this Article for Franchisee to have or maintain a passive investment in stock of any publicly traded corporation, provided said stock holdings shall not exceed five percent (5%) of the issued and outstanding stock of such corporation.

16.02.07 For purposes of this Agreement, all references to Franchisor shall be deemed to include: (a) any corporation or entity which acquires all, or substantially all, of the assets of Franchisor, whether by statutory merger or otherwise, (b) any corporation, partnership, or other entity directly or indirectly controlled by or under common control with Franchisor or its successor, and (c) any subfranchisor or other assignee of Franchisor.

16.02.08 Franchisee agrees that it would be extremely difficult to prove with certainty the exact amount of damages caused to Franchisor by a violation of this Article 16 by Franchisee and therefore, Franchisee agrees that, upon proof that Franchisee violated this Article 16, Franchisor shall be entitled to liquidated damages in an amount calculated by multiplying the amount of gross revenues generated by Franchisee or a third party that benefited from the violation during the period of breach and multiplying it by 1.5. Franchisee acknowledges that this results in a reasonable estimate of what Franchisor's actual damages would be and is not a penalty.

16.02.09 Franchisee agrees that any violation of the covenants contained in this Article will cause irreparable harm to Franchisor and its other franchisees and may, as a matter of course, be restrained by process issued out of a court of competent jurisdiction, in addition to any other remedies provided by law. In the event of any action for a temporary or permanent injunction to enforce this Covenant, Franchisee hereby waives any requirement of a bond to the extent that any bond would exceed one hundred dollars. The substantially prevailing party in any such enforcement action shall be entitled to recover their attorneys fees and costs incurred therein in addition to any and all other remedies.

16.02.10 Nothing in this Article 16 shall obligate Franchisor to take action to enforce this or any other covenant against competition against any other franchisee or former franchisee. Nothing in this Article 16 shall entitle Franchisee to take any action to enforce this or any other covenant against competition against any other franchisee or former franchisee.

16.02.11 The terms of this Article 16 shall survive the termination or expiration of this Agreement for any reason.

## ARTICLE 17 - EFFECT OF TERMINATION

### 17.01 Loss Of Rights.

After the Termination Date, Franchisee shall have no further rights to use, in any manner, the System, the Marks, anything similar to the Marks, the telephone numbers, the telephone listings, any proprietary computer software, any trade secrets or the Manual. Franchisee shall immediately notify such persons as Franchisor shall reasonably require of Franchisee's loss of rights thereto. All sums of money due from Franchisee to Franchisor or to any other Tully's franchisee as of the Termination Date shall become immediately due and payable. As between the parties hereto, whether or not a Lease Conditional Assignment Agreement has been signed, Franchisor or Franchisor's designee shall have the option, exercisable within sixty (60) days, to assume the lease for the Premises. If Franchisor elects to assume the lease for the Premises, pursuant to the Lease Conditional Assignment Agreement or otherwise, Franchisee agrees to cooperate in the transfer, to execute any documents which may be required for Franchisor or Franchisor's designee to assume the lease, and to otherwise take no actions which would interfere with the ability of Franchisor or its designee to assume the said lease. Franchisee specifically agrees to execute such document(s) as may be necessary to transfer the telephone number(s) to Franchisor or Franchisor's designee. In

Tully's
**FRANCHISE AGREEMENT**
OC-65B
Page 19

*initials*

.EXHIBIT A, PAGE 84

the event Franchisee or any owner or affiliate of Franchisee owns or controls the Premises, Franchisee agrees that Franchisor shall have the option to lease or sublease the Premises at fair market value for a term of up to ten (10) years, at Franchisor's election, such option exercisable by Franchisor within sixty (60) days following the Termination Date.

### 17.02 Change Of Identity.

After the Termination Date, Franchisee shall immediately refrain from holding itself out to the public in any way as a Franchisee or affiliate of Franchisor or as a former Franchisee or affiliate of Franchisor. If directed by Franchisor, Franchisee shall, at Franchisee's sole cost and expense, make or cause to be made such changes in signs, telephone numbers, buildings or structures as Franchisor may direct to distinguish the Premises from its former appearance and from other Tully's franchisees. If Franchisee fails to make such changes within ten (10) calendar days, then Franchisor shall have the right to enter upon the Premises, without liability for trespass or otherwise, and to make or cause to be made such changes at the expense of Franchisee, which expenses shall be paid by Franchisee upon demand. Franchisee shall immediately file the appropriate forms to abandon or withdraw any assumed name certificate or to change the name of its corporation or partnership to eliminate any reference to the System or the Marks, including discontinuation of use of any web site address or email address bearing the Marks or any part of the Marks. If Franchisee fails or refuses to cooperate with Franchisor, Franchisee hereby appoints Franchisor as its Attorney in Fact to complete the changeover. Franchisee shall immediately return to Franchisor the Manual, Trade Secrets, bulletins, instruction sheets, software, forms, Marks, designs, signs, printed matter and other material containing any part of the System or the Marks together with all copies thereof (including electronic or digital copies) that are or have been within Franchisee's custody or control.

### 17.03 Changeover Procedure.

Upon termination of this Agreement, either by expiration, non-renewal, or otherwise, if Franchisor or Franchisor's designee has indicated its intention to assume Franchisee's lease for the Premises and to operate a Tully's business from that location, the parties agree to cooperate in the changeover of the Licensed Business to Franchisor, including by taking the steps set forth herein. If Franchisee fails or refuses to cooperate with Franchisor, Franchisee hereby appoints Franchisor as its Attorney in Fact to complete the changeover. The parties shall: notify the landlord of the change of tenancy pursuant to the Lease Conditional Assignment Agreement or otherwise and Franchisor shall be entitled to take control of the Premises, including by changing the locks; terminate vendor accounts at Franchisor's option; conduct an inventory of all equipment, fixtures, tenant improvements, supplies and inventory (if Franchisee elects to not participate in the inventory, Franchisor's inventory shall be presumed accurate and complete); Franchisor shall have the right to use Franchisee's equipment, furniture, fixtures and related items for up to sixty (60) days and shall pay or credit Franchisee with the fair market rental value of that use; Franchisor shall be entitled to communicate directly with Franchisee's agents, employees, customers and vendors in order to facilitate a smooth transition to ownership by Franchisor or Franchisor's designee; Franchisor or its designee shall be entitled to all Gross Revenues received after the date of termination. No action taken pursuant to this paragraph shall constitute a waiver by Franchisor of any claims against Franchisee for any reason. The parties agree that there are no circumstances justifying a stay or delay in implementation of the terms of this paragraph and the parties specifically agree that any claims, including, but not limited to, allegations of wrongful termination, can be separately resolved and that an award of damages would be an adequate remedy.

### 17.04 Continuing Royalties.

Franchisor shall be entitled to receive royalties on all Gross Revenues received or receivable by Franchisee as of the Termination Date. All such royalties shall be due and payable on the Termination Date.

### 17.05 Option To Purchase Certain Assets.

Franchisor shall have and is hereby granted an exclusive option for a period of sixty (60) days from and after the Termination Date, to purchase from Franchisee all of Franchisee's right, title and interest in all or any part of the franchise, Franchisee's Licensed Business and business assets and/or the Premises, if applicable, at the fair market value, except as otherwise specifically provided herein, of all assets purchased, but excluding any value for purported "goodwill" or "blue sky". Franchisee acknowledges that Franchisor already owns the "goodwill" or "blue sky", which is attached to the Marks and the Licensed Business. Franchisor's notice exercising the option granted herein shall contain a list, at least by major category, of the assets Franchisor is purchasing. Franchisor shall not be obligated to assume any liabilities of Franchisee.

### 17.06 Payment And Terms.

Franchisor shall pay to Franchisee all sums due pursuant to this Article, and any other sums required by this Agreement or by law, over a period of sixty months, or such shorter period as Franchisor, in its sole discretion, shall elect, with interest thereon at the prime interest rate as published by Bank of America or its successor, if applicable, determined as of the end of the calendar quarter immediately preceding the Termination Date.


*initials*

### 17.07 Survival Of Terms.

The terms of this Article 17 shall survive the termination, non-renewal or expiration of this Agreement for any reason.

## ARTICLE 18 – RELEASE FROM FRANCHISEE OBLIGATIONS.

### 18.01 Release From Continuing Obligations.

At any time, upon not less than ninety (90) days prior written notice to Franchisor, Franchisee may secure a release from Franchisee's continuing obligations under this Agreement by executing a Release From Continuing Obligations in substantially the form of Exhibit L and by electing one of the alternatives contained in the Release From Continuing Obligations. Upon receipt of a notice pursuant to this paragraph, Franchisor may, but is not obligated to, accelerate the effective date of Franchisee's termination to such date as Franchisor may select in Franchisor's sole discretion.

## ARTICLE 19 - ARBITRATION OF DISPUTES.

### 19.01 Agreement to Arbitrate.

Except as provided in paragraph 19.04, any controversy or claim or dispute between the parties hereto or between any party hereto and any other person arising out of or relating to this Agreement, the negotiation thereof, the offer or acceptance thereof, or the performance or breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. This Article shall be governed by the Federal Arbitration Act. Any arbitration shall be before a panel of three arbitrators and shall take place in Seattle, Washington, U.S.A. No party shall join or attempt to join their claims in a single proceeding with the claims of any other party, person or entity even if similarly situated. The parties shall bear their own expenses, including their own attorneys fees and costs and shall share equally all expenses of the arbitrator and the American Arbitration Association.

### 19.02 Conduct of Arbitration.

Unless otherwise specifically required by applicable law, a demand for arbitration or proceedings in arbitration, or court proceedings shall not operate to stay, postpone, prohibit or rescind any expiration, termination or non-renewal of this Agreement as provided in this Agreement, and the parties will be limited to their remedy in damages, as determined by the court or arbitrator, for non-renewal or termination found by the arbitrator to be wrongful. Damages would be an adequate remedy for any such wrongs. The court or arbitrator shall not extend, modify or suspend any of the terms of this Agreement or the reasonable standards of business performance set by Franchisor. The arbitrators shall permit discovery between the parties pursuant to the Federal Rules of Civil Procedure.

### 19.03 Conditions Precedent to Arbitration.

As conditions precedent to commencing an arbitration proceeding pursuant to this Agreement, the parties shall first comply with the terms of this paragraph 19.03. Failure to comply with this paragraph shall be a material breach of this Agreement and shall entitle the non-defaulting party to an award of all of their attorneys fees and costs reasonably expended in enforcing the terms of this paragraph. Such award of attorneys fees shall be made by the court enforcing this paragraph and shall be paid by the breaching party before and as a condition precedent to further proceeding in accordance with this Article. For the limited purpose of enforcing this paragraph 19.03, each party hereby waives arbitration and the matter shall be heard in the King County Superior Court in Seattle, Washington. Within not more than sixty days following the date on which the aggrieved party first discovered or reasonably should have discovered the facts of a dispute between the parties, but not more than one year after the date of the events or facts which gave rise to the dispute, the aggrieved party shall give a Notice to the other party (and any involved other persons) of the existence of the dispute, and shall set forth, in writing, a detailed description of the relevant facts together with a reasonably detailed description of the legal basis of the claim. The Notice shall include a detailed description by the aggrieved party of the remedy or outcome desired. The non-aggrieved party shall respond to the Notice within thirty days following its receipt. If the Notice and response does not resolve the dispute, the parties shall meet, in person, within sixty days following the date of the non-aggrieved party's response, in the corporate offices of the Franchisor, and attempt to informally resolve the matter. If the informal meeting does not resolve the matter, the parties shall, within sixty days following the date of the informal meeting, submit to non-binding mediation in Seattle, Washington with a mediator selected according to the rules of the American Arbitration Association. If the dispute is not resolved through mediation, then either party may commence an arbitration proceeding, but must do so within ninety days following the date that either party or the mediator has declared the mediation terminated. The demand for arbitration shall contain a certificate by the party commencing arbitration that the party has fully complied with every provision of this paragraph 19.03. Copies of the Notice and the response thereto exchanged pursuant to this paragraph shall be attached to the demand for arbitration and the issues in the arbitration shall be limited to matters contained therein. Except as specifically provided in this paragraph 19.03, each party

|
*initials*

EXHIBIT A, PAGE 86

shall bear its own attorneys fees and costs and shall share equally all expenses of the mediator and American Arbitration Association.

### 19.04 Limited Exceptions to Arbitration and Mediation.

The requirements of paragraphs 19.01, 19.02, and 19.03 shall not apply to actions for the sole purpose of collecting unpaid money, including franchise fees, royalties or marketing fees pursuant to this Agreement or to actions for the sole purpose of enforcing Franchisor's rights in the Marks (both for injunctive relief and damages), the Trade Secrets or the covenant against competition. Such actions and claims are not submitted to arbitration. Any such actions and claims shall be brought in the King County Superior Court in Seattle, Washington, U.S.A. Any counterclaims to such actions and claims are submitted to arbitration and shall be subject to paragraphs 19.01, 19.02 and 19.03.

## ARTICLE 20 - REPRESENTATIONS OF FRANCHISEE

### 20.01 Representations

Franchisee represents and warrants as follows:

20.01.01 Franchisee is not currently a party to or subject to any contract or agreement, including any other franchise agreement, employment agreement or any covenant not to compete which would directly or indirectly be breached by entering into this Agreement or which would directly or indirectly prohibit or restrict Franchisee's signing of this Agreement or performance thereunder;

20.01.02 Franchisee is executing this Agreement and purchasing the license herein for Franchisee's own account and not as an agent or representative of another (unless for an Entity otherwise named herein and in compliance herewith);

20.01.03 Franchisee intends to be actively involved in the Licensed Business for the entire term of this Agreement and knows of no reason that he/she might become a passive owner;

20.01.04 Franchisee is basing Franchisee's decision to purchase this license, in full, upon statements and representations contained in this Agreement and upon facts obtained pursuant to Franchisee's own investigation. Franchisee is not relying upon any statements or any information received either directly or indirectly from Franchisor or any person acting or purporting to act on behalf of Franchisor which information or statements are not contained in this Agreement or otherwise in writing and signed by an officer of Franchisor. Franchisee has not received any earnings claims or financial performance information, directly or indirectly.

20.01.05 Franchisee has not terminated and will not terminate Franchisee's existing employment or cease any other income-producing activity until after franchisee has an approved location, has successfully completed the Initial Training, and is open for business. If Franchisee elects, notwithstanding this sub-paragraph to terminate employment or income-producing activity, Franchisee knowingly assumes the risk of loss of income and does so contrary to Franchisor's advice.

## ARTICLE 21 - MISCELLANEOUS PROVISIONS

### 21.01 Nonwaiver.

No act or omission or delay in enforcing a right by either party shall waive any right under or breach by the other of this Agreement unless such party executes and delivers a written waiver. The waiver by either party of any right under or breach of this Agreement shall not be a waiver of any subsequent or continuing right or breach.

### 21.02 Attorneys Fees.

In the event that legal action is properly commenced in court or in arbitration by either party to enforce this Agreement or to determine the rights of any party, as permitted by Article 19, including any appeal proceeding, the substantially prevailing party, in addition to any other remedy, shall be entitled to receive its reasonable actual attorneys fees and costs, including expert fees and fees on appeal.

### 21.03 Severability.

In the event that any of the provisions, or portions thereof, of this Agreement are held to be unenforceable or invalid by any court of competent jurisdiction or by an arbitration panel, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected thereby, and full effect shall be given to the intent manifested by the provisions, or portions thereof, held to be enforceable and valid, unless such invalidity shall pertain to the obligation to pay fees, in which event this Agreement shall terminate.

Tully's
**FRANCHISE AGREEMENT**
OC-05B
Page 22

_initials_

### 21.04 Warranty Of Authority.

Each person signing this Agreement for or on behalf of any party to this Agreement warrants that he/she has full authority to sign and to legally bind the party.

### 21.05 Estoppel Certificate

In the event that Franchisor is considering transferring, assigning or encumbrancing this Agreement, the System, or any other of Franchisor's rights or assets, or upon request by Franchisor at any time, Franchisee shall, within ten (10) calendar days after Franchisor shall request the same, execute, acknowledge and deliver to Franchisor, a written certificate that (a) this Agreement is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Agreement as so modified is in full force and effect); (b) the date to which royalties or other charges have been paid in advance, if any; (c) there are not, to Franchisee's knowledge, any uncured defaults on the part of Franchisor or Franchisee hereunder, or specifying such defaults if any are claimed; (d) setting forth the dates of commencement and expiration of the Term of this Agreement; (e) Franchisee has and knows of no basis for any claims of any kind against Franchisor (or, if Franchisee has or knows of any such claims, a detailed statement of all such claims and a statement that Franchisee has and knows of no other claims); and (f) any other matter upon which certification is requested by Franchisor or a prospective assignee or encumbrancer. Franchisor may rely upon any certificate given pursuant to this sub-paragraph as may any prospective purchaser or encumbrancer of all or any portion of Franchisor's rights hereunder. Any failure or refusal to timely execute a truthful certificate pursuant to this sub-paragraph shall be a material breach of this Agreement.

### 21.06 Paragraph Headings.

The various paragraph headings are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement or any portion thereof.

### 21.07 Recitals.

The recitals preceding the first numbered paragraph of this Agreement are hereby made part of this Agreement as if set forth within the numbered paragraphs. All references to "Franchisee" shall include all owners, parents and subsidiaries of Franchisee if Franchisee is an entity.

### 21.08 No Third Party Beneficiary.

Nothing in this Agreement shall be construed to give Franchisee any rights as a third party beneficiary or otherwise arising out of any similar or other agreement(s) between Franchisor and any other franchisee(s). Nothing in this Agreement shall be construed to give to any other franchisee or any other person any rights arising out of this Agreement. Any action or inaction by Franchisor with regard to any other franchisee's performance or non-performance as to any term of this or any similar agreement shall not give rise to any claims or rights in favor of Franchisee under this Agreement.

### 21.09 Choice Of Law.

Except as otherwise specified herein, this Agreement shall be governed by and construed under the laws of the state or province in which the Licensed Business is located, without reference to any choice of laws provisions thereof.

### 21.10 Notices.

All notices required or permitted by this Agreement ("Notice" or "Notices") shall be sent to the respective parties at the addresses set forth herein. The place of Notice may be modified by appropriate Notice to the other party. All Notices shall be sent by certified mail, return receipt requested, postage prepaid, personally delivered, or by facsimile (with receipt acknowledgment) or overnight delivery. Notices shall be deemed given at the earlier of (a) receipt by the addressee, including by facsimile, or overnight delivery, (b) two (2) days following deposit with the United States Postal Service or its successor, with postage prepaid, or (c) immediately upon refusal of delivery by the addressee.

### 21.11 Entire Agreement.

This document, together with any exhibits and addenda appended hereto and the content of any required disclosure document, constitutes the full and complete agreement between the parties hereto with respect to the subject matter hereof. There are no verbal or other agreements that affect or modify this Agreement. Any prior representations, promises, understandings, contracts or agreements are hereby fully superseded.

### 21.12 Modification.

This Agreement shall not be modified or changed except by a written agreement executed by an officer of Franchisor. No approval of a deviation from the terms of this Agreement shall be valid unless signed by an officer of Franchisor.

Tully's
**FRANCHISE AGREEMENT**
CC-553
Page 23



*initials*

*21.13  Effective Date.*

This Agreement shall have no force or effect unless and until signed by an officer of Franchisor. The effective date shall be the date of such corporate signature. Notwithstanding the order of signatures, this Agreement shall be deemed made and entered into in the state where the Licensed Business is located.

*21.14  Time Of Essence.*

Time is of the essence of this Agreement.

## ARTICLE 22 - BUSINESS RISK.

*22.01  No Promises.*

Franchisee has been informed by Franchisor, realizes and acknowledges that the business venture contemplated by this Agreement involves business risks and its success or failure will be largely dependent upon Franchisee's abilities in operating and managing the Licensed Business. Neither Franchisor nor anyone acting or purporting to act on behalf of Franchisor has made any promises or warranties, expressed or implied, as to Franchisee's potential sales, profits or success. As to those issues, Franchisee has made its own investigation and evaluation.

*22.02  Receipt.*

Franchisee has received a complete copy of this Agreement and all exhibits and addenda, with all material blanks filled in, at least five (5) days before signing this Agreement. Franchisee has been encouraged and provided ample opportunity to consult an attorney or other advisor(s) of its own choosing before entering into this Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the day and year indicated below.

Dated: _____, 200__ [Effective Date]          Date signed: _____, 200__

**FRANCHISOR:**                                          **FRANCHISEE:**

Tully's Coffee Corporation                               JH Development, LLC

By _____                             By _____

(Print Name) _____                             (Print Name) Jaehee Hwang

(Title) _____                             (Title)  Manager

3100 Airport Way South                                   6281 Beach Blvd., Suite 156
Seattle, WA 98134                                        Buena Park, CA 90621
(206) 233-2070                                           (714) 523-8202
Fax: (206) 233-2075                                      Fax: (714) 523-8206

Tully's
**FRANCHISE AGREEMENT**
OC-65B
Page 24                                                  *initials*

**EXHIBIT A, PAGE 89**

## EXHIBIT

### A.   Location of Licensed Business

The location of Franchisee's "Tully's" Licensed Business Premises shall be:

Located at 8631 W. Third Street, Suite 31, Los Angeles, CA 90048.

Tully's Franchise
**Exhibit A  -  Location**
OC-05B
Page A-1

*initials*

**EXHIBIT A, PAGE 90**

**EXHIBIT**

## B.   Territory

Franchisee's designated Territory shall be defined as follows:

The geographic boundaries (all geographic boundaries shall be as they exist on the date of this Agreement): The area contained within 500 feet of the Business Premises at 8631 W. Third Street, Suite 31, Los Angeles, CA 90048.

Tully's Franchise
**Exhibit B - Territory**
OC-05B
Page B-1

_initials_

**EXHIBIT**

## C.   Required Equipment

     The required equipment for the "Tully's" Licensed Business is as set forth in the Manual, but includes the following.  All equipment must comply with the specifications published in the Manual.

Tully's Franchise
**Exhibit C  -  Required Equipment**
OC-05B
Page C-1

*initials*

**EXHIBIT A, PAGE 92**

## EXHIBIT

### D.   Items Subject To Specifications

You must purchase the following items or categories of items in compliance with Franchisor's specifications.

- Signs, banners or promotional items
- All Items bearing the Marks
- Milk, cream and other dairy products
- Bakery goods
- Juices, bottled waters and soft drinks
- Drink flavorings and syrups
- Candies and snacks
- Retail accessories (including hardware for preparation and consumption of coffee and tea beverages)
- Coffee
- Tea
- Ice cream mix
- Prepayment Media and related systems and equipment

Tully's Franchise
**Exhibit D - Items Subject to Specifications**
OC-05B
Page D-1

*initials*

**EXHIBIT A, PAGE 93**

**EXHIBIT**

## E.   Lease Conditional Assignment Agreement

This Rider is attached to and is part of that certain Lease, by and between: _____
_____ Lessor) and _____ (Lessee) dated _____ for the premises located at: _____, legally described in Annex A hereto.

**A.**     **CONDITIONAL ASSIGNMENT:**  Lessee hereby conditionally assigns all of the Lessee's right, title and interest in this lease to Tully's Coffee Corporation (hereinafter, "Franchisor").  This assignment shall become effective only upon occurrence of both of the following conditions:

1.     Termination of the Tully's Franchise Agreement between Franchisor and Lessee as Franchisee for the operation of an Tully's franchise within the leased premises, and

2.     Exercise by Franchisor of its option to assume the obligations of and to replace Lessee as the lessee under this lease as provided in the said Franchise Agreement within fifteen (15) days after termination of said Franchise Agreement.

**B.**     **Lessor** hereby consents to the said conditional assignment and hereby agrees that if said conditional assignment becomes effective, Franchisor shall thereafter be substituted for Lessee as the Lessee in this lease, Lessee shall be relieved of all liability accruing under this lease after the effective date of the assignment and Franchisor shall have the right to reassign this lease to a new Franchisee of Franchisor without the prior consent of Lessor.  In the event of such reassignment, Franchisor shall be relieved of all liability accruing under this lease after the date of said reassignment.

**C.**     Lessee agrees that at such time as Franchisor exercises its option to become the Lessee under this lease, Lessee will immediately vacate the demised premises without removing any fixtures, parts, or accessories except as authorized in the Franchise Agreement and Lessor will permit Franchisor to enter upon and take possession of the demised premises.  Lessor will cooperate in all legal action necessary to remove lessee if lessee refuses to vacate premises.

**D.**     Lessor is hereby authorized and directed to rely solely upon written notice by Franchisor of the termination of the said Tully's Franchise Agreement and exercise by Franchisor of its option to become the Lessee under this lease and is hereby relieved of any and all liability to Lessee for any action it takes in so relying.

**E.**     **DEFAULT BY LESSEE:**  Lessor agrees to give Franchisor thirty (30) days prior written notice of its intention to reenter and repossess the premises and to cancel the lease on account of Lessee's default of any of the terms, conditions or provisions thereof.  During the thirty (30) day period Franchisor may cure such default or otherwise exercise its rights under the conditional assignment.

**F.**     **OPTION TO RENEW:**  In the event that Lessee fails to exercise any option which he might have under the lease to renew same prior to the expiration thereof, Lessor agrees to notify Franchisor in writing of lessee's failure to renew the lease and Franchisor shall then have fifteen (15) days from the receipt of such notice to exercise any option to renew and replace Lessee as the lessee under the lease.

Dated: _____ [effective date]          Date signed: _____

**Tully's Coffee Corporation**                              **FRANCHISEE**
(Franchisor/Assignee)

By _____

(Print Name) _____          Franchisee

(Title) _____

3100 Airport Way South                              Address: _____
Seattle, WA 98134                                  _____
206-233-2070
                                                   Phone: _____
**LESSOR:**

_____

By: _____
    Its _____

Tully's Franchise
**Exhibit E - Lease Assignment Agreement**
OC-05B                                                          ____|____
Page E-1                                                        *initials*

### ACKNOWLEDGMENTS

STATE OF _____ )

COUNTY OF _____ ) ss

    On this day personally appeared before me _____, to me known to be the individual(s) described in and who executed the within and foregoing instrument, and acknowledged that _____ signed the same as _____ free and voluntary act and deed, for the uses and purposes therein mentioned.

    GIVEN under my hand and official seal this _____ day of _____ 20_____.

            Notary Public in and for the State of _____

            residing at _____

            My appointment expires: _____

            * * *

STATE OF _____ )

COUNTY OF _____ ) ss

    On this day personally appeared before me _____, to me known to be the individual(s) described in and who executed the within and foregoing instrument, and acknowledged that _____ signed the same as _____ free and voluntary act and deed, for the uses and purposes therein mentioned.

    GIVEN under my hand and official seal this _____ day of _____ 20_____.

            Notary Public in and for the State of _____

            residing at _____

            My appointment expires: _____

            * * *

STATE OF _____ )

COUNTY OF _____ ) ss.

    On this day personally appeared before me _____, to me known to be the _____ [Title], of _____, a _____ [Type of Entity and State of Organization], the Entity that executed the foregoing instrument, and acknowledged the said instrument to be the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned and on oath stated that __he__ is/are authorized to execute the said instrument on behalf of said Entity.

    WITNESS my hand and official seal this ____ day of _____, 20____.

            Notary Public in and for the State of _____

            residing at _____

            My appointment expires: _____

Tully's Franchise
**Exhibit E - Lease Assignment Agreement**
OC-05B
Page E-2

_____
_initials_

**EXHIBIT A, PAGE 95**

## EXHIBIT

### F.   Assignment of Telephone Numbers

_____ Franchisee/Assignor, in consideration of Franchisor/Assignee granting a Tully's franchise contemporaneously herewith, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby assigns to Tully's Coffee Corporation all telephone numbers and listings utilized or to be utilized by Franchisee/Assignor in the operation of his Tully's Licensed Business. The Assignee hereby assumes the performance of all of the Terms, Covenants, and Conditions of the agreement(s) with the telephone company with respect to such telephones, telephone numbers and telephone listings with the same force and effect as if Assignee had been originally issued such telephone, telephone numbers, telephone listings and the usage thereof. This Assignment is valid on the effective date and is irrevocable. It applies equally to any numbers first used after the effective date. The telephone company is authorized to rely upon this Assignment at any time that it is delivered to the telephone company by Franchisor/Assignee. Assignee and Assignor each agree to hold harmless and indemnify the telephone company from any claims based upon the telephone company's reliance upon this Assignment. Assignee and Assignor each agree to sign any other documents necessary in the opinion of the telephone company to give effect to this Assignment.

Dated: _____ [effective date]          Date signed: _____

**Tully's Coffee Corporation**                              **FRANCHISEE**
(Franchisor/Assignee)                                      (Assignor)

By _____

                                                          _____
(Print Name) _____                    Franchisee

(Title) _____


3100 Airport Way South                                     Address: _____
Seattle, WA 98134                                                   _____
206-233-2070                                                       _____

                                                          Phone: _____
**Subject telephone number(s):**                                   _____
(as of date of this document)                                     _____

Tully's Franchise
**Exhibit F - Telephone Numbers**
OC-05B
Page F-1

_____
initials

**EXHIBIT A, PAGE 96**

**EXHIBIT**

## G.  Personal Guaranty

IN CONSIDERATION of and to induce the consent by Tully's Coffee Corporation, a Washington corporation ("Franchisor") to the assignment of all right, title, and interest in and to the Tully's Franchise Agreement dated _____ to _____, a _____ [Type of Entity and State of organization] ("Franchisee"), [or alternatively, in consideration of and to induce Franchisor's consent for the undersigned to enter into the Franchise Agreement in the Entity form], and for other good and valuable consideration, I/we, and each of us jointly, severally, absolutely and unconditionally guarantee to Franchisor:

1.01  Payment Of Obligations.

The punctual payment and satisfaction of each and every claim, demand, default, liability, indebtedness, right or cause of action of every nature whatsoever, including expenses, damages and fees, now or hereafter existing, due or to become due, or held by Franchisor, its subsidiaries, divisions, or related companies, together with any interest as it may accrue, and all costs, expenses and attorneys fees paid or incurred by Franchisor or its subsidiary, division, or related company in collecting or attempting to collect the obligations of the Franchisee or in enforcing or attempting to enforce this Guaranty; and

1.02  Continuing Performance.

The timely performance of each term, covenant, and obligation of the license set forth in the Tully's Franchise Agreement described above.  This is a continuing Guaranty which shall apply to the Franchise Agreement and any subsequent renewals, extensions, amendments or modifications thereof, and such renewals, extensions, amendments or modifications shall be conclusively presumed to be covered by this Guaranty without further notice to or acceptance by the undersigned.

2.01  Execution And Delivery.

The undersigned acknowledge(s) and agree(s) that possession of this Guaranty by Franchisor constitutes true and correct execution and actual and proper delivery of same to Franchisor, and the undersigned waive notice of acceptance of this Guaranty and of the incurrence by Franchisee of any liability to which it applies or may apply, and waive presentment and demand for payment thereof, protest, notice of protest and notice of dishonor or non-payment thereof, collection thereof including any notice of default in payment thereof or other notice to, or demand of payment therefore on, any party.  The undersigned further waive any right to have security applied before enforcing this Guaranty, any right to require suit against the Franchisee or any other party before enforcing this Guaranty, and any right to subrogation to Franchisor's rights against the Franchisee until the Franchisee's liabilities and obligations to Franchisor are paid and satisfied in full.  Payment by the undersigned shall be made at the office of Franchisor in Portland, Oregon, or such other location as Franchisor may designate in writing.

3.01  Rights Of Company

Franchisor may, at its option, at any time, without the consent of or notice to the undersigned, without incurring responsibility to the undersigned and without impairing or releasing the obligations of the undersigned, upon or without any terms or conditions and in whole or in part:

3.01.01  change the manner, place or terms of payment or change or extend the time of payment of, renew, or alter any obligation, liability or right of the Franchisee under the Franchise Agreement hereby guaranteed, or any liabilities incurred directly or indirectly hereunder, and the guaranty herein made shall apply to the obligations and liabilities of the Franchisee, so changed, extended, renewed or altered;

3.01.02  exercise or refrain from exercising any rights against Franchisee or others, or otherwise act or refrain from acting;

3.01.03  settle or compromise any liabilities hereby guaranteed or hereby incurred, and may subordinate the payment of all or any part of such liabilities to the payment of any liabilities which may be due to Franchisor or others; and

3.01.04  apply any sums paid to any liability or liabilities of Franchisee to Franchisor regardless of what liability or liabilities of Franchisee remain unpaid.  Franchisor may, at its option, without the consent of or notice to the undersigned, apply to the payment of the liability created by this guaranty, at any time after such liability becomes

Tully's Franchise
**Exhibit G - Personal Guaranty**
OC-05B
Page G-1

*initials*

payable, any moneys, property, or other assets belonging to the undersigned in the possession, care, custody and control of Franchisor.

4.01  Irrevocable.

This agreement shall not affect in any manner the right of Franchisor to terminate the Franchise Agreement pursuant to the terms thereof, and this Guaranty shall survive the termination, expiration, or cancellation of the Franchise Agreement.  Franchisor may at its option, elect to take no action pursuant to this Guaranty or the Franchise Agreement without waiving any rights under either.  The undersigned do further agree that it will not be necessary for Franchisor, in order to enforce the terms of this agreement against them, to first institute suit or exhaust its remedies against the Franchisee or any others.  This Guaranty shall operate as a continuing Guaranty and shall be non revocable, except with the express written consent of Franchisor.

4.02  Joint And Several Liability.

The undersigned, if more than one, shall be jointly and severally liable hereunder and the term "undersigned" shall mean the undersigned or any one or more of them.  Anyone signing this Guaranty shall be bound thereto at any time.  Any married person who signs this Guaranty hereby expressly agrees that recourse may be had against his/her community and separate property for all obligations under this Guaranty.

4.03  Successors And Assigns.

This Guaranty shall bind and inure to the benefit of the heirs, executors, administrators, successors, and assigns of Franchisor and of the undersigned.

4.04  Non-competition.

The undersigned hereby agree that they shall be individually bound by the provisions of the Franchise Agreement relating to trade secrets, confidentiality, and non-competition.

4.05  Bankruptcy Or Insolvency Of Franchisee.

In the event that a petition in bankruptcy or for an arrangement or reorganization of the Franchisee under any state or federal bankruptcy law or for the appointment of a receiver for the Franchisee or any of its property is filed by or against the Franchisee, or if the Franchisee shall make an assignment for the benefit of creditors or shall become insolvent, all indebtedness and other obligations of the Franchisee shall, for purposes of this Guaranty be immediately due and payable.

WITNESS our hands at _____, on this the _____ day of _____,
20__.

[SIGNATURE]
_____% owner of Franchisee

[SIGNATURE]
_____% owner of Franchisee

[SIGNATURE]
_____% owner of Franchisee

[SIGNATURE]
_____% owner of Franchisee

[SIGNATURE]
_____% owner of Franchisee

[SIGNATURE]
_____% owner of Franchisee

Tully's Franchise
**Exhibit G - Personal Guaranty**
OC-05B
Page G-2

_____|_____
*initials*

**EXHIBIT A, PAGE 98**

**EXHIBIT H**

**H.   Master Lease**

_____ See Attached.

_____ None Applicable.

Tully's Franchise
**Exhibit H - Master Lease**
OC-05B
Page H-1

initials

**EXHIBIT**

## I.   Trade Secrets & Confidentiality Agreement

This Agreement is made and entered into by and between _____, dba Tully's (hereinafter, "the Employer") and _____ , (hereinafter, "Employee").

**WHEREAS,** Employer is engaged in the business of offering and selling at retail a limited menu of specialty espresso and coffee drinks, baked goods, soft drinks other complementary food and beverage items and related accessories and supplies under the Tully's Marks and using the System, pursuant to a franchise agreement with Tully's Coffee Corporation (herein, "the Licensed Business") according to a unique formula and under the trade name and mark, "Tully's".

**WHEREAS,** Employer has a need for a manager or key employee for the Licensed Business;

**WHEREAS,** Employee is willing and able to become a manager or key employee for the Licensed Business;

**WHEREAS,** Employer is willing to hire Employee or to promote Employee to the position of manager or key employee of the Licensed Business, but only upon the terms and conditions set forth herein,

**NOW THEREFORE,** for and in consideration of the mutual covenants herein contained and other good and faithful consideration, the receipt and sufficiency of which is hereby acknowledged by each party, the parties hereby agree as follows:

1. Employment.

Employer agrees to employ Employee as _____, and to pay compensation as follows:

_____
_____
_____
_____
_____

1. Trade Secrets

Employee agrees that all of the information provided to Employee by Employer in the course of employment relating to the Licensed Business, its operation, management, policies, relationship with its Franchisor, identity of is customers, members and vendors, pricing structures and formulas, product mix, and similar information, constitutes trade secrets. Employee acknowledges that such information has been received only from Employer and that it is not generally available to the public and that it derives independent economic value from not being widely known. Employee acknowledges and agrees that certain items or information to be made available may not, if analyzed in isolation, be trade secrets; however, unless Employer specifically agrees otherwise in writing, all such items and information, when placed in the context of those things which are trade secrets if analyzed in isolation, become and are part of the trade secrets and are subject to this Agreement. Employee further acknowledges that should the information be misappropriated or transferred to any third party, the Employer and Employer's Franchisor would suffer irreparable harm. Trade secrets does not include information on public record or readily available from a third party without consent by Employer.

2. Employer Owns All Incidents

Employer shall be entitled to all of the benefits, profits and other issues arising from or incident to all work, services, and advice of Employee relating to the Trade Secrets or arising out of discussions with Employer regarding same, and in any way communicated to Employer or becoming known to Employer during or after the term of employment.

3. Nondisclosure

Employee shall not at any time or in any manner, either directly or indirectly, divulge, disclose or communicate to any unauthorized person(s) any information regarding any trade secret(s) or any proprietary information of Employer. All such information shall be held by Employee in complete confidence. Such information is important, material, and confidential and gravely affects the effective and successful conduct of Employer's Licensed Business and goodwill. Should Employee, at any time, cease to be an employee of Employer, Employee shall immediately return to the Employer the originals and all copies of all documents or other media containing or representing trade secrets. Breach

Tully's Franchise
**Exhibit I – Trade Secrets & Confidentiality Agreement**
OC-05B
Page I-1

_____
*initials*

**EXHIBIT A, PAGE 100**

of any of the terms of this paragraph shall be a material breach of this Agreement. The terms of this paragraph shall survive termination of this Agreement for any reason. Employee shall be in breach of this Agreement during any month in which Employee or any third party has possession or use of any trade secrets in violation of this Agreement.

4. Remedies

Employee agrees that, in the event of alleged breach, Employer shall be entitled, in addition to all other remedies available at law or in equity, to a temporary restraining order, a preliminary injunction and other interim relief and that the maximum bond to be required of Employer for such relief shall be one hundred dollars ($100.00). Employee waives any right to a higher bond. Employee agrees that any action taken by Employer pursuant to this Agreement shall not constitute an election of remedies. In addition to, and not in lieu of, an injunction, Employer shall be entitled to a judgment against Employee for the greater of (a) Employer's actual damages (if provable under the circumstances) or (b) liquidated damages calculated as Employee's average monthly gross compensation for the last six months (or portion thereof) for which Employee was employed by Employer, multiplied by the number of months during which Employee was in breach of this Agreement. The parties mutually agree that the liquidated damages agreed herein are not a penalty, but are a best good faith effort to estimate what Employer's actual damages would be in the event of a breach under circumstances where actual damages may, because of facts known at that time, not be readily susceptible of accurate calculation.

5. Enforcement By Franchisor

Both Employer and Employee acknowledge and agree that this Agreement is for the benefit not only of the Employer, but also of the Employer's Franchisor, Tully's Coffee Corporation. Employer and Employee each agree that Tully's Coffee Corporation shall have the same right to enforce this Agreement as Employer has; provided only that as between Employer and Tully's Coffee Corporation, they shall be entitled to only one recovery of damages or liquidated damages.

6. Effectiveness

This Agreement shall become effective when signed and shall be enforceable at any time thereafter.

6.1. Nonwaiver.

No act or omission or delay in enforcing a right by either party shall waive any right under or breach by the other of this Agreement unless such party executes and delivers a written waiver. The waiver by either party of any right under or breach of this Agreement shall not be a waiver of any subsequent or continuing right or breach.

6.2. Attorneys Fees.

In the event that legal action or arbitration is commenced by either party to enforce this Agreement or to determine the rights of any party, including any appeal proceeding, the substantially prevailing party, in addition to any other remedy, shall be entitled to receive its reasonable attorneys fees and costs.

6.3. Severability.

In the event that any of the provisions, or portions thereof, of this Agreement are held to be unenforceable or invalid by any court of competent jurisdiction, the validity and enforceability of the remaining provisions, or portions thereof, shall not be affected thereby, and full effect shall be given to the intent manifested by the provisions, or portions thereof, held to be enforceable and valid, unless such invalidity shall pertain to the obligation to pay fees, in which event this Agreement shall terminate.

6.4. Warranty Of Authority.

Each person signing this Agreement for or on behalf of any party to this Agreement warrants that he/she has full authority to sign and to legally bind the party.

6.5. Paragraph Headings.

The various paragraph headings are inserted for convenience of reference only and shall not affect the meaning or interpretation of this Agreement or any portion thereof.

6.6. Recitals.

The recitals preceding the first numbered paragraph of this Agreement are hereby made part of this Agreement as if set forth within the numbered paragraphs.

6.7. Choice Of Law.

Tully's Franchise
**Exhibit I – Trade Secrets & Confidentiality Agreement**
OC-05B
Page I-2


*initials*

This Agreement shall be governed by and construed under the laws of the state in which the Licensed Business is located without regard to any choice of law provisions thereof.

6.8. Notices.

All notices required or permitted by this Agreement shall be sent to the respective parties at the addresses set forth herein. The place of notice may be modified by appropriate registered or certified mailing to the other party. All notices shall be sent by certified mail, return receipt requested, postage prepaid, or personally delivered. Notices shall be deemed given at the earlier of (a) receipt by the addressee or (b) two (2) days following deposit with the United States Postal Service or its successor.

6.9. Entire Agreement.

This document, together with any exhibits and addenda appended hereto, constitutes the full and complete agreement between the parties hereto with respect to the subject matter hereof. There are no verbal or other agreements that affect or modify this Agreement. Any prior representations, promises, contracts or agreements are hereby fully superseded.

6.10. Modification.

This Agreement shall not be modified or changed except by a written agreement executed by an officer of Employer. No approval of a deviation from the terms of this Agreement shall be valid unless signed by an officer of Employer.


Date: _____


**THE EMPLOYER**                                   **EMPLOYEE**

                                                   _____
                                                            Signature

By _____
         _____, its _____           Address: _____
Address: _____           _____

_____                    _____
_____                    Phone: _____

Tully's Franchise
**Exhibit I – Trade Secrets & Confidentiality Agreement**
OC-05B
Page I-3

_____
*initials*

**EXHIBIT A, PAGE 102**

**EXHIBIT**

## J.   Mutual Termination of Franchise Agreement and Release

This Mutual Termination of Tully's Franchise Agreement and Release is entered into by and between _____ _____ (Franchisee) and Tully's Coffee Corporation (Franchisor).

WHEREAS Franchisee is a franchisee of Franchisor pursuant to a franchise agreement dated _____ _____ (the Agreement), governing a Licensed Business located at _____ _____ ;

WHEREAS Franchisee and Franchisor desire to mutually terminate the Agreement and wind up and resolve all matters between them relating to or arising out of the Agreement and their relationship as Franchisor and Franchisee; and

WHEREAS Franchisee and Franchisor each desire to be bound by the terms of this Mutual Termination of Tully's Franchise Agreement and Release,

NOW THEREFORE, the parties hereby agree as follows, acknowledging that each has received adequate consideration for this agreement.

1.      Franchisee and Franchisor each acknowledge and agree that, by entering into this Agreement, all of their respective rights under the Agreement are terminated except only as specifically reserved herein.

2.      Except for any remaining financial obligations of Franchisee to Franchisor for franchise fees or for merchandise purchased and except for any post-termination requirements of the Agreement, including those relating to competition and trade secrets, all claims, demands, rights, duties, obligations, debts, dues, sums of money, accounts, covenants, contracts, controversies, agreements, promises, torts, judgments, executions, liabilities, damages, injunctions, assignments, suits or causes of action of every kind and nature, however or wherever arising, whether known or unknown, foreseen or unknown, direct, indirect, contingent or actual, liquidated or unliquidated, which have arisen or which might or could arise under Federal, state or local law from any relationship under the Agreement (including any supplier-purchaser relationship) or under any agreement in connection therewith, or from the execution, operation under or termination of the Agreement and any services to Franchisee thereunder or under any prior agreement relating to the Licensed Business, existing or arising at any time prior to or at the item of the execution hereof or the Effective Date (whichever is later) are hereby mutually satisfied, acquitted, discharged and released by Franchisee and Franchisor, it being the express intention of each party that this Release is as broad as permitted by law.

3.      Franchisee intends this Release to acquit and forever fully discharge Franchisor and any parent or direct or indirect subsidiary thereof, any division, affiliate or supplier who provided merchandise for Franchisor's operation of the Licensed Business, and its and their respective officers, directors, agents, employees, representatives, successors and assigns, and all other persons, firms or corporations who have acted in agreement or in concert with any of them or with Franchisee.

4.      This Mutual Termination of Tully's Franchise Agreement and Release shall be binding upon Franchisee and the heirs, legal representatives, successor and assigns of Franchisee and upon Franchisor and its successors and assigns.

5.      Franchisee has either been advised by independent counsel before signing this or, acknowledging the need for independent counsel, knowingly waives any such review and advice.

6.      In the event of litigation or arbitration to enforce this Agreement, the substantially prevailing party shall be entitled to its reasonable attorneys fees in addition to all other sums owed pursuant to this Agreement or otherwise.

7.      The Effective Date of this document shall be: _____

**Franchisee(s)**                                   **Franchisor**

                                                    Tully's Coffee Corporation

_____

          Franchisee                               By: _____

                                                    _____, its _____

_____

          Franchisee

Tully's Franchise
**Exhibit J – Mutual Termination of Franchise Agreement and Release**
OC-05B
Page J-1

                                                                        ____|____
                                                                         *initials*

**EXHIBIT K**

## K.   Consent, Waiver And Release For Training

This Consent, Waiver and Release is entered into by and between _____
_____ (Franchisee) and Tully's Coffee Corporation (Franchisor) and shall also be for the benefit of any franchisee of Tully's Coffee Corporation in whose unit or premises Franchisee receives any part of his training under Franchisee's Franchise Agreement (Trainer).

Franchisee recognizes and acknowledges the value of receiving part of Franchisee's training (or Franchisee's employees' training, if appropriate) under the Tully's Franchise Agreement in an actual Tully's unit owned and operated by Franchisor or another Tully's franchisee.  At least some of the training will be "hands-on", actually operating the Trainer's Business or some aspect of the Trainer's Business on a day-to-day basis.  In some cases, Franchisee may be left solely in charge of the Tully's unit of the Trainer for some periods of time.  "Franchisee" as used in this agreement shall include any employee(s) of franchisee who obtain training.

In consideration of the value of the hands-on, on-location training, Franchisee covenants and agrees:

Franchisee is not and will not be or become an employee of Trainer unless by a separate written agreement.

Franchisee covenants and agrees to not sue or make any claim, including under any federal, state or local statute or ordinance, for any compensation for services or for any benefits.

Franchisee shall not make any statement(s) or representation(s) inconsistent with this agreement.

Franchisee hereby assumes the risk of injury or death arising out of Franchisee's presence on the Licensed Business premises of Trainer and agrees to defend, hold harmless and indemnify Franchisor and Trainer from and against all claims, demands, damages, injuries or settlements arising out of or related to Franchisee's training on the premises of Trainer, excepting only for intentional or grossly negligent acts of Franchisor or Trainer.

Franchisee hereby assumes the risk of injury or death to others arising out of any negligent or intentional acts of Franchisee while on the Licensed Business premises of Trainer and agrees to defend, hold harmless and indemnify Franchisor and Trainer from and against all claims, demands, damages, injuries or settlements arising out of or related to Franchisee's training on the premises of Trainer caused in whole or in part by Franchisee's negligent or intentional acts.

Franchisee consents to having some or all of Franchisee's training occur under the guidance and on the premises of Trainer. Franchisee's training will take approximately two weeks or until Franchisee has achieved a level of competency as determined by Franchisor.

Franchisee understands and acknowledges that each Tully's franchisee conducts the Licensed Business slightly differently and that Franchisee is advised to consider Trainer's methods and procedures, in light of Franchisee's own study of the Manual(s), as one way of operating the Licensed Business.  Franchisee is solely responsible for Franchisee's conduct of Franchisee's Licensed Business.  If Franchisee is in doubt as to the appropriateness of a procedure or manner of operating the Licensed Business, Franchisee shall obtain clarification from the Franchisor directly.  Franchisee understands that it would not be a defense to a later breach of contract notice that he/she acted consistently with what Trainer said or did.

Trainer covenants and agrees as follows:

Trainer shall not be or become an employer of Franchisee, unless by separate written agreement.

Trainer covenants and agrees to not sue or make any claim, including under any federal, state or local statute or ordinance, for any compensation for services or for any benefits to Trainer.

Trainer shall not make any statement(s) or representation(s) inconsistent with this agreement.

Trainer hereby assumes the risk of injury or death arising out of Franchisee's presence on the Licensed Business premises of Trainer and agrees to defend, hold harmless and indemnify Franchisor from and against all claims, demands, damages, injuries or settlements arising out of or related to Franchisee's training on the premises of Trainer, excepting only for intentional or grossly negligent acts of Franchisor.

Trainer hereby assumes the risk of injury or death to others arising out of any negligent or intentional acts of Trainer and agrees to defend, hold harmless and indemnify Franchisor from and against all claims, demands, damages, injuries or settlements arising out of or related to Franchisee's training on the premises of Trainer caused in whole or in part by Trainer's negligent or intentional acts.

Tully's Franchise
**Exhibit K – Consent, Waiver & Release For Training**
OC-05B
Page K-1


*initials*

Trainer consents to having some or all of Franchisee's training occur under the guidance and on the premises of Trainer. Franchisee's training will take approximately two weeks or until Franchisee has achieved a level of competency as determined by Franchisor.

Trainer will make best efforts to teach Franchisee the operation of the Licensed Business in accordance with the current version of the Manual(s) and to remind Franchisee that, if Franchisee has questions about the proper procedure under the Manual(s) to obtain clarification from the Franchisor. Upon Franchisor's request, Trainer will immediately modify the training to comply with the Manual(s).

Franchisor undertakes as follows:

Franchisor will be responsible for determining whether Franchisee has achieved a level of competency sufficient to satisfy the training requirement under the Franchise Agreement.

During any period of time that Trainer has one or more franchisees training in Trainer's Licensed Business, Franchisor will reduce Trainer's royalties by twenty percent (20%). Such reductions shall be calculated by Franchisor on a daily basis.

By signing below, the parties each hereby agree to be bound by this Consent, Waiver and Release for Training Agreement.

Executed this _____ day of _____, _____

**Trainer:**                                    **Franchisee**

_____                _____
_____                _____

**Franchisor:**
Tully's Coffee Corporation

By: _____

(Print Name) _____

(Title) _____

Tully's Franchise
**Exhibit K – Consent, Waiver & Release For Training**
OC-05B
Page K-2

_____|_____
*initials*

**EXHIBIT A, PAGE 105**

EXHIBIT

## L.   Release From Continuing Obligations

This Release From Continuing Obligations is entered into by and between _____
_____ (Franchisee) and Tully's Coffee Corporation (Franchisor).

WHEREAS Franchisee is a franchisee of Franchisor pursuant to a franchise agreement dated _____
_____ (the Agreement), governing a Licensed Business located at _____
_____ ;

WHEREAS Franchisee desires to be released from certain of Franchisee's continuing obligations under the terms of
the Agreement; and

WHEREAS Franchisor is willing to release Franchisee from certain continuing obligations under the terms of the
Agreement, but only upon the terms and conditions herein,

NOW THEREFORE, the parties hereby agree as follows, acknowledging that each has received adequate
consideration for this agreement.

1.   Release from Continuing Obligations.

For the consideration set forth in the alternative selected by Franchisee below, Franchisor hereby releases Franchisee
from Franchisee's continuing obligations under the Agreement to the extent set forth in the alternative selected by Franchisee.
Except to the extent specifically released by Franchisor according to this Release from Continuing Obligations, Franchisee
shall continue to be obligated and shall continue to fully and timely perform all of Franchisee's continuing obligations under
the Agreement.

2.   Election by Franchisee and Terms of Release

Franchisee, by initialing one of the following options, hereby elects to be released from certain continuing obligations
under the Franchise Agreement (and to continue to fully perform otherwise) as set forth in the option:

> A
>
> initials

A.  By selecting this Option A, Franchisee elects to be released from all continuing obligations under
the Agreement except for any existing financial obligations of Franchisee to Franchisor for franchise fees
accrued or for goods purchased up to the date of this Release of Continuing Obligations, except that
Franchisee shall continue to fully and timely perform according to the terms of Articles 5 (Trade Secrets), 16
(no competition), 17 (effect of termination) and 19 (arbitration) of the Agreement.  In consideration of this
Release, Franchisee shall pay to Franchisor $5,000.00 (USD).

> B
>
> initials

B.  By selecting this Option B, Franchisee elects to be released from all continuing obligations under
the Agreement except for any existing financial obligations of Franchisee to Franchisor for franchise fees
accrued or for goods purchased up to the date of this Release of Continuing Obligations, except that
Franchisee shall continue to fully and timely perform according to the terms of Article 5 (Trade Secrets),
paragraph 17.05 (option to purchase certain assets) and Article 19 (arbitration) of the Agreement.  In
consideration of this Release, Franchisee shall pay to Franchisor the greater of $50,000.00 (USD) or 50%
times the average monthly royalty paid during the last twelve months (or portion thereof) Franchisee was a
franchisee times the number of months remaining in the Term of the Agreement.  The consideration for this
Option B shall be due and payable in full upon execution of this Release of Continuing Obligations.

> C
>
> initials
>
> (Initial Only
> One Box)

C.  By selecting this Option C, Franchisee elects to be released from all continuing obligations under
the Agreement except for any existing financial obligations of Franchisee to Franchisor for franchise fees
accrued or for goods purchased up to the date of this Release of Continuing Obligations, except that
Franchisee shall continue to fully and timely perform according to the terms of Articles 5 (Trade Secrets) and
19 (arbitration) of the Agreement.  In addition, for so long as Franchisee is not in breach of any term of this
Release of Continuing Obligations, Franchisor hereby agrees to not open or permit to be opened a company-
owned or franchised Tully's Licensed Business within Franchisee's Territory as described in the Agreement,
as modified to the date of this Release of Continuing Obligations, for the greater of two years following this
date or the balance of the Term of the Agreement had it not been terminated by this Release of Continuing
Obligations. In consideration of this Release, Franchisee shall pay to Franchisor the sum of $100,000.00
(USD) plus the amount which results from multiplying the number of months remaining in the Term of the
Agreement times the lesser of (a) 1.5 times the average monthly royalty paid during the months Franchisee
was a franchisee or (b) 1.25 times the average monthly royalty paid during the immediately preceding twelve

Tully's Franchise
**Exhibit L – Release From Continuing Obligations**
OC-05B
Page L-I

_____|_____
*initials*

months Franchisee was a franchisee. The consideration for this Option C shall be due and payable in full upon execution of this Release of Continuing Obligations.

3.      Mutual Release and Termination

3.01    Franchisee and Franchisor each acknowledge and agree that, by entering into this Agreement, all of their respective rights under the Agreement are terminated except only as specifically reserved herein. The parties specifically agree to fully and timely perform pursuant to this Release From Continuing Obligations.

3.02    Except for any existing financial obligations of Franchisee to Franchisor for franchise fees accrued or for goods purchased up to the date of this Release of Continuing Obligations and except for any post-termination requirements of the Agreement specifically preserved by this Release From Continuing Obligations, all claims, demands, rights, duties, obligations, debts, dues, sums of money, accounts, covenants, contracts, controversies, agreements, promises, torts, judgments, executions, liabilities, damages, injunctions, assignments, suits or causes of action of every kind and nature, however or wherever arising, whether known or unknown, foreseen or unforeseen, direct, indirect, contingent or actual, liquidated or unliquidated, which have arisen or which might or could arise under Federal, state or local law from any relationship under the Agreement (including any supplier-purchaser relationship) or under any agreement in connection therewith, or from the negotiation, execution, operation under or termination of the Agreement and any services to Franchisee thereunder or under any prior agreement relating to the Licensed Business, existing or arising at any time prior to or at the time of the execution hereof or the Effective Date (whichever is later) are hereby mutually satisfied, acquitted, discharged and released by Franchisee and Franchisor, it being the express intention of each party that this Release is as broad as permitted by law.

3.03    Franchisee intends this Release to acquit and forever fully discharge Franchisor and any parent or direct or indirect subsidiary thereof, any division, affiliate or supplier who provided goods or services for Franchisee's operation of the Licensed Business, and its and their respective officers, directors, agents, employees, representatives, successors and assigns, and all other persons, firms or corporations who have acted in agreement or in concert with any of them or with Franchisee.

4.      This Release of Continuing Obligations shall be binding upon Franchisee and the heirs, legal representatives, successors and assigns of Franchisee and upon Franchisor and its successors and assigns.

5.      Franchisee has either been advised by independent counsel before signing this or, acknowledging the need for independent counsel, knowingly waives any such review and advice.

6.      Terms defined in the Franchise Agreement shall have the same meanings in this Agreement. Jurisdiction and Venue shall be in King County, Washington. The law of the state where the Licensed Business is located (except any choice of law provisions thereof) shall govern interpretation of this Agreement. In the event of litigation or arbitration to enforce this Agreement, the substantially prevailing party shall be entitled to its reasonable attorneys fees in addition to all other sums owed pursuant to this Agreement or otherwise.

7.      The Effective Date of this document shall be: _____

**Franchisee(s)**                              **Franchisor**

                                               Tully's Coffee Corporation

_____                    By: _____
        Franchisee                             _____, its _____


_____
        Franchisee


Tully's Franchise
**Exhibit L – Release From Continuing Obligations**
OC-05B
Page L-2

_____|_____
*initials*

**EXHIBIT A, PAGE 107**

**EXHIBIT M**

**M.   Confidentiality Agreement – Additional Information**

[Applicable only if additional information requested by Franchisee]

This Confidentiality Agreement is entered into by and between _____
(Franchisee) and Tully's Coffee Corporation (Franchisor).

Whereas Franchisee is considering purchasing a Tully's Franchise;

Whereas Franchisee has requested additional information from Franchisor;

Whereas the Franchisor regards the information Franchisee has requested to be proprietary, confidential information, and Trade Secrets;

Whereas, notwithstanding the foregoing, Franchisor is willing to provide certain additional information, but only upon the terms of this Confidentiality Agreement.

Therefore, the parties agree as follows, acknowledging the existence and sufficiency of consideration, and fully intending to be bound hereby.

1.      Upon receipt of this Confidentiality Agreement, unaltered and fully executed by Franchisee, Franchisor will make a reasonable effort to provide to Franchisee one copy of the following information (the "Confidential Information"):

_____
_____
_____
_____
_____

2.      Franchisee shall be entitled to review the Confidential Information and may permit Franchisee's advisors with a genuine need to know and who are disclosed herein, including attorneys, accountants and confidential business advisors, to review it. No person shall make any reproduction, photo, electronic or other copy of the Confidential Information or any part thereof for any purpose, including summaries. No person shall use the Confidential Information or any part thereof for any purposes except as specifically permitted pursuant to this Confidentiality Agreement. Franchisee warrants that every person, including attorneys, accountants and confidential business advisors, who reviews any portion of the Confidential Information shall be subject to this Confidentiality Agreement, has been informed of the contents of this Confidentiality Agreement before reviewing any of the Confidential Information and has indicated, in writing, a willingness to be bound by this Confidentiality Agreement.

Franchisee's advisors whom Franchisee may permit to review the Confidential Information on Franchisee's behalf are as follows. Franchisee shall not, directly or indirectly, permit any other person to review the Confidential Information or any part thereof:

| Name | Address & Telephone | Relationship to Franchisee |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

[Attach and initial an additional page if necessary]

3.      Franchisee agrees that, immediately upon completion of Franchisee's review of the Confidential Information, regardless of whether Franchisee ever purchases a Tully's franchise, to return the original and all copies of the Confidential Information to Franchisor, including all summaries of the information contained therein.

4.      No person shall ever transfer or convey the Confidential Information or any part thereof to any person not specifically authorized to review the information pursuant to this Agreement. No person shall ever use, directly or indirectly,

Tully's Franchise
**Exhibit N – Addendum to Tully's Franchise Agreement**
OC-05B

_____
*initials*

the Confidential Information or any part of it for any purpose whatsoever except as specifically permitted by this Confidentiality Agreement.

5.       In the event Franchisee or any person authorized or permitted by Franchisee or this Confidentiality Agreement to review or possess any of the Confidential Information violates this Confidentiality Agreement, in addition to all other remedies available to Franchisor, Franchisee agrees to defend, hold harmless and indemnity Franchisor and its officers, directors, attorneys, agents and assigns, from and against any claims and liability arising out of or resulting from the violation, including, but not limited to claims by any person that the information provided constituted earnings claims or financial performance information which was unlawfully provided to a prospective franchisee. The obligation to defend, indemnify and hold harmless contained in this paragraph shall specifically require Franchisee to pay any attorneys fees, costs and expert witness fees incurred by Franchisor and the other beneficiaries of this paragraph in defending any such claim or in monitoring Franchisee's defense of any such claim.

6.       In the event Franchisee or any person authorized or permitted by Franchisee or this Confidentiality Agreement to review or possess any of the Confidential Information violates this Confidentiality Agreement, in addition to all other remedies available to Franchisor, Franchisee agrees to pay to Franchisor, as liquidated damages, an amount calculated as the greater of: (a) all gross revenues of the person or entity who improperly had any of the Confidential Information during the time the person or entity retained or used any of the Confidential Information for any purpose; or (b) $250.00 per page, or equivalent, of Confidential Information as to which this Confidentiality Agreement is violated for each day that any provision of this Confidentiality Agreement is violated. Franchisee acknowledges and agrees that calculating actual damages would be impossible and that the liquidated damages calculated pursuant to this paragraph would be a reasonable approximation of actual damages Franchisor would sustain on account of such breach and does not constitute a penalty.

7.       In the event Franchisee or any person authorized or permitted by Franchisee or this Confidentiality Agreement to review or possess any of the Confidential Information violates this Confidentiality Agreement, in addition to all other remedies available to Franchisor, Franchisor shall be entitled to obtain a temporary and a permanent injunction or similar equitable relief from any court having jurisdiction thereof and any statutory or other requirement of a bond in excess of $100.00 as a condition of obtaining such relief is hereby waived to the extent permitted by applicable law.

8.       This Agreement shall be construed under the laws of the State of Washington and jurisdiction and venue of any action brought to enforce or interpret this Agreement shall be in King County, Washington. Terms defined in the Franchise Agreement shall have the same meanings in this Agreement.

9.       If any action is brought to enforce or interpret this Confidentiality Agreement, the substantially prevailing party, in addition to all other remedies, shall be entitled to an award of their attorneys fees and costs, including expert witness fees and any fees on appeal.

10.      This Confidentiality Agreement is the complete agreement of the parties with regard to the Confidential Information and supersedes any prior or contemporaneous written or unwritten communications, representations or agreements.

11.      Time is of the essence of this Agreement.

Dated: _____
**Franchisee(s)**                                        **Franchisor**

                                                         Tully's Coffee Corporation

_____
        Franchisee                                       By _____

                                                         (Print Name) _____
                                                         (Title) _____

_____
        Franchisee                                       3100 Airport Way South
                                                         Seattle, WA 98134
                                                         206-233-2070

Tully's Franchise
**Exhibit N – Addendum to Tully's Franchise Agreement**
OC-05B                                                              initials

### EXHIBIT

### N.   Addendum to Tully's Franchise Agreement

This Addendum is made and entered into by and between Tully's Coffee Corporation, a Washington corporation, d.b.a. "Tully's" (hereinafter "Franchisor") and JH Development, LLC, a California limited liability company (hereinafter "Franchisee") and amends that certain Tully's Franchise Agreement between these parties dated the same date as this Addendum.

NOW THEREFORE, for and in consideration of the mutual covenants herein set forth, and other good and valuable consideration, the receipt and sufficiency of which each party hereby acknowledges, and each party fully intending to be legally bound hereby, Franchisor and Franchisee mutually agree as follows:

## A. THE FRANCHISE AGREEMENT IS HEREBY AMENDED AS FOLLOWS:

### 1.01  Grant of License.

Sub-paragraph 1.01.01 is amended and restated as follows:  Subject to the terms and conditions of this Agreement, Franchisor grants to Franchisee a non-exclusive license to operate one (1) Licensed Business using the System and Marks for a period of ten (10) years from and after the Effective Date of this Agreement, said Licensed Business to be located only at the location specified in Exhibit A hereto, or at such other location within the Territory as Franchisor may approve in writing. Franchisee shall not move Franchisee's Premises without Franchisor's prior written approval.

### 1.02  Location and Territory.

Sub-paragraph 1.02.01 is deleted in its entirety; superseded by the Area Development Agreement contemporaneous herewith.

Sub-paragraph 1.02.03 is deleted in its entirety; superseded by the Area Development Agreement contemporaneous herewith.

### 2.01  Initial Fee.

Paragraph 2.01 is modified to provide for an Initial Fee of Seven Thousand Five Hundred Dollars ($7,500.00), not Twenty Thousand Dollars ($20,000.00).  The Initial Fee shall be paid by Franchisee to Franchisor at the time of mutual execution of this Agreement. This paragraph also subject to the contemporaneous Asset Purchas Agreement.

### 2.02  Royalties.

Paragraph 2.02 is amended and restated as follows:  Franchisee shall pay to Franchisor a monthly royalty in an amount equal to two percent (2%) of Gross Revenues. The royalties are payable monthly by check or Electronic Funds Transfer no later than the tenth day after the end of the calendar month for which the payment is being made. Franchisor may, upon thirty (30) days prior written notice require Franchisee to pay Royalties by check, pre-authorized check, electronic funds transfer or other mechanism or to pay on a different periodic basis.  If Franchisee owns more than one Licensed Business, Franchisee shall report and pay royalties for each Licensed Business independently, unless otherwise directed by Franchisor.

### 2.03  Marketing Fee.

Paragraphs 2.03.01 and 2.03.02 are amended as follows:

Sub-paragraph 2.03.01 is deleted in it entirety and replaced with the following: Franchisor waives any requirement to pay a Marketing Fee during this Agreement.  In lieu of a Marketing Fee, Developer shall spend not less than one percent (1%) of the Gross Revenues on marketing and advertising.

Sub-paragraph 2.03.02 is deleted in its entirety.

### 2.04  Gross Revenues.

Paragraph 2.04 is amended and restated as follows:  "Gross Revenues" shall mean the actual price of all goods and services sold by Franchisee relating to the Licensed Business (the "Covered Goods and Services").  All sales of Covered Goods Tully's Franchise

**Exhibit N – Addendum to Tully's Franchise Agreement**
OC-05B

_initials_

and Services shall be included in Gross Revenues if any of these apply: the Covered Goods and Services were stored or displayed within the Licensed Business, or prepared within the Licensed Business, or served from the Licensed Business, or entered into the cash register (or equivalent device) of the Licensed Business, or if they were prepared using any proprietary product that Franchisor has restricted only for use in Tully's outlets, or if they were prepared by, served by, or the customer order was taken by, a Franchisee employee wearing a uniform bearing the Marks. Gross Revenues shall be computed net of any promotional discounts actually given to customers through the cash register for Covered Goods and Services, and shall be computed net of any Tully's card customer loyalty discounts actually paid by Franchisee under the Tully's Card program. Gross Revenues shall not include taxes or fees Franchisee is required to collect on behalf of the government and which Franchisee actually remits. Gross Revenues are calculated at the time Franchisee sells the Covered Goods or Services, without regard to when Franchisee receives or expects to receive cash or other consideration therefore.

*2.05 Local Marketing.*

For the current Term, in paragraph 2.05, the percentage is changed from one percent (1%) to zero percent (0%). During the current Term, Franchisee shall not be required to participate in any telephone yellow pages advertising specified by Franchisor, but if Franchisee does participate in the telephone yellow pages advertising, Franchisee shall pay its pro rata share of the cost as provided in paragraph 2.05.

*2.06 Local Marketing Cooperative.*

The first sentence of paragraph 2.06 is amended to read: If at least two-thirds (based upon one vote per franchised outlet without regard to ownership) of the Tully's franchisees in a marketing area, as determined by Franchisor, vote to form a local advertising cooperative, Franchisee may participate in said cooperative and in such instance shall contribute such sums thereto as may be assessed by a majority vote of the cooperative, provided that Franchisee's participation shall be at Franchisee's option during the current Term.

*7.07 Minimum Hours.*

The following shall be added to the end of the paragraph: This paragraph shall not be applicable to any period that the Premises is undergoing renovation undertaken by Franchisee, upon thirty–day notice to Franchisor, or as otherwise agreed upon by the parties.

*15. Termination.*

The following shall be added as a new Paragraph 15.05: If, within nine (9) months from the Effective Date of this Agreement, Franchisee is unable to operate the Tully's outlet at cash flow positive, Franchisee shall have the right to sell and liquate the store location without the payment of any fees outlined in Exhibit L.

*Exhibit B.*

Exhibit b is deleted in its entirety.

## B. SCOPE OF AMENDMENT:

This Addendum amends the Franchise Agreement to the extent specifically set forth herein. This Addendum is personal to Franchisee and is not assignable without Franchisor's prior written consent. Any conflict between the terms of the Franchise Agreement and this Addendum shall be resolved in favor of the terms of this Addendum. Except as specifically amended by this Addendum, the Franchise Agreement shall remain in full force and effect as to all of its terms.

**IN WITNESS WHEREOF**, the parties have executed this Addendum on the day and year indicated below.

Dated: _____ [effective date]       Date signed: _____

Tully's Franchise
**Exhibit N – Addendum to Tully's Franchise Agreement**
OC-05B

                                                                                    _____|_____
                                                                                         *initials*

**FRANCHISOR:**
Tully's Coffee Corporation

By _____

(Print Name) _____

(Title) _____

3100 Airport Way South
Seattle, WA 98134

206-233-2070

**FRANCHISEE:**

JH Development, LLC

By _____

(Print Name)   Jaehee Hwang

(Title)   Manager

6281 Beach Blvd., Suite 156
Buena Park, CA 90621
Telephone:  (714) 523-8202
Fax:  (714) 523-8206

Tully's Franchise
**Exhibit N – Addendum to Tully's Franchise Agreement**
OC-05B

_____
*Initials*

**EXHIBIT**

### A.   Location of Licensed Business

The location of Franchisee's "Tully's" Licensed Business Premises shall be:

20025 Lake Forest Drive, Lake Forest, California 92630.

Tully's Franchise
**Exhibit A  -  Location**
OC-05B
Page A-1

*initials*

**EXHIBIT**

## B.   Territory

Franchisee's designated Territory shall be defined as follows:
The geographic boundaries (all geographic boundaries shall be as they exist on the date of this Agreement):
The area contained within 500 feet of the Business Premises at 20025 Lake Forest Drive, Lake Forest,
California 92630.

Tully's Franchise
**Exhibit A - Location**
OC-05B
Page 2

_initials_

## EXHIBIT

### A.   Location of Licensed Business

The location of Franchisee's "Tully's" Licensed Business Premises shall be:

1280 Bison Street, Suite D-1, Newport Beach, California 92660.

Tully's Franchise
**Exhibit A - Location**
OC-05B
Page A-1

_____
*initials*

**EXHIBIT**

## B.   Territory

Franchisee's designated Territory shall be defined as follows:

The geographic boundaries (all geographic boundaries shall be as they exist on the date of this Agreement): The area contained within 500 feet of the Business Premises at 1280 Bison Street, Suite D-1, Newport Beach, California 92660.

Tully's Franchise
**Exhibit A - Location**
OC-05B
Page 2

_____|_____
*initials*

**EXHIBIT**

## A.   Location of Licensed Business

The location of Franchisee's "Tully's" Licensed Business Premises shall be:

4610 Barranca Parkway, Irvine, California 92604.

Tully's Franchise
**Exhibit A - Location**
OC-05B
Page A-1

_initials_

**EXHIBIT**

### B.   Territory

Franchisee's designated Territory shall be defined as follows:
The geographic boundaries (all geographic boundaries shall be as they exist on the date of this Agreement):
The area contained within 500 feet of the Business Premises at 4610 Barranca Parkway, Irvine, California 92604.

Tully's Franchise
**Exhibit A  -  Location**
OC-05B
Page 2

1
*initials*

**EXHIBIT A, PAGE 118**

## A.   Location of Licensed Business

The location of Franchisee's "Tully's" Licensed Business Premises shall be:

2425 Colorado Avenue, Suite #118B, Santa Monica, California, 90404.

Tully's Franchise
**Exhibit A - Location**
OC-05B
Page A-1

_initials_

**EXHIBIT A, PAGE 119**

**EXHIBIT**

## B.  Territory

Franchisee's designated Territory shall be defined as follows:
The geographic boundaries (all geographic boundaries shall be as they exist on the date of this Agreement):
The area contained within 500 feet of the Business Premises at 2425 Colorado Avenue, Suite #118B, Santa Monica, California, 90404.

Tully's Franchise
**Exhibit A  -  Location**
OC-05B
Page 2

*initials*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge James V. Selna and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV11- 949 JVS (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[X] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
JH Development, LLC

**DEFENDANTS**
TC Global, Inc. fka Tully's Coffee Corp. dba Tully's Coffee ("Tully's")

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Kenneth W. Chung (SBN 194654); Laura C. Hess (SBN 198294)
Min K. Chai (SBN 2238084)
KRING & CHUNG, LLP
38 Corporate Park, Irvine, CA 92606-5105
909-204-6900

**Attorneys** (If Known)
Jonathan Solish (SBN 67609)
Louise Nutt (SBN 273130)
BRYAN CAVE LLP
120 Broadway, Suite 300, Santa Monica, California 90401-2386
(310) 576-2100

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)
☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Tully's is removing based on diversity jurisdiction, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities – Employment | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 892 Economic Stabilization Act | ☒ 196 Franchise | **REAL PROPERTY** | | ☐ 640 R.R.& Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities – Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | **IMMIGRATION** | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | ☐ 871 IRS-Third Party 26 USC 7609 |

**SACV11-00949**

FOR OFFICE USE ONLY:   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)          CIVIL COVER SHEET          Page 1 of 2

American LegalNet, Inc.
www.FormsWorkflow.com

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
#### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | According to the complaint, the plaintiff is a California limited liability company.  Tully's is unaware of the exact citizenship of each of the plaintiff's members. |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Tully's is incorporated in and has its principal place of business in Washington. |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | Los Angeles |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER):  _Louise Nutt_                          Date  June 23, 2011

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com